Anthony L. Lanza (Bar No. 156703)
tony@lanzasmith.com
Brodie H. Smith (Bar No. 221877)
brodie@lanzasmith.com
LANZA & SMITH
A Professional Law Corporation
3 Park Plaza, Suite 1650
Irvine, California 92614-8540
Telephone (949) 221-0490

Attorneys for George Hatcher
& Wrongful Death Consultants

# THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDELSON PC, an Illinois Professional corporation,<br><br>            Plaintiffs,<br><br>      vs.<br><br>DAVID LIRA, an individual, KEITH GRIFFIN, an individual, ERIKA GIRARDI a/k/a ERIKA JAYNE, an individual, EJ GLOBAL, LLC, a California limited liability company, CHRISTOPHER KAMON, an individual, GEORGE HATCHER, an individual, WRONGFUL DEATH CONSULTANTS, a California corporation, JOSEPH DINARDO, an individual, CALIFORNIA ATTORNEY LENDING II, INC., a New York corporation,<br>            Defendants. | Case No.: 2:22-cv-08787-JFW (MAAx)<br><br>Hon. John F. Walter<br><br>**DEFENDANTS HATCHER AND WRONGFUL DEATH CONSULTANTS' MOTION TO DISMISS PURSANT TO FED. R. CIV. PROC. § 12(B)(6)&(7)**<br><br>Motion Date:   February 27, 2023<br>Motion Time:   1:30 p.m.<br>Courtroom:      7A<br><br>Complaint Filed: July 6, 2022 (N.D. Cal) |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on February 27, 2023 at 1:30 p.m., in

Courtroom 7A in the United States District Court, located 350 W. 1st Street, Los

Angeles, CA 90012, the Honorable John F. Walter presiding, Defendants George

Hatcher ("Hatcher") and Wrongful Death Consultants, a California Corporation ("WDC") will move the Court pursuant to Federal Rules of Civil Procedure 12(b)(6) and (7) to dismiss Plaintiff's complaint for failure to state a cause of action and failure to join an indispensable party.

Specifically, Defendants request that Plaintiff's:

1. First Claim for RICO violation of 18 U.S.C. § 1962(c) be dismissed for failure to state a claim as to Defendant Hatcher;

2. Second Claim for RICO Conspiracy pursuant to 18 U.S.C. § 1962(d) be dismissed for failure to state a claim as to Defendants Hatcher and WDC;

3. Third Claim for Receipt of Stolen Property under California Penal Code §496(c) be dismissed for failure to state a claim as to Defendants Hatcher and WDC;

4. Fourth Claim for Aiding and Abetting Concealment of Stolen Property under California Penal Code § 496(c) be dismissed for failure to state a claim as to Defendants Hatcher and WDC.

5. Sixth Claim for Conversion be dismissed for failure to state a claim as to Defendants Hatcher and WDC.

6. All Claims be dismissed for failure to join an indispensable party pursuant to Fed. R. Civ. Proc. 12(b)(7).

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, all pleadings and papers on file in this action, and such other matters as the Court may consider. This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on January 3, 2023.

LANZA & SMITH, PLC

Dated:  January 23, 2023          /s/ Brodie H. Smith
                                  Anthony Lanza
                                  Brodie H. Smith
                                  Attorneys for George Hatcher
                                  & Wrongful Death Consultants

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................7

1.  Fails to allege a RICO scheme with sufficient "continuity" of predicate acts .....8

2.  Fails to allege a valid RICO enterprise....................................................8

3.  Fails to allege that Hatcher/WDC "managed or conducted"
    the affairs of the enterprise ...............................................................9

4.  Fails to allege valid damages ..............................................................9

5.  Fails to allege receipt of stolen money ..................................................9

6.  Fails to name indispensable parties ......................................................9

II.   RELEVANT FACTUAL ALLEGATIONS OF THE COMPLAINT...............9

    A. GK's "Ponzi Scheme" Allegedly Involved *Many* Victims—
       Over More Than a Decade—Not Only the Lion Air Clients ......................9

    B. Edelson is Allegedly an Assignee of the Lion Air Clients' Claims ...........10

    C. Edelson Attempts to Minimize its Role ..........................................10

    D. Edelson's Conclusory Allegations Against Hatcher................................10

       1. Allegations not constituting any predicate act or legal violation ...........11

       2. Allegations of wire fraud ..........................................................11

       3. Allegations of "transportation of stolen goods" ..............................11

       4. No further factual allegations against Hatcher and WDC ....................11

III.  ANALYSIS........................................................................................12

    A. Plaintiff's First and Second Claims (RICO and RICO Conspiracy) fail .....12

    1. Edelson's RICO allegations lack a sufficient "pattern" ..........................12

       a. Edelson fails to allege closed-ended continuity
          against Hatcher and WDC ...........................................................13

X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) and (7) 012323.docx

b. Edelson fails to allege open-ended continuity
as against all Defendants ....................................................14

2. Edelson fails to allege a viable RICO "enterprise"................................14

a. There is No 'enterprise' distinct from the pattern
of racketeering activity ........................................................14

b. There is No 'common purpose' among the members........................15

3. Edelson Fails to allege that Hatcher and WDC "conducted
the affairs of" the alleged enterprise ........................................17

4. Edelson fails to allege RICO *mens rea* ................................19

5. Edelson's RICO Conspiracy Allegations Fail ......................................20

B.   The Third, Fourth, and Sixth Claims for Receipt of Stolen
Property, Aiding and Abetting, and Conversion Fail ..............................20

C.   Edelson Fails to Allege Viable Damages....................................................22

D.   Edelson's Claims Fail Because Edelson is
a Surety Who Lacks Subrogation Rights ................................................23

E.   Edelson Fails to Join Required Parties Thomas Girardi and GK.............23

IV.   CONCLUSION ..............................................................24

# TABLE OF AUTHORITIES

<u>Federal Cases</u>                                                                                <u>Page</u>

*In re Apple iPhone Antitrust Litig.*,
   874 F.Supp.2d. 889, 899 (N.D. Cal, 2012)...........................................................25

*American Surety Co. v. Bank of California*,
   133 F.2d 160, 162 - 65 (9th Cir. 1943)...............................................................24

*Ashcroft v. Iqbal*, 556 U.S. 662, 678-680 (2009) ...........................................12, 16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007).......................12, 16

*Boyle v. United States*, 129 S.Ct. 2237 (2009) ........................................................15

*Bridge v. Phoenix Bond & Indem. Co.* 128 S.Ct. 2134 (2008) ..............................19

*Bush v. Superior Court*, 10 Cal. App. 4th 1375 (1992)

*Chung Goh v. Prima Fin. Grp. Inc.*,
   2017 WL 77887860 at *3 (C.D. Cal. July 26, 2017)............................................20

*Crichton v. Golden Rule, Ins. Co.*, 576 F.3d 392 (7th Cir. 2009) ...................... 18-19

*Duke v. Superior Court*, 18 Cal.App.5th 490, 508 (2017)......................................21

*Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998)...................18-19

*H.J. Inc. v. NW. Bell Tell Co.*, 492 U.S. 229, 237-38, 242 (1989) ...................... 12-13

*Lavigne v. Herbalife, LTD*,
   2019 WL 6721619 at *9 (C.D. Cal. Oct. 22, 2019).............................................20

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
   431 F.3d 353, 361 (9th Cir. 2005) .......................................................................12

*Local 1351 Int'l Longshoremens Ass'n v. Sea-Land Service Inc.*,
   214 F3d 566, 570 (5th Cir. 2000) .......................................................................23

*Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987) ...............15

*Nastro v. D'Onofrio*, 542 F.Supp.2d 207 (D.Conn. 2008).............................. 18-19

*Neely v. Campos,* 26 F.3d 131 (9th Cir. 1994; unpublished opinion) .....................13

*Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364 (9th Cir. 1992)........................13

*Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993) ........................................... 18-19

*Shearin v. E.F. Hutton Group, Inc.* 885 F.2d 1162 (3d Cir. 1989) .........................12

*Ticor Title Ins. Co. v. Florida*, 937 F.2d. 447 (9th Cir. 1991)...............................14

*United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993)............................................12

*United States v. Indelicato,* 865 F.2d 1370, 1381-1384 (2nd Cir. 1989)................14

*United States v. Turkette*, 452 U.S. 576, 583 (1981)................................................14

*Walk v. Baltimore & Ohio R.R.*, 890 F. 2d 688, 690 (4th Cir. 1989) .....................13

*In Re WellPoint, Inc.*, 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011) ....................13


Statutes

18 U.S.C. §1343.........................................................................................................10

18 U.S.C. § 1961........................................................................................................12

18 U.S.C. § 2314 ................................................................................................. 10-11

Cal. Penal Code § 496................................................................................................21

Cal. Rule of Professional Conduct 1.15................................................................11, 21

Federal Rule of Civil Procedure 9(b)........................................................................16

Federal Rule of Civil Procedure 12(b)......................................................................23

Federal Rule of Civil Procedure 19 ..........................................................................19

RICO § 1961 ..............................................................................................................12

RICO § 1962 ................................................................................................... 12, 18-19

Miscellaneous

*Edelson PC v. Thomas Girardi, et al*, USDC, N.D. Ill., 1:20-cv-07115............8, 19

*In Re Lion Air*, 1:18-cv-07686.............................................................................7, 22

DEFENDANT HATCHER AND W.D.C.'S 12(B)(6) AND (7) MTD

X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) and (7) 012323.docx

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Plaintiff Edelson PC ("Edelson") and the now-infamous law firm Girardi Keese ("GK") were co-counsel in a case that resulted in one of the most high-profile thefts of client money by a law firm in history. As co-counsel, Edelson and GK represented the families of the 2018 Lion Air crash of a Boeing 737 Max aircraft in Indonesia. The case settled; the settlement funded in early 2020. For nine months in 2020, Edelson did very little knowing that its clients' settlement money had been paid by Boeing to its co-counsel, GK, and yet not distributed to its clients.

This case represents Plaintiff Edelson's attempt to deflect the impending legal and media storm—trying now to pass itself off as a victim rather than a liable party. Edelson knew that the settlement was fully funded by Boeing for nine months. Complaint, ¶¶ 96, 101 (settlement received March, 2020) and ¶¶228-229 (Edelson finally acts in December). Edelson admits that it *knew* that the settlement agreement with Boeing required the plaintiffs' legal team—which included Edelson—to "wire the [settlement] funds to a specific account 'as soon as practicable' after they were received" in March, 2020. Complaint, ¶ 100. Edelson states that it was aware that something was wrong; that it doubted GK's excuses for the delay. Complaint, ¶51.

By early 2022, both GK and its founder Thomas Girardi had long since filed bankruptcy and Edelson realized that it would be the one left "holding the bag," both legally and in the eyes of the public. Edelson would be the logical first named defendant in any inevitable lawsuit to recover the unpaid settlement. Thus, with its back against the wall, Edelson "purchased" the victims' claims and now tries to hide itself as a victim. See, Assignment Agreement, *In Re Lion Air*, 1:18-cv-07686, Dkt. 1360, Ex. 1.

Edelson's plan to portray itself as a victim, not a perpetrator, is transparent. Back in December, 2020, Edelson had already begun to tell the story of the key nine-months (March to December, 2020) to courts in the Northern District of Illinois, both in the

underlying case against Boeing, and in a new lawsuit similar to this case against Tom Girardi and GK. See, Complaint in *Edelson PC v. Thomas Girardi, et al*, USDC, N.D. Ill., 1:20-cv-07115. In these initial versions of its story, Edelson was, fittingly, a central figure—as one would expect.

However, after Edelson purchased its own clients' claims, Edelson re-drafted the story for this case. Suddenly Edelson's involvement in the key nine-month period was erased. Edelson thus changed venues, seeking a do-over, and now tells the story to a different court, with itself almost totally omitted. But therein lies one of the problems for Edelson. Its efforts to rewrite the story without a central figure—itself—creates holes and plausibility problems that Edelson struggles to fill with a patchwork of boilerplate allegations.

With itself largely erased, Edelson fills the gaps by portraying sundry spouses, lenders, associate attorneys, vendors and consultants of Girardi and GK, implausibly, as all conspiring together with Thomas Girardi to defraud the Lion Air families. But the more Edelson tries to paint a picture of a cohesive "enterprise" among the unrelated defendants, the more it turns the spotlight back on itself—co-counsel of GK, at the center of it all and with *power to do something about it*. There is no closer connection to GK than its own co-counsel. Edelson shared jointly in GK's fiduciary duties to their mutual clients, and was the only one who could stand up in court and do something about it. Edelson owed *exactly the same duties* to the Lion Air clients as Girardi Keese. The Complaint's tabloid style hides deficient claims, including:

1.   Fails to allege a RICO scheme with sufficient "continuity" of predicate acts. Continuity must be judged as to each RICO Defendant. Edelson alleges that RICO predicate acts by Hatcher took place over, at most, eight months, from March to November, 2020. Eight months is insufficient;

2.   Fails to allege a valid RICO enterprise. For an association-in-fact enterprise, Plaintiff must allege an enterprise that exists separate and apart from the pattern of racketeering activity. Edelson alleges the enterprise was one-and-the-same with the

pattern of racketeering activity;

3.  <u>Fails to allege that Hatcher/WDC "managed or conducted" the affairs of the enterprise</u>. Each RICO defendant must be alleged to have taken a managerial role in the alleged enterprise. The facts of this case are *nearly identical* to many other cases where outside consultants were dismissed because they could not have "managed or controlled" the affairs the enterprise.

4.  <u>Fails to allege valid damages</u>. Edelson allegedly "stands in the shoes" of the Lion Air Clients, yet Edelson admits the Lion Air Clients have been fully paid and made whole. The Lion Air clients no longer have any damages to assign.  Edelson confuses the concepts of assignment, subrogation, contribution and equitable indemnity.

5.  <u>Fails to allege receipt of stolen money</u>. In a case where Edelson admits that the alleged stolen funds were comingled with the fund of "hundreds" of other clients, dating back "over a decade," Plaintiff fails to plausibly allege that (a) Hatcher or WDC *intended* to receive stolen funds, nor (b) that they *did* receive stolen funds.

6.  <u>Fails to name indispensable parties</u>. Edelson alleges a scheme at the center of which is Thomas Girardi and his law firm, Girardi Keese. These parties are indispensable under FRCP 19.

## II. <u>REVEVANT FACTUAL ALLEGATIONS OF THE COMPLAINT</u>

### A.   GK's "Ponzi Scheme" Allegedly Involved *Many* Victims—Over More Than a Decade—Not Only the Lion Air Clients

Although the majority of Edelson's allegations relate to the Lion Air crash case, Edelson alleges that, before the Lion Air case, GK had already established a "Ponzi scheme" for "over a decade." Complaint ¶¶ 11, 46-49, 262. Girardi would pay older settlements with funding from more recent settlements, and so forth. Complaint ¶¶ 11, 46-49. The pre-existence of this scheme—and the allegations that *many* clients' funds were *commingled* in GK's IOLTA account—is important. In every Ponzi scheme, there

1   are some who are eventually left uncompensated when the scheme finally collapses.

2   Edelson describes its own Lion Air clients as those victims.

### B. Edelson is Allegedly an Assignee of the Lion Air Clients' Claims

4   Plaintiff is clear throughout the Complaint that it "stands in the shoes of" its Lion

5   Air clients as assignees. Complaint, p.1, ln. 19, and ¶¶ 22, 24, 281, 288, 299, 305, 316,

6   325, 337, 350, 357, 363. Edelson does not allege *any* direct claims or damages in this

7   lawsuit. See, e.g. Complaint, p. i ("Plaintiff Edelson PC as assignee of the bereaved

8   families whose Lion Air settlement monies were stolen through the fraudulent scheme

9   described below, brings this lawsuit…")

### C. Edelson Attempts to Minimize its Role

11   Edelson next alleges that after GK acquired the Lion Air case, GK "brought in

12   Plaintiff Edelson PC to act as local counsel for the Lion Air clients." Complaint ¶ 96. In

13   a complete reversal from its otherwise similar complaint in the Northern District of

14   Illinois, Edelson now almost totally eliminates all references to its role in this process,

15   and describes what little remains as passive and minimal.

### D. Edelson's Conclusory Allegations Against Hatcher

17   Edelson alleges that Hatcher and his company, Wrongful Death Consultants

18   (WDC) were "case runners"—obtaining clients for GK. Complaint, ¶ 55. Such alleged

19   conduct would *not* be a RICO predicate act.

20   The claim-relevant allegations against Defendant Hatcher are largely limited to a

21   7-page section of the Complaint entitled "**March 26, 2020 to November 12, 2020**…"

22   Complaint ¶¶ 171-200, pp. 33-37. The sub-title to this section reveals that the RICO

23   predicate acts alleged against Hatcher are (1) wire fraud under 18 U.S.C. §1343, and (2)

24   Transportation of Stolen Goods, 18 U.S.C. § 2314. Complaint, p. 33. There are 7-8

25   other earlier paragraphs where Hatcher is mentioned, which attempt to "sling mud" but

26   ultimately are not incorporated into Edelson's legal claims and do not constitute

27   predicate acts. Complaint, ¶¶ 55-59, 135, 137. The Hatcher/WDC section of the

28   Complaint at pages 33-37 alleges:

X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) and (7) 012323.docx

1. Allegations not constituting any predicate act or legal violation

First, Edelson alleges that in the year 2020, Hatcher, *like Edelson itself*, was not being paid by GK in a timely manner. Complaint, ¶ 172. Therefore, Hatcher emailed the company's CFO, Kamon, asking for payment. Edelson alleges that Hatcher was "…not legally entitled to be paid from any client trust account." This is an incorrect statement of the law—there is no such prohibition. See below, and Cal. R. Prof. Conduct 1.15(c)(2). Edelson, however, never ties this allegation to any recognized RICO predicate act. It would not be a predicate act.

2. Allegations of wire fraud

Second, Edelson quotes from WhatsApp transcripts between Hatcher and the Lion Air clients from March to November, 2020, discussing why the clients had not been paid their settlement shares yet. Edelson concludes that these communications "were intended to lull the Lion Air Clients into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make discovery of the Enterprise's criminal scheme less likely." Complaint, ¶ 191. These so-called "lulling" communications constitute Edelson's allegations of "wire fraud."

3. Allegations of "transportation of stolen goods"

Third, Edelson alleges that between March and August, 2020, GK issued a series of six monthly checks from two GK bank accounts—three from the operating account and three from the client trust account, to WDC. Complaint, ¶¶ 173-178. Plaintiff alleges that "at the time Hatcher deposited each of the checks listed in paragraphs 170-175 [sic], Hatcher knew and intended for it to be paid with money stolen from the Lion Air Clients." Complaint. ¶ 182. This depositing of checks, Edelson alleges, was an act of "transportation of stolen goods" pursuant to 18 U.S.C. § 2314.

4. No further factual allegations against Hatcher and WDC

In Edelson's five causes of action against Hatcher and WDC (First Claim for RICO; Second Claim for RICO Conspiracy; Third Claim for Receipt of Stolen Property; Fourth Claim for Aiding and Abetting Concealment of Stolen Property; and

Sixth Claim for Conversion), Edelson fails to allege any additional facts. See, Complaint beginning at p. 48, ¶ 258. The only references to Hatcher and WDC in these five claims are (1) conclusory recitations of statutory elements and (2) incorporation of earlier factual allegations summarized above. See, e.g., Complaint, ¶¶262, 274, 278.

### III. ANALYSIS

#### A. Plaintiff's First and Second Claims (RICO and RICO Conspiracy) Fail.

To adequately plead a RICO § 1962(c) claim, a plaintiff must plead: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity ("predicate acts"), (5) causing injury to the plaintiff's "business or property." See, *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir 2005). Each element of each predicate act alleged must also be adequately alleged, including *mens rea*. *United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993).

To plead a RICO *conspiracy* claim (RICO § 1962(d)), a plaintiff must allege that a person conspired to violate Section 1962(a), (b), or (c) including the overt acts taken in furtherance of the conspiracy, and the knowledge that the acts were part of a pattern of racketeering activity and the intention to further it. *Shearin v. E.F. Hutton Group, Inc.* 885 F.2d 1162 (3d Cir. 1989).

The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-680 (2009). The court must determine whether the evidentiary facts alleged in the complaint support a plausible right to relief that rises above the "speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

##### 1. Edelson's RICO allegations lack a sufficient "pattern"

Under 18 U.S.C. § 1961(1), a "pattern" of racketeering activity must consist of "[a]t least two [predicate] acts of racketeering activity." 18 U.S.C. § 1961(5). The "pattern" element includes a requirement of "continuity"—the predicate acts must be part of a long-term practice and pattern. See, *H.J. Inc. v. NW. Bell Tell Co.*, 492 U.S. 229, 237-38 (1989). "To prove a pattern of racketeering activity a plaintiff must show that the

12

racketeering predicates are related, and that they amount to or pose a threat of continued activity." *Id.*, at 239. The "Plaintiff must allege at least two predicate acts by *each defendant*." *In Re WellPoint, Inc.,* 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011) [emphasis added]. "Continuity" can be either closed-ended or open-ended. *H.J. Inc. v. NW. Bell Tell Co.,* 492 U.S. 229, 237-38 (1989).

### a. Edelson fails to allege <u>closed-ended</u> continuity against Hatcher and WDC

Closed-ended continuity requires proof of "[a] series of related predicates extending over a substantial period of time." *H.J., Inc.*, *supra,* at 242. Generally, "what constitutes a substantial duration must of course remain a matter for case-by-case determination." *Walk v. Baltimore & Ohio R.R.*, 890 F. 2d 688, 690 (4th Cir. 1989).

The Ninth Circuit has stated "[w]e have found *no* case in which a court has held the 'closed-ended continuity' to be satisfied by a pattern of activity lasting *less than a year*." *Religious Tech. Ctr. v. Wollersheim,* 971 F.2d 364 (9th Cir. 1992) (emphasis added). This was echoed in *Neely v. Campos,* 26 F.3d 131 (9th Cir. 1994; unpublished opinion), holding "[t]he predicate acts in this case occurred *over a period of nine months*. This period of time is *not sufficient* to establish continuity over a closed period of time." *Id.*, at 4. Although there is no bright line rule, defendants are unaware of any case that has found closed-ended continuity where the acts span less than a year.

In this case, Edelson alleges two types of predicate acts against Hatcher and WDC. The first is a series of WhatsApp communications—which Edelson claims constitute wire fraud—spanning eight months beginning in April and ending in November, 2020. Complaint, ¶¶ 184-197. Even an email allegedly sent by Hatcher mentioned earlier in the Complaint also occurred within this eight month period. Complaint, ¶ 135. Emails occurring over eight months simply are insufficient for closed-ended RICO continuity in every federal circuit court.

Edelson also alleges a second predicate act of Transportation of Stolen Goods—referring to six payments, from two separate GK accounts, from March to August, 2020,

from GK to WDC. Complaint, ¶173-178. This six-month period overlaps the alleged wire fraud period and is also inadequate.

### b. *Edelson fails to allege <u>open-ended</u> continuity as against <u>all</u> Defendants*

While duration is the key to closed-ended continuity, open-ended schemes may satisfy the RICO continuity requirement regardless of their brevity. The question is whether the predicate acts project a threat of *continuing* misconduct. *United States v. Indelicato*, 865 F.2d 1370, 1381-1384 (2nd Cir. 1989). Open-ended continuity is established if the alleged enterprise, by its nature, would be expected to continue its activities into the future. *Ticor Title Ins. Co. v. Florida*, 937 F.2d. 447 (9th Cir. 1991). In this case, however, Edelson alleges that the "enterprise" was centered around Tom Girardi and his law firm, GK, and yet Tom Girardi is bankrupt and has lost his license to practice law; and GK is defunct. Throughout the complaint, Edelson refers to the "scheme" and "enterprise" in the *past tense*. See, e.g., Complaint, ¶¶ 1, 15, 16. Edelson alleges that "the scheme eventually *collapsed*." Complaint, ¶¶ 16 (emphasis added). It had a "downfall." ¶ 1.

With Edelson's allegations deliberately focused on the "collapse" of the scheme, there is no realistic possibility the alleged scheme could qualify as an open-ended scheme. Plaintiff thus fails to establish a sufficient "pattern" as against Hatcher and WDC. The RICO claims should be dismissed.

### 2. Edelson fails to allege a viable RICO "enterprise."

Plaintiff's RICO claims fail to plausibly allege the "enterprise" element. Edelson's allegations fail to both allege an enterprise (1) *distinct from the pattern* of racketeering activity, and (2) where all members have a *common purpose*.

### a. *There is no 'enterprise' distinct from the pattern of racketeering activity.*

A RICO enterprise must have a purpose, structure, and activities separate and apart from the alleged racketeering. *United States v. Turkette*, 452 U.S. 576, 583 (1981). "The

enterprise is not the 'pattern of racketeering activity,' it is an entity separate and apart from the pattern in which it engages." *Id.* at 583.

When an alleged enterprise is a "partnership, corporation, association, or other legal entity," the enterprise element typically is satisfied. *Id.* at 583. The courts do, however, recognize that it is possible to allege an "association-in-fact" enterprise, but such enterprises must have an *ascertainable structure that is distinct from the pattern of racketeering activity*. *Id.* The "plaintiff must plead facts that establish an association that exists other than merely to commit the predicate acts forming the pattern." *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir. 1987).

In this case, Edelson's alleged "enterprise" exists solely to commit the pattern of racketeering activity. The alleged "enterprise" is described in paragraph 49 of the Complaint:

> 49.   But the scheme always needed new money to prevent collapse. And gradually, the firm began to throw all sense of ethics and legality out the window to make sure that new cases continuously came in, and correspondingly, that no one the firm owed money to would reveal the fraud to the world. Tom relied on lawyers within his firm, the firm's accountant, and non-lawyer case referrers—operating under illegal agreements—<u>to run what quickly became a full-fledged criminal enterprise: the Girardi Family Enterprise</u>. (Complaint, ¶ 49, emphasis added.)

Edelson makes attempts to define the "enterprise" in other paragraphs of the Complaint, but always in the same manner: the enterprise existed to commit the predicate acts. See, e.g. Complaint, ¶¶ 1-2, 21. Plaintiff thus alleges the "enterprise" to be one-and-the-same with the alleged "pattern of racketeering" activity.

### b.   *There is no 'common purpose' among the members*.

An association-in-fact enterprise must have an "ascertainable structure," and such a "structure" must have at least three components. *Boyle v. United States*, 556 U.S. 938, 949 (2009). *Boyle* resolved a circuit split, holding that "an association-in-fact enterprise must have: (1) a purpose, (2) a relationship among those associated with the enterprise, [and] (3) longevity sufficient to permit those associates to pursue the enterprise's

1    purpose." *Id.*

2        Edelson fails to allege a "common purpose" among the defendants. The Complaint

3    alleges that Girardi and Erika "misappropriated client settlement money to project an

4    image of wealth and to prop up a lifestyle made for reality TV." See, Complaint, heading

5    at p. 9. Edelson revisits this "lifestyle" theme over and over when describing the

6    motivations and "purpose" of Girardi and Erika. Complaint, Factual Background

7    Sections B, E, G(1), H, J and K. However, the other alleged enterprise participants are

8    *not* alleged to have participated in the stealing of client money or "lavish lifestyle" goals.

9        More broadly, the Complaint alleges that the purpose was to operate a Ponzi

10   scheme. But it fails to join Hatcher and WDC in this purpose either. Notably, the

11   Complaint does *not* allege that Hatcher or WDC knew that Girardi was operating a Ponzi

12   scheme. While the Complaint accuses Hatcher and WDC of engaging in "capping" and

13   being a "client runner," which is *not* alleged to be (and clearly does not constitute) RICO

14   predicate acts, those allegations relate to GK's *acquisition* of clients, which is presented

15   merely as "background" (not predicate acts).

16       The actual alleged RICO predicate acts relate to the Ponzi scheme and failure to

17   transmit settlement funds to clients. Nowhere does the Complaint allege that Hatcher or

18   WDC knew that Tom Girardi was operating a Ponzi scheme. In fact, the Complaint

19   alleges that the Ponzi scheme was operated in a specific way from *within GK*. Complaint,

20   ¶¶ 47, 53, 184, 212. Hatcher was, however, merely an outside vendor.

21       In contrast, the allegations against Hatcher are that, from the *outside* of GK, he

22   allegedly (1) asked to be paid and was paid for his services, and (2) sent "lulling"

23   communications. Complaint, ¶¶ 33-38, 173-178.

24       The "lulling" allegations are implausible on their face and fail to pass the

25   *Twombly/Iqbal* plausibility standard. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545

26   (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-680. Because these "lulling" allegations, at

27   their core, are fraud allegations, they must be alleged with particularity and plausibility.

28   Fed. R. Civ. Proc. 9(b). The Complaint describes a Ponzi scheme that had been

DEFENDANT HATCHER AND W.D.C.'S 12(B)(6) AND (7) MTD

X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) and (7) 012323.docx

perpetrated "successfully" by Tom Girardi for "*over a decade*" before it finally unraveled in 2020. If true, it could be one of the longest-running Ponzi schemes in history. It would mean that a very long chain of clients dating back over ten years had been fully *paid* their settlements by Girardi. From Hatcher's vantage point in 2020, it would be logical to conclude that the Lion Air clients would also be paid—just as all these other clients had been paid over the past 10 years.

However, Edelson tries to apply the advantage of retrospect to Hatcher while hypocritically *not* applying the same advantage to itself (Edelson's inaction for nine months.) In reality, perhaps for the *same reason it took Edelson nine months to file a motion against GK,* Hatcher had absolutely no reason to believe that the Lion Air clients would not be paid. Why would he? Plaintiff admits Girardi had been paying its settlements (albeit through a secret Ponzi scheme) for "over a decade." See, Complaint ¶¶ 11, 46-49, 262.[1] Viewed in that light, every allegedly "lulling" statement the Complaint attributes to Hatcher is more plausibly read as a sincere reflection of Hatcher's thoughts. Even Edelson's highly curated WhatsApp excerpts paint a picture of Hatcher as frustrated by the delay and trying to help the GK/Edelson clients. Edelson's allegation that these communications were false consists of nothing more than a conclusory statement to that effect. This is insufficient.

When viewed as a whole, under the *Twombly* standard, Edelson's Complaint simply fails to plausibly allege that Hatcher and WDC were working to fund Girardi's lavish lifestyle or further his Ponzi scheme. Edelson has not alleged that Hatcher or WDC had a common purpose or were part of a RICO enterprise. The RICO claims thus should be dismissed as to Hatcher and WDC.

> 3. Edelson fails to allege that Hatcher and WDC "conducted the affairs of" the alleged enterprise.

---

[1] But see, contradictory allegations in paragraph 6: "Once a client's settlement money was funneled into the black hole that was the Girardi Keese scheme, Lira and Griffin were tasked with fending off inquiries from clients and other lawyers about why that money *never* came back out." Complaint, ¶ 6 (emphasis added). Edelson never resolves this contradiction.

The RICO Act's phrase "conduct or participate…in the conduct" of an enterprise means that the defendant must have been involved in the *management* of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). "Once we understand the word 'conduct' to require some degree of direction and the word 'participate' to require some part in that direction, the meaning of § 1962(c) comes into focus." *Id.* at 179.

In *Reves*, the plaintiff alleged that the outside accountants of a RICO enterprise were part of the enterprise because they allegedly knew about the enterprises' activities and nevertheless performed accounting work for it. Despite these allegations, the Supreme Court ruled that the outside accounts' role was *not* managing or conducting the enterprise. The accountants were dismissed. In *Crichton v. Golden Rule, Ins. Co.*, 576 F.3d 392 (7th Cir. 2009), the Court held:

> "Allegations that the defendant had a business relationship with the putative RICO enterprise or that a defendant performed services for that enterprise do not suffice…Here, [plaintiff] has done little more than suggest the existence of the marketing relationship between Federal and Golden Rule. Assisting in the setting and collection of membership dues on the Federation's behalf and controlling the content of its own insurance promotional materials are activities <u>consistent with the existence of a business partnership, not a prototypical RICO violation</u> in which the defendant <u>seizes control of</u> an enterprise to accomplish an illegal purpose." (*Id.* at 392, emphasis added.)

In *Nastro v. D'Onofrio*, 542 F.Supp.2d 207 (D.Conn. 2008) the court held that "the Plaintiff has failed to put forth any evidence that…Defendants, in their roles as an attorney and law firm [conducted the enterprise]… [T]he performance of these duties would not make the Defendants liable even if they had knowledge of the alleged enterprise's illicit nature. Thus there was *no evidence they operated or managed* the alleged RICO enterprise." *Id.* [emphasis added.]

In *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998), the court held that non-employees hired by a corporation "cannot be said to conduct the affairs of the enterprise." *Id.* Rather, such outsiders are "best characterized as contractors hired by

X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) and (7) 012323.docx

the enterprise." *Id.* The Goren court further explained that "simply performing services for an enterprise, *even with the knowledge of the enterprise's illicit nature, is not enough* to subject an individual to RICO liability under § 1962(c); instead *the individual must have **participated** in the **operation and management*** of the enterprise itself." *Id.* at 728 (emphasis added).

In cases like *Reves*, *Crichton, Nastro*, and *Goren*, courts drew a distinction between "insiders" to the organization, and "outsiders"— the latter do not usually "conduct" the enterprise.

In this case there is a clear divide between Edelson's in-Claim allegations against Hatcher/WDC compared to its general factual allegations. The former concludes that Hatcher exercised some sort of control (see, ¶¶ 260, 283); but the latter clearly alleges that the "enterprise" and its Ponzi scheme was an in-house affair at the GK law firm. (see, ¶¶ 53, 109-110, 121-126). In fact, the Complaint alleges that Hatcher was an *outsider* to the firm who had no control over the affairs of the firm and had to "get in line" with the other creditors of the firm and beg for payment. Complaint, ¶ 195. In its Illinois Complaint, Edelson alleged, "On information and belief, Girardi, who exercises ***exclusive and total control*** over all bank accounts for GK, embezzled the settlement proceeds transferred by Boing, for his own personal use…" See, Complaint in *Edelson PC v. Thomas Girardi, et al*, USDC, N.D. Ill., 1:20-cv-07115, ¶¶ 2, 63 (emphasis added). The Complaint in *this* case fails to allege plausibly that Hatcher/WDC controlled the enterprise in any way.

### 4.  Edelson fails to allege RICO *mens rea*

The RICO Act is fundamentally a criminal statute. Although section 1964(c) creates a civil cause of action, the racketeering activity giving rise to RICO liability is criminal in nature. *Bridge v. Phoenix Bond & Indem. Co.* 128 S.Ct. 2134 (2008). To be criminal, conduct must be committed with *mens rea*. *Id.*

Plaintiff's RICO claims fail to plausibly allege *mens rea*. The "racketeering activity" allegedly committed by Hatcher is described in the Complaint as various receipt

of stolen funds and wire fraud. However, the Complaint *never* alleges that Hatcher knew about the Ponzi scheme—because he didn't. The Complaint instead alleges that Tom Girardi was in complete and exclusive control of the bank accounts. See, e.g., Complaint, ¶¶ 184, 212. The *mens rea* allegations as to the firm's financial situation are contained in paragraphs 53 and 109 and do *not* mention Hatcher or WDC. Complaint, ¶ 109.

Yet the Complaint paradoxically alleges that Hatcher sought to "postpone…[the Lion Air Clients'] discovery of the Enterprise's criminal scheme." How could Hatcher help hide a scheme he didn't know about? Edelson variously uses the word "scheme" to refer to different acts and omissions throughout the Complaint without plausibly connecting them into a cohesive "scheme."

### 5.  Edelson's RICO Conspiracy Allegations Fail.

If the underlying RICO claims fail, there can be no RICO conspiracy. Plaintiff's RICO conspiracy claims are fatally deficient for all of the reasons in subsections (1)-(4) above. Additionally, Plaintiff's sparse and conclusory conspiracy allegations themselves are lacking. Plaintiff's Complaint is devoid of any allegations claiming that Hatcher or WDC entered into an agreement with any of the other Defendants to participate in a RICO scheme. The Complaint lacks the required "how, why, when, or where" of the alleged agreement to participate in the scheme. *Chung Goh v. Prima Fin. Grp. Inc.*, 2017 WL 77887860 at *3 (C.D. Cal. July 26, 2017). "Conclusory allegations that RICO defendants entered into an agreement are insufficient" to plead RICO conspiracy. *Lavigne v. Herbalife, LTD*, 2019 WL 6721619 at *9 (C.D. Cal. Oct. 22, 2019). Plaintiff fails to allege any facts to support its conclusory allegation in paragraphs 283 and 284 of the Complaint regarding RICO conspiracy against Hatcher and WDC.

### B.  The Third, Fourth, and Sixth Claims for Receipt of Stolen Property, Aiding and Abetting, and Conversion Fail.

Plaintiff's Third, Fourth, and Sixth Claims have at least one common element: they require that the Defendant "knew" he was in receipt of money or property belonging to

---

1   someone else. See, Cal Penal Code § 496; *Duke v. Superior Court*, 18 Cal.App.5th 490,

2   508 (2017) ("to prove a cause of action for conversion, the plaintiff must show that the

3   defendant acted intentionally to wrongfully dispose of the property of another.")

4        Edelson's allegations of "knowingly" receiving stolen money are fatally deficient.

5   Paragraph 182 alleges Hatcher "intended for it [the money he received] to be paid with

6   money stolen from the Lion Air Clients." Complaint, ¶ 182. Yet this conclusory

7   allegation contradicts both logic and everything Edelson wrote both before and after it—

8   about how the two GK bank accounts operated (1) under the **control** of Girardi, and (2)

9   with **commingled** funds over decades.

10       Edelson's admits that GK had "hundreds" of clients whose settlements and

11  judgments fed money into the GK client trust account. Complaint, ¶¶ 103-104. Nowhere

12  in the Complaint does Edelson allege that Hatcher requested that the Lion Air Clients'

13  money be transferred to him.

14       While a law firm is required to keep an accounting of the client trust account (Cal.

15  Rule of Professional Conduct 1.15(d)(3),(5)) a non-lawyer vendor of the firm has no such

16  obligation. Edelson alleges that only Tom Girardi and, arguably, Kamon, controlled the

17  client trust account. Complaint, ¶¶ 47, 53, 184, 212. The Complaint quotes an excerpt

18  from an email from Hatcher to Kamon in which Hatcher demonstrates ignorance of GK's

19  financial status (*asking* whether it's a "bad money time" for the firm.) Complaint, ¶ 195.

20  Edelson's own allegations demonstrate the implausibility of the conclusory allegation

21  that Hatcher supposedly "knew" the origin of *commingled*, electronic funds.

22       Even if Edelson could plausibly allege that Hatcher *intended* to be paid from stolen

23  funds, Edelson fails to plausibly allege that it *was*. Instead, Edelson offers Paragraph 180,

24  a single sentence which states: "Each of the checks listed in paragraphs 173-178 were

25  paid with money stolen from the Lion Air Clients." Complaint, ¶ 180. This lone

26  conclusory statement is unsupported.

27       Edelson fails to explain how it could possibly reach the conclusion that the *specific*

28  *funds WDC actually received* originated from Boeing. This would require an explanation

from Edelson describing how it traced the source of the GK funds. No tracing is explained or alleged—so "clean" funds have *not* been separated from "dirty" funds. Without tracing, paragraph 180 of the Complaint is nothing more than a conclusory and implausible allegation which this court may ignore. The court should dismiss the Third, Fourth, and Sixth Claims.

### C.     Edelson Fails to Allege Viable Damages

All five of the Claims alleged against Hatcher and WDC require "damages" as an element. Yet Plaintiffs' conclusory damages allegations are contradicted by its own allegations in related cases.

Edelson alleges that it is entitled to recover damages "as the assignee of the Lion Air Clients." See, e.g., ¶¶ 281, 288. With respect to its *clients'* damages, which Edelson now purportedly asserts as assignee, Edelson recites:

> "As a foreseeable and natural consequence of the Girardi Family Enterprise's fraudulent scheme described above, the Anice Family, the Bias Family, the Dian  Family, and the Septiana Family **each lost at least $500,000** of the amounts that should have been paid to them under their settlements with Boeing. The Multi Family lost at least $[redacted]." See, Complaint, ¶¶ 279, 286 (emphasis added.)

These allegations cannot be reconciled with the information Edelson submitted in the Northern District of Illinois stating that the Lion Air clients have been fully compensated these missing $500,000 amounts in exchange for Edelson's purchase of their claims. See, *In Re Lion Air*, 1:18-cv-07686, Dkt. 1360, Ex. 1. Every penny of their settlements have now been paid by a combination of insurance and Edelson's purchase of their claims. *Id.*

Edelson's assignment agreement contains a choice of law clause selecting California law. See, *In Re Lion Air*, 1:18-cv-07686, Dkt. 1360, Ex. 1. Under California law, assignment, subrogation, contribution, and equitable indemnity are four separate concepts. *Bush v. Superior Court*, 10 Cal. App. 4th 1375 (1992). The "primary rights" theory is used to distinguish between these four doctrines. *Id.* at 1384. If a Plaintiff's

right has been extinguished it cannot be pursued vicariously "in the shoes of" the plaintiff as through an assignment. *Id.* Rather, because Edelson's insurer apparently paid the $500,000 sums to its Lion Air clients, Edelson's claim, if any, would lie under a different primary right pursued on its own behalf.

### D.      Edelson's Claims Fail Because Edelson is a Surety Who Lacks Subrogation Rights.

This argument was asserted by Defendant CAL II in their Reply Brief in Support of Rule 12(b)(6) motion filed in the Northern District of California. Dkt. 117, pp. 3-5. As co-counsel with joint fiduciary duties to the Lion Air families, Edelson was a surety with secondary responsibility to ensure delivery of the settlement funds to the families. However, under California law, Edelson lacks subrogation rights as a surety against the non-GK defendants in this case. See, *American Surety Co. v. Bank of California*, 133 F.2d 160, 162 - 65 (9th Cir. 1943). The "equities" do not favor a surety (Edleson) with actual *knowledge* of the receipt by GK of the settlement funds (and *power* to petition the court regarding the funds) versus parties outside of GK owing no fiduciary duty and with no power over the funds – such as George Hatcher.

### E.      Edelson Fails to Join Required Parties Thomas Girardi and GK

Federal Rule of Civil Procedure 12(b)(7) provides that a complaint may be dismissed for "failure to join a party under Rule 19." Fed. R. Civ. Proc. 12(b)(7). Rule 19(a) states:

> "(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties…" Fed. R. Civ. Proc. 19(a).

Non-named parties should be joined in a case where a judgment rendered in their absence might "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the [non-named party's] interest." *Local 1351 Int'l Longshoremens Ass'n v. Sea-Land Service Inc.*, 214 F3d 566,

23

570 (5th Cir. 2000). When a plaintiff alleges the existence of a conspiracy, any party alleged to be a leader of the conspiracy would ordinarily be an indispensable party. See, *In re Apple iPhone Antitrust Litig.*, 874 F.Supp.2d. 889, 899 (N.D. Cal, 2012) (ruling that the court would ordinarily be required to evaluate the conduct of an alleged leader of a conspiracy, and such evaluation would "necessarily implicate the interests of" the conspiracy leader.)

Plaintiff's Complaint alleges that Girardi and GK are *primarily* responsible for the alleged malfeasance. There is already a similar legal action, with similar claims, pending against Girardi, GK, Lira, Griffin, and others in the Northern District of Illinois. As the Complaint in *this* case states, Thomas Girardi and GK filed bankruptcy (Complaint, ¶¶ 230-231) and, on information and belief, there are efforts underway in these bankruptcy matters to have the debts deemed non-dischargeable. Under these circumstances, Girardi and GK are indispensable to the case.

Moreover, as Defendant Griffin has argued, because this case includes defendants that are former employees of GK and Thomas Girardi, California Labor Code § 2802(a) renders the GK law firm and Girardi indispensable parties.

## IV.  **CONCLUSION**

In the end, Edelson cannot seem to help dunking the ball on its own basket, alleging: "These clients didn't think they were purchasing an asset, risky or otherwise; they thought there were buying competent legal representation to redress a horrific injury or death of a loved one." Complaint, ¶ 10. Indeed they did, and Edelson failed to deliver. This case is an attempt to deflect that blame. But, in trying to re-write the story of the key nine months, now in a different District, Edelson suddenly omits itself and in the process creates a void that it struggles to fill.

/ / /

/ / /

/ / /

1    The Court should grant this Motion to Dismiss.

2                                          LANZA & SMITH, PLC

3

4    Dated:  January 23, 2023         By:    /s/Brodie H. Smith

5                                             Brodie H. Smith
                                              Anthony Lanza
6                                             *Attorneys for Defendants*
                                              *George Hatcher and W.D.C.*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT HATCHER AND W.D.C.'S 12(B)(6) AND (7) MTD
X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) and (7) 012323.docx

## CERTIFICATE OF COMPLAICE
### Local Rule 11-6

The undersigned, counsel of record for Defendants George Hatcher and WDC certifies that this brief contains 6,073 words, which complies with the 7,000 word limit of L.R. 11-6.1.

LANZA & SMITH, PLC


Dated:  January 23, 2023          By:  _/s/Brodie H. Smith_____
                                         Anthony Lanza
                                         Brodie H. Smith
                                         Attorneys for George Hatcher and
                                         Wrongful Death Consultants

DEFENDANT HATCHER AND W.D.C.'S 12(B)(6) AND (7) MTD

X:\D\767-01\Pleadings\MTD FRCP 12(b)(6) and (7) 012323.docx