1
2
3
4
5

J. Eli Wade-Scott (*pro hac vice*) (ARDC 6316974)
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

6

*Counsel for Plaintiff Edelson PC*

7

[Additional counsel appear on the signature page]

8
9
10

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

11
12

EDELSON PC, an Illinois professional
corporation,

13

                    *Plaintiff,*

14

          *v.*

15
16
17
18
19
20
21
22
23
24

DAVID LIRA, an individual, KEITH
GRIFFIN, an individual, ERIKA
GIRARDI a/k/a ERIKA JAYNE, an
individual, EJ GLOBAL, LLC, a
California limited liability company,
CHRISTOPHER KAMON, an
individual, GEORGE HATCHER, an
individual, WRONGFUL DEATH
CONSULTANTS, a California
corporation, JOSEPH DINARDO, an
individual, CALIFORNIA ATTORNEY
LENDING II, INC., a New York
corporation,

25

                    *Defendants.*

Case No. 2:22-cv-08787-JFW
(MAAx)

**PLAINTIFF'S CONSOLIDATED
OPPOSITION TO DEFENDANTS'
RULE 12(b)(6) AND RULE 12(b)(7)
MOTIONS TO DISMISS**

Hearing Date: February 27, 2023
Time: 1:30 pm
Place: Courtroom 7A
United States Courthouse,
350 W. 1st Street,
Los Angeles, CA 90012
Judge: Hon. John F. Walter

26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED ........................................................x

I.    INTRODUCTION........................................................................................ 1

II.   RELEVANT ALLEGATIONS ................................................................... 3

III.  ARGUMENT IN OPPOSITION TO RULE 12(b)(6) MOTIONS ........... 7

      A.    Legal Standards ................................................................................. 7

      B.    Plaintiff Adequately Alleges RICO Claims Against Hatcher,
            WDC, and Griffin ............................................................................. 8

            1.    Enterprise.................................................................................. 9

            2.    Participation in the Conduct of the Enterprise ................... 13

            3.    Pattern..................................................................................... 16

            4.    Racketeering Activity............................................................. 19

      C.    Plaintiff Adequately Alleges RICO Conspiracy Claims against
            the EG Defendants and Griffin ...................................................... 22

      D.    Plaintiff Adequately Alleges Receipt of Stolen Property Claims
            Against Hatcher, WDC, the EG Defendants, and Griffin ........... 26

      E.    Plaintiff Adequately Alleges Conversion Claims Against
            Hatcher, WDC, and Griffin ............................................................ 28

      F.    Plaintiff Adequately Alleges an Unfair Business Practices Claim
            Against CAL II and Griffin ............................................................ 30

      G.    Plaintiff Adequately Alleges a CLRA Claim Against CAL II and
            Griffin ............................................................................................... 33

      H.    Plaintiff Adequately States a Claim for Money Had and
            Received ............................................................................................ 35

I.   Assignment of Claims Does Not Extinguish Them ........................ 39

IV.   ARGUMENT IN OPPOSITION TO RULE 12(b)(7) MOTIONS ......... 42

A.   Tom Girardi and GK are Not Necessary Parties Under Rule 19(a) .......................................................................................... 43

1.   The Court Can Accord Complete Relief Among Existing Parties Without Joining Tom and GK .................................. 43

2.   There is No Risk of Impairing the Interests of Absent Parties, Nor Is There a Risk of Exposing an Existing Party to Inconsistent Obligations ........................................................ 46

B.   It is Not Feasible to Join Tom and GK to this Action Due to the 11 U.S.C. § 362(a) Automatic Stay ................................................ 46

C.   Rule 19(b) Supports Allowing This Action To Proceed Among the Existing Parties ........................................................................ 47

V.   CONCLUSION .......................................................................................... 48

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ................................................................. 7

*Beck v. Prupis,*
    529 U.S. 494 (2000) ................................................................. 25

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................. 7

*Boyle v. United States,*
    556 U.S. 938 (2009) ................................................................. 10, 11

*H.J. Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229 (1989) ................................................................. 16, 17, 18

*Republic of the Philippines v. Pimentel,*
    553 U.S. 851 (2008) ................................................................. 48

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ................................................................. 13, 14

**United States Appellate Court Cases**

*Allwaste, Inc. v. Hecht,*
    65 F.3d 1523 (9th Cir. 1995) ................................................................. 17, 19

*Baumer v. Pachl,*
    8 F.3d 1341 (9th Cir. 1993) ................................................................. 9, 22, 25

*Crichton v. Golden Rule Ins. Co,*
    576 F.3d 392 (7th Cir. 2009) ................................................................. 14

*Crown Paper Liquidating Tr. v. Pricewaterhousecoopers LLP,*
    198 F. App'x 597 (9th Cir. 2006) ................................................................. 16

*Dowie v. Fleishman-Hillard Inc.,*
    422 Fed. App'x 627 (9th Cir. 2011) ................................................................. 45

*Eclectic Properties E., LLC v. Marcus & Millichap Co.,*
    751 F.3d 990 (9th Cir. 2014) ...................................................... 10, 20, 21, 24

*Goren v. New Vision Int'l, Inc.,*
    156 F.3d 721 (7th Cir. 1998) ...................................................... 14

*Howard v. Am. Online, Inc.,*
    208 F.3d 741 (9th Cir. 2000) ...................................................... 8

*Kearney v. Foley & Lardner, LLP,*
    607 F. App'x 757 (9th Cir. 2015) ................................................ 17

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,*
    431 F.3d 353, 361 (9th Cir. 2005) .............................................. 88

*Northrop Corp. v. McDonnell Douglas Corp.,*
    705 F.2d 1030 (9th Cir. 1983) .................................................... 43

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n,*
    298 F.3d 768 (9th Cir. 2002) ...................................................... 25, 44

*United States v. Bowen,*
    172 F.3d 682 (9th Cir. 1999) ...................................................... 46

*United States v. Christensen,*
    828 F.3d 763 (9th Cir. 2015) ...................................................... 10, 12, 14

*United States v. Fiander,*
    547 F.3d 1036 (9th Cir. 2008) .................................................... 15

*United States v. Flores,*
    901 F.3d 1150 (9th Cir. 2018) .................................................... 27

*Verdugo-Gonzalez v. Holder,*
    581 F.3d 1059 (9th Cir. 2009) .................................................... 26

*Walter v. Drayson,*
    538 F.3d 1244 (9th Cir. 2008) .................................................... 13

*Ward v. Apple Inc.,*
    791 F.3d 1041 (9th Cir. 2015) .................................................... 44

*Wasco Prod., Inc. v. Southwall Techs., Inc.*,
    435 F.3d 989 (9th Cir. 2006) ........................................................... 22

**United States District Court Cases**

*Andrade v. Station Casinos LLC*,
    No. 20-CV-06495-EMC, 2021 WL 4441990 (N.D. Cal. Mar. 22, 2021) ..... 44

*Asis Internet Servs. v. Vistaprint USA, Inc.*,
    617 F. Supp. 2d 989 (N.D. Cal. 2009) ............................................. 8

*Blech v. Gantman*,
    No. 18-CV-02086-JLS-JDE, 2019 WL 3240111
    (C.D. Cal. Apr. 24, 2019) ............................................................. 19

*Bokaie v. Green Earth Coffee LLC*,
    No. 18-CV-05244-JST, 2018 WL 6813212 (N.D. Cal. Dec. 27, 2018) ....... 19

*ChinaCast Educ. Corp. v. Chen Zhou Guo*,
    No. 15-cv-05475-AB (EX), 2016 WL 6645792 (C.D. Cal. June 3, 2016) ... 39

*Coleman v. Sterling*,
    No. 09-cv-1594 W BGS, 2011 WL 1668956 (S.D. Cal. May 3, 2011) ........ 37

*Drakeford v. Cap. Benefit, Inc.*,
    No. 20-CV-04161-WHO, 2022 WL 2643984
    (N.D. Cal. July 8, 2022) ........................................................ 30, 31

*Edelson PC v. Girardi et al.*,
    No. 20 C 7115, 2021 WL 3033616 (N.D. Ill. July 19, 2021) ...................... 46

*Gaines v. Home Loan Ctr., Inc.*,
    No. SACV08667AHSRNBX, 2010 WL 11506442
    (C.D. Cal. May 24, 2010) ............................................................. 34

*Givex USA Corp. v. Spaghetti Warehouse Rests., Inc.*,
    No. 17-cv-03730-BRO-SSX, 2017 WL 8183140
    (C.D. Cal. Oct. 11, 2017) ............................................................. 38

*Gross Belsky Alonso LLP v. Henry Edelson*,
    No. C 08-4666 SBA, 2009 WL 1505284 (N.D. Cal. May 27, 2009) ........... 47

*Haas v. Travelex Ins. Servs. Inc.*,
    555 F. Supp. 3d 970 (C.D. Cal. 2021) ............................................................. 38

*Hawthorne v. Umpqua Bank*,
    No. 11-CV-06700-JST, 2013 WL 5781608 (N.D. Cal. Oct. 25, 2013) ........ 34

*Huynh v. Walmart, Inc.*,
    No. 22-CV-00142-JSC, 2022 WL 3109562 (N.D. Cal. Aug. 4, 2022) ........... 8

*Ikeda v. San Francisco Firemen Credit Union*,
    No. 20-CV-08071-TSH, 2021 WL 4776705 (N.D. Cal. Oct. 13, 2021) ....... 43

*In re Crown Vantage, Inc.*,
    No. 02-3836-MMC, 2004 WL 1635543 (N.D. Cal. July 12, 2004) ............. 16

*In re Girardi*,
    No. 2:21-ap-01216-BR (Bankr. C.D. Cal. Jan. 24, 2022) ........................... 47

*In re Lion Air Flight JT 610 Crash*,
    No. 18-cv-7686 (N.D. Ill. Apr. 6, 2022) .................................................. 40

*In re Lion Air Flight JT 610 Crash*,
    No. 18 C 7686, 2022 WL 16635552 (N.D. Ill. Nov. 2, 2022) ............... *passim*

*In re Nat. W. Life Ins. Deferred Annuities Litig.*,
    635 F. Supp. 2d 1170 (S.D. Cal. 2009) ..................................................... 12

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ...................................................... 25

*Kelmar v. Bank of Am. Corp.*,
    No. CV-12-6826-PSG, 2012 WL 12850425 (C.D. Cal. Oct. 26, 2012) . 13, 14

*Miller v. Counsel Fin. Servs., Inc.*,
    No. 2:22-ap-01169-BR (Aug. 31, 2022) .................................................. 42

*Nastro v. D'Onofrio*,
    542 F. Supp. 2d 207 (D. Conn. 2008) ...................................................... 14

*Nationstar Mortg. LLC v. Presley*,
    No. 20-CV-00620-JLT-BAK, 2022 WL 1616546
    (E.D. Cal. May 19, 2022)..................................................................8

*Oculus Innovative Scis., Inc. v. Nofil Corp.*,
    No. C 06-01686 SI, 2007 WL 205068 (N.D. Cal. Jan. 25, 2007)...............47

*Progressive N. Ins. Co. v. Alivio Chiropractic Clinic, Inc.*,
    No. 05-0951 PAM/RLE, 2005 WL 3526581 (D. Minn. Dec. 22, 2005) ......15

*Rex v. Chase Home Fin. LLC*,
    905 F. Supp. 2d 1111 (C.D. Cal. 2012) ........................................35

*Ringler Ins. Agency v. Atlas Settlement Grp., Inc.*,
    No. 09-cv-597-DOC-MLGX, 2010 WL 11596114
    (C.D. Cal. May 3, 2010) ........................................................38

*Rotskoff v. Cooley*,
    No. 05-cv-0314-AG, 2008 WL 11342739 (C.D. Cal. Apr. 21, 2008) ....35, 37

*SASCO v. Byers*,
    No. C 08-5641 JF (RS), 2009 WL 1010513 (N.D. Cal. Apr. 14, 2009) .......45

*Tan v. Quick Box, LLC*,
    No. 3:20-CV-01082-H-DEB, 2021 WL 2473948
    (S.D. Cal. June 16, 2021) ........................................................48

*Travelers Prop. Cas. Co. of Am. v. Levine*,
    No. 17-CV-07344-LB, 2018 WL 3377692 (N.D. Cal. July 11, 2018) .........45

*Underwood v. Future Income Payments, LLC*,
    No. SACV171570DOCDFMX, 2018 WL 4964333
    (C.D. Cal. Apr. 26, 2018).........................................................34

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
    472 F. Supp. 3d 649 (N.D. Cal. 2020) ................................42, 43, 46

**State Court Cases**

*AMCO Ins. Co. v. All Sols. Ins. Agency, LLC*,
    244 Cal. App. 4th 883 (2016) .......................................40, 41

*Bush v. Superior Ct.,*
    10 Cal. App. 4th 1374 (1992) ..................................................................40

*Duke v. Superior Ct.,*
    18 Cal. App. 5th 490 (2017) ...................................................................30

*Fabricon Prods. v. United Cal. Bank,*
    264 Cal. App. 2d 113 (1968) ..................................................................39

*First Nationwide Sav. v. Perry,*
    11 Cal. App. 4th 1657 (1992) ..................................................................39

*Gassman v. State Bar,*
    18 Cal. 3d 125 (1976) .............................................................................31

*Gutierrez v. Girardi,*
    194 Cal. App. 4th 925 (2011) ............................................................34, 36

*Matter of Gordon,*
    No. 12-O-15516, 2018 WL 5801495 (Cal. Bar Ct. Oct. 31, 2018) .............32

*People ex rel. Herrera v. Stender,*
    212 Cal. App. 4th 614 (2012) ..................................................................31

*People v. Anderson,*
    210 Cal. App. 3d 414 (1989) ...................................................................26

*Siry Inv., L.P. v. Farkhondehpour,*
    13 Cal. 5th 333 (2022) .............................................................................27

**Miscellaneous Authority**

18 U.S.C. § 1343 ...........................................................................................20

18 U.S.C. § 1961 ...........................................................................................10

Cal. Civ. Code § 1760 ...................................................................................34

Cal. Civ. Code § 1761 ...................................................................................33

Cal. Civ. Code § 1770 ..............................................................................33, 34

Cal. Civ. Code § 2787 .................................................................................... 41

Cal. Lab. Code § 2802 ................................................................................... 45

Fed. R. Civ. P. 9 ....................................................................................... 8, 22

Fed. R. Civ. P. 12 ......................................................................................... 31

Fed. R. Civ. P. 19 .................................................................................. 43, 48

Ill. R. Prof'l Conduct 1.5 .............................................................................. 41

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiff states a RICO claim against George Hatcher and Keith Griffin, and RICO conspiracy claims against Hatcher, Wrongful Death Consultants and Griffin;

2. Whether Plaintiff states a RICO conspiracy claim against Erika Girardi and EJ Global, LLC;

3. Whether Plaintiff states a claim for Receipt of Stolen Property against Hatcher, Wrongful Death Consultants, Erika Girardi, EJ Global, LLC, and Griffin, and a claim for Aiding and Abetting Concealment of Stolen Property against Hatcher, Wrongful Death Consultants, and Griffin;

4. Whether Plaintiff states a claim for Conversion against Hatcher, Wrongful Death Consultants, and Griffin;

5. Whether Plaintiff states a claim for Unlawful and Unfair Business Practice against California Attorney Lending II and Griffin;

6. Whether Plaintiff states a CLRA claim against California Attorney Lending II and Griffin;

7. Whether Plaintiff states a claim for Money Had and Received against California Attorney Lending II and Joseph DiNardo;

8. Whether Thomas Girardi or Girardi Keese are necessary parties such that their nonjoinder requires dismissal of this action.

**PLAINTIFF'S CONSOLIDATED OPPOSITION MEMORANDUM**

## I.   INTRODUCTION

The Girardi Keese law firm was once one of the most prominent plaintiffs' firms in the country. Ultimately, it has been revealed that the true mission of the Girardi Keese firm and a number of people associated with it was not to represent clients, but to steal from them: raiding funds held in trust for clients to keep the firm afloat and to fund a larger-than-life image of wealth and power for the firm's founder and his wife, Thomas Girardi and Erika Girardi. The Girardi Family Enterprise—consisting of a team of lawyers, the firm's accountant, the firm's case-runner, and the frontwoman—worked alongside lenders who also benefited from the scheme to misappropriate client funds and to defraud those clients, other lawyers, and the public. And it was incredibly successful: the criminal scheme appears to have stolen more than $100 million, and incredibly went undetected—despite *hundreds* of complaints against Girardi to the California State Bar dating back to 1982—until December 2020, when Plaintiff sought a contempt finding and filed suit against Girardi in the Northern District of Illinois. Girardi and the firm were held in contempt in a case in which they had stolen money from the clients, *In re Lion Air*. *See generally* 18-cv-7686 (N.D. Ill.) And after an evidentiary hearing in December 2021, Judge Durkin—the judge presiding over the contempt proceedings in *Lion* Air against Lira and Griffin—found it "difficult to believe Griffin and Lira were unaware that Girardi was running a Ponzi scheme with client money, which in fact he was." *See In*

*re Lion Air Flight JT 610 Crash*, No. 18 C 7686, 2022 WL 16635552, at *4 (N.D. Ill. Nov. 2, 2022).

Defendants George Hatcher; Wrongful Death Consultants; Erika Girardi; EJ Global, LLC; Joseph DiNardo; California Attorney Lending II, Inc., and Keith Griffin each move to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6). *See* Dkt. 161; Dkt. 163; Dkt. 166; Dkt. 167; Dkt. 171 (incorporating arguments in Dkts. 163, 166, and 167). As discussed further below, Plaintiff's Complaint clearly details the existence of a criminal enterprise and a pattern of racketeering activity involving each Defendant who argues otherwise and alleges sufficient facts to support each of its other claims. The motions should be denied. In light of indictments of two Defendants in this case (Kamon and Lira) for their role in this scheme, as well as the detailed findings of Judge Durkin in the *Lion Air* matter, Plaintiff is quite confident in its ability to prove the existence of a RICO Enterprise at trial. Troublingly, much of the strategy of the remaining defendants seems to be to shift blame for a multi-decade criminal conspiracy to Plaintiff's alleged failure to detect it fast enough. Much of that invective appears to have been drafted (and then copied-and-pasted) from Defendants' first motions, which preceded Judge Durkin's ruling on contempt against Defendants Griffin and Lira. Plaintiff directs the Defendants and the Court to Judge Durkin's opinion on this point. *In re Lion Air, 2022 WL 16635552*.

Defendants Erika Girardi, EJ Global, LLC, Wrongful Death Consultants, and

George Hatcher also move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(7). *See* Dkt. 166; Dkt. 167. These motions should likewise be denied because neither Thomas Girardi ("Tom") nor Girardi Keese is a necessary party to this action.[1]

## II.   RELEVANT ALLEGATIONS

The following paragraphs briefly summarize the allegations in the Complaint, focusing on those relevant to the motions discussed in this brief.

The "basic scheme" of the Girardi Family Enterprise was to "operat[e] Girardi Keese ("GK") in a manner that appears to be a legitimate plaintiffs' law firm but in fact is a vehicle to obtain settlements on behalf of injured clients then steal the settlement funds" and to "funnel[] those into ventures that increased Tom and Erika's public profiles thereby permitting Girardi Keese to retain more clients and steal more money." *See* Compl. ¶¶ 5, 259; *see also id.* ¶¶ 5-9 (describing the role of each Defendant). The team of case-referrer, lawyers, accountant, and frontwoman, along with the lenders who also benefited from the scheme, "maintained those roles over the years and from scheme to scheme," *id.* ¶ 274, resulting in a "decades-long fraud," *id.* ¶ 17, that "operated in a manner similar to a Ponzi scheme, but much worse" because it preyed not on investors but on injured clients seeking legal help, *id.* ¶ 10.

Hatcher and his wholly-owned company, Wrongful Death Consultants

---

[1]     Defendant David Lira answered the complaint on December 13, 2022 at dkt. 135. Defendant Christopher Kamon filed an answer on January 11, 2023 at dkt. 157.

("WDC"), knowingly entered into "unlawful referral arrangements" and "illegal contingency fee arrangements" with GK in exchange for referring clients exclusively to GK. *Id.* ¶ 57. Following the Lion Air crash, he recruited victims' families and engaged Mohamed Eltaher as a local contact, whom the Enterprise offered to pay an illegal cash referral bonus in addition to 25% of the attorneys' fees. *Id.* ¶ 83. During the *Lion Air* litigation, settlement, and afterwards, Hatcher served "as the clients' first-line point of contact," *id.* ¶ 56, sending false and misleading messages over WhatsApp to coverup the Enterprise's fraudulent scheme, to lull the Clients into thinking there were no problems with their settlement money, and to prevent the Clients from talking to anyone outside the Enterprise about the delayed payments, *see, e.g.*, *id.* ¶¶ 184-200. At the same time, Hatcher was communicating with GK staff regarding partial settlement payments to the Lion Air Clients, *id.* ¶ 134-37; his own illegal payments, including sometimes directly from GK's client trust account, *id.* ¶ 172; false letters GK sent to the Clients, *id.* ¶ 188; and the fact that the GK operating account was not always solvent, *id.* ¶¶ 172, 195.

"Within the firm," Defendants David Lira and Keith Griffin managed the lawsuits and "struck the deals the firm needed to get a case to settlement," including sometimes "committing to pay out more than 100% of the available fees." *Id.* ¶ 6. Both Lira and Griffin also "were tasked with fending off inquiries from clients and other lawyers" about why payments were delayed or missing. *Id.* For example, Griffin knew that GK was sending partial payments to the Lion Air Clients while

mischaracterizing it as a "loan," *id.* ¶¶ 134-37; he knew that Tom sent false letters to the Lion Air Clients, *id.* ¶¶ 156-68; he sent misleading communications to Multi Rizki long after he "knew that the Enterprise had stolen a substantial portion of Multi's settlement," *id.* ¶¶ 201-14; and he asked Eltaher to "convince [Multi] to wait until the end of November before taking any action to report the Girardi Family Enterprise to the authorities," *id.* ¶ 215. Meanwhile, Griffin drew a biweekly salary of over $10,000 from the GK payroll account, *id.* ¶ 123, despite knowing that the Lion Air Clients had not been paid and that "[t]he money used to fund [his] salary was obtained from funds held in trust for the Lion Air Clients," *id.* ¶ 291; *see also In re Lion Air*, 2022 WL 16635552, at *4, n.1.

As the "frontwoman" of the operation, Erika sold the image of GK's success to the public, Compl. ¶ 8, including by bragging about her "strong checkbook" and her "exorbitant spending habits," *id.* ¶¶ 43-44; *see also In re Lion Air*, 2022 WL 16635552, at *5 ("Indeed, Girardi's gaudy displays of wealth and extravagant lifestyle furthered the fiction that he and his firm were successful and solvent."). Erika is the sole owner and controller of EJ Global, LLC (together the "EG Defendants"), which she used "as a shell entity . . . for the purpose of funneling money from Girardi Keese" to her benefit. Compl. ¶ 26. "[M]ore than $25 million of her own expenses were paid by Girardi Keese," including "more than $14 million in American Express charges that were made by Erika on a Girardi Keese card . . . , as well as more than $11 million in vendor payments that the Girardi Family Enterprise

made for her benefit through the law firm." *Id.* ¶ 60. Erika knew that "the credit card bills and invoices that she submitted to Girardi Keese related to her own personal expenses [] had no connection whatsoever with the law firm." *Id.* ¶¶ 61-62. When asked about lawsuits against GK or about money shortfalls, Erika obfuscated and misled the public. *Id.* ¶¶ 68-72. She made false statements "to protect her and Tom's public image and to hold their countless other creditors at bay . . . . demonstrat[ing] that Erika had specific knowledge that her financial arrangement with GK was inappropriate and needed to be hidden from creditors using any means necessary." *Id.* ¶ 73. Erika also signed lien agreements in 2019 showing that she knew "she and Tom were on the hook for significant debt and that a lender had to be paid in full before her and Tom took any more money from Girardi Keese." *Id.* ¶ 92. As recently as June 2022, "Erika opined on national television that 'We're not even sure that there were [Lion Air Clients] who weren't paid,'" and that there was a "chance that they [could] be lying." *Id.* ¶ 75.

When the Enterprise needed additional money, it turned to Joseph DiNardo and his company California Attorney Lending II ("CAL II"), in part because "by 2019, no legitimate lender wanted to do business with Tom." *Id.* ¶¶ 9, 85. DiNardo knew by 2019 that the Enterprise "was stealing money from Tom's clients" because he had received "copies of [GK's] monthly bank statements and numerous other financial records that would have demonstrated that the firm was misappropriating client settlement funds and improperly exercising control over funds held in its client trust

account." *Id.* ¶ 88. Nonetheless, DiNardo and CAL II provided the Enterprise with additional loans "in the hopes of keeping the scheme going for long enough to recoup the money his companies were owed." *Id.* ¶ 89. In exchange for the loans, "Tom agreed that [CAL II] would receive 50% of the attorneys' fees from various cases when they settle, including from the Lion Air Clients." *Id.* ¶ 93. CAL II and DiNardo insisted that the "settling defendants in the covered cases," including *Lion Air*, "wire [CAL II's] 50% portion of the attorneys' fees *directly* to California Attorney Lending." *Id.* DiNardo knew or should have known that GK "was not actually entitled to 50% of the fees," or that "nothing would be left to actually fund the firm after DiNardo was paid—again demonstrating that money was coming from somewhere else." *Id.* ¶ 94.

## III.    ARGUMENT IN OPPOSITION TO RULE 12(b)(6) MOTIONS

### A.    Legal Standards

On a Rule 12(b)(6) motion for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940, 1949 (2009) (complaint need only contain sufficient factual matter to state a claim for relief that is plausible on its face: "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). At this stage, the court takes all factual allegations as true and draws

all reasonable inferences in plaintiff's favor. *Asis Internet Servs. v. Vistaprint USA, Inc.*, 617 F. Supp. 2d 989, 991 (N.D. Cal. 2009). For claims alleging fraud or mistake, plaintiffs "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

**B.    Plaintiff Adequately Alleges RICO Claims Against Hatcher, WDC, and Griffin**

Defendants Wrongful Death Consultants and George Hatcher, joined by Keith Griffin, move to dismiss both the direct RICO and RICO conspiracy claims against them. *See generally* Dkt. 167; Dkt. 171.

 "To state a civil RICO claim, a plaintiff must allege facts showing each defendant engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property.'" *Huynh v. Walmart, Inc.*, No. 22-CV-00142-JSC, 2022 WL 3109562, at *7 (N.D. Cal. Aug. 4, 2022) (Corley, J.) (quoting *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)). To state a conspiracy claim under 18 U.S.C. § 1962(d), a plaintiff must allege "either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). A plaintiff need not allege that a defendant "personally committed a predicate act, or even an overt act in furtherance of the RICO conspiracy." *Nationstar Mortg. LLC v. Presley*, No. 20-CV-00620-JLT-

BAK, 2022 WL 1616546, at *3 (E.D. Cal. May 19, 2022). Rather, the defendant simply must "be aware of the essential nature and scope of the enterprise" and have "intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993).

WDC and Hatcher, joined by Griffin, make three main arguments that relate to RICO specifically. First, they contend that Plaintiff fails to allege the existence of an enterprise with a common purpose. To the contrary, the complaint details the existence of a group of people acting together to operate the Girardi Family Enterprise. Second, they contend that Plaintiff does not allege that WDC and Hatcher directed the affairs of the Girardi Family Enterprise. In fact, Plaintiff alleges that Hatcher participated in the Girardi Family Enterprise by directing its affairs, particularly by helping it gather clients and prevent those clients from reporting illegal activities to the authorities. Third, they insist that there is no pattern of racketeering activity, despite allegations of a pattern spanning many years. And fourth, WDC and Hatcher suggest that they did not participate in predicate acts, despite plain allegations that they participated in wire fraud and other relevant crimes.

Because Plaintiff alleges plausible facts to support each element of its RICO claims, the Court should deny WDC/Hatcher and Griffin's motions to dismiss the RICO claims.

### 1.    Enterprise

"RICO defines the term 'enterprise' as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals

associated in fact although not a legal entity. 18 U.S.C. § 1961(4). This expansive definition is not very demanding[,]" has a "wide reach," and should be "liberally construed to effectuate its remedial purposes." *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (internal quotation marks omitted). "To show the existence of an enterprise . . . , plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

Plaintiff alleges more than sufficient facts to show an association-in-fact enterprise with "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Lira, Griffin, Kamon, and Hatcher worked together on numerous lawsuits, *see* Compl. ¶¶ 260-72, and the Complaint describes the roles each member played in the Enterprise. *Id.* ¶¶ 49-58 ("Lira and Griffin managed the law firm side . . . . Kamon was the bookkeeper . . . . [T]hey turned to Hatcher to bring clients into the enterprise, and then to assist—as the client's first-line point of contact—in lying to the clients and lulling them into thinking that all was well with their settlement money"); *see also id.* ¶¶ 5-9 (describing each player's role in the "basic scheme"); *id.* ¶ 274 (alleging that they "maintained those roles over the years and from scheme to scheme"). The Complaint also points to communications between Hatcher and each of the others, showing that

they had relationships with each other and worked together. *Id*. ¶¶ 135, 172, 188, 195, 202, 216. These allegations show an "ongoing organization, formal or informal" and that "the various associates function as a continuing unit." *Boyle*, 556 U.S. at 945. No more is required.

WDC, Hatcher, and Griffin nevertheless contend that Plaintiff fails to allege an enterprise because the "alleged 'enterprise' . . . exists solely to commit the pattern of racketeering activity." Dkt. 167 at 15, Dkt. 171 at 5. That argument badly misstates the law. The Supreme Court has expressly rejected the idea "that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity[.]" *Boyle*, 556 U.S. at 947. The enterprise in *Boyle*, for example, consisted of "a core group, along with others who were recruited from time to time" who were responsible for about 30 similar thefts from night deposit boxes at banks. *Id*. at 941. There was no suggestion that the enterprise had a purpose other than committing bank robberies or any organization beyond that required to plan and commit said bank robberies.

Here, the key purpose of the Girardi Family Enterprise was to use lawsuits on behalf of injured clients to make money illegally, and to maintain a public image of success and propriety in order to retain more clients and make more money. *See* Compl. ¶ 259; *see also id*. ¶¶ 5-9 (describing the "basic scheme"). Hatcher—and by extension, his company WDC—knew of and agreed to these goals. *Id*. ¶ 59. This is not mere speculation. For example, Hatcher knew that GK sometimes paid him

directly from the firm's client trust account, and he knew that the firm's operating account was not always solvent. *Id.* ¶ 172. He regularly communicated with the Lion Air Clients, "intend[ing] to build trust" so that he could assist the Enterprise in its scheme. *Id.* ¶ 185. He knew that other members of the Enterprise were lying to clients but covered up for those lies. *Id.* ¶¶ 187-88. By all of these actions, he "intended to lull the Lion Air Clients into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the discovery of the Enterprise's criminal scheme less likely." *Id.* ¶ 191; *see also id.* ¶ 198 ("Hatcher intended to convince [Bias] not to take any action that would result in the discovery of the Enterprise's crimes.").

It is not relevant whether Hatcher shared others' "'lavish lifestyle' goals" or whether he personally hoped for the clients to be paid eventually, *see* dkt. 167 at 16, since "the common purpose element . . . does not require the enterprise participants to share all of their purposes in common." *In re Nat. W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1174 (S.D. Cal. 2009). Rather, "[i]t is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *Christensen*, 828 F.3d at 780-82 (finding a valid RICO claim where alleged common purpose was "earning income through the conduct of diverse criminal activities"). The Complaint sufficiently pleads the existence of an Enterprise involving Hatcher.

## 2.    Participation in the Conduct of the Enterprise

WDC and Hatcher next argue that Hatcher did not "participate, directly or indirectly, in the conduct of such enterprise's affairs" as required for liability under 18 U.S.C. § 1962(c), because he was an "outsider to the firm who had no control over the affairs of the firm and had to 'get in line' with the other creditors of the firm and beg for payment." Dkt. 167 at 19 (emphasis omitted). But control over the GK bank accounts is far from the only criminal activity alleged to be part of the Girardi Family Enterprise's affairs.

Under *Reves v. Ernst & Young*, "*some* part in directing the enterprise's affairs is required" for RICO liability. 507 U.S. 170, 179 (1993). Defendants need not have "primary responsibility for the enterprise's affairs," have a "formal position," or exercise "significant control," *id.* at 179 & n.4, but they must "participate in the operation or management of the enterprise," *id.* at 185. In applying this "operation or management" test, courts consider factors such as "whether the defendant occupied a position in the chain of command through which the affairs of the enterprise are conducted, whether the defendant knowingly implemented the decisions of upper management, and whether the defendant's participation was vital to the mission's success." *Kelmar v. Bank of Am. Corp.*, No. CV-12-6826-PSG, 2012 WL 12850425, at *7 (C.D. Cal. Oct. 26, 2012), *aff'd*, 599 F. App'x 806 (9th Cir. 2015) (cleaned up); *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). RICO liability is not limited to "upper management," since "[a]n enterprise is 'operated' not just by

upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Reves*, 507 U.S. at 184; *Christensen*, 828 F.3d at 781 (noting that "[t]he RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise").

Here, Hatcher Participated in the operation of the Enterprise by entering into an exclusivity agreement with GK, *see* Compl. ¶ 5, recruiting and referring clients to GK in exchange for illegal payments, *id.*, and then "assist[ing]—as the clients' first-line point of contact—in lying to the clients and lulling them into thinking that all was well with their settlement money," *id.* ¶ 56. Thus, while it's true that Hatcher was not "upper management" at GK, he helped implement decisions made by Tom Girardi and others by lying to the clients and convincing them not to raise concerns to anyone outside the Enterprise. *E.g.*, *id.* ¶¶ 183-200. He also "occupied a position in the chain of command," such as by recruiting Mohamed Eltaher to help solicit clients on the ground in Indonesia, *id.* ¶¶ 83, and serving as the "clients' first-line point of contact," *id.* ¶ 56. See *Kelmar*, 2012 WL 12850425, at *7. Hatcher's participation in the Enterprise was thus "vital to the mission's success," *id* (cleaned up), and he was far more ingrained in the Enterprise's operations than "outsider," professional service providers such as the accountants in *Reves*, the insurance marketers in *Crichton v. Golden Rule Insurance Company*, 576 F.3d 392 (7th Cir. 2009), the outside law firm in *Nastro v. D'Onofrio*, 542 F. Supp. 2d 207 (D. Conn. 2008), or the service providers in *Goren v. New Vision International, Inc.*, 156 F.3d 721, 728 (7th Cir.

1998). *See* Dkt. 167 at 18-19.

In a case with similar allegations regarding "runners" or "cappers" recruiting injury victims for an insurance scam, the court found that the complaint "sufficiently describes [a defendant's] operation and management of the alleged enterprise" where the plaintiffs alleged that the defendant "was the 'face of the enterprise' in that he targeted the Hispanic community as a runner and capper and brought prospective clients to [the co-defendant clinic]." *Progressive N. Ins. Co. v. Alivio Chiropractic Clinic, Inc.*, No. 05-0951 PAM/RLE, 2005 WL 3526581, at *2 (D. Minn. Dec. 22, 2005) (noting that "[w]hen clients resisted or threatened to reveal the scheme, [the "runner" defendant] engaged in witness tampering and threatened to reveal their illegal immigration status in order to conceal the enterprise's activity"). Hatcher likewise participated in the operation of the Enterprise when he referred clients exclusively to GK in exchange for illegal payments, served as the first-line point of contact with the clients, lied to cover up the Enterprise's activities, and convinced the clients not to reveal the scheme.

As far as WDC is concerned, conspiracy liability does not require the type of direct management or control that a direct RICO claim requires. Rather, it is sufficient that the defendant "knew about and agreed to facilitate the scheme." *United States v. Fiander*, 547 F.3d 1036, 1041 (9th Cir. 2008). To the extent WDC is an entity distinct from Hatcher (and the nature of their motion to dismiss briefing strongly suggests that it isn't), the fact that WDC accepted and cashed checks that

represented profits of the Enterprise's theft is sufficient to permit the conclusion that it knew about and facilitated the scheme. Compl. ¶¶ 173-74.[2]

### 3. Pattern

WDC, Hatcher, and Griffin's only challenge regarding the "pattern of racketeering activity" element is that the Complaint failed to allege "continuity." Dkt. 167 at 12-14; Dkt. 171 at 4-5. To show a pattern of racketeering activity, a plaintiff must allege that the predicate acts are "related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Continuity can be showed either by a "closed period of repeated conduct" (*i.e.*, closed-ended continuity) or by "past conduct that by its nature projects into the future with a threat of repetition" (*i.e.*, open-ended continuity). *Id.* at 241. The requirement is designed to ensure that RICO is used in the way Congress intended: to fight "long-term criminal conduct." *See id.* at 242.

Regarding closed-ended continuity, the Complaint alleges that the Girardi Family Enterprise—which is defined to include Hatcher and Griffin—operated a Ponzi scheme for "over a decade, embezzling funds from clients who settled cases

---

[2] Plaintiff's Complaint alleges that Wrongful Death Consultants is "owned and controlled exclusively by George Hatcher," Compl. ¶ 31, so the allegations regarding Hatcher's knowledge of the Enterprise's purpose and his agreement to participate in it may be imputed to WDC as well. *See In re Crown Vantage, Inc.*, No. 02-3836-MMC, 2004 WL 1635543, at *5 (N.D. Cal. July 12, 2004), *aff'd sub nom. Crown Paper Liquidating Tr. v. Pricewaterhousecoopers LLP*, 198 F. App'x 597 (9th Cir. 2006) ("The knowledge of a corporation's sole shareholder is legally imputed to the corporation."). Neither Hatcher nor WDC argues otherwise in their motion to dismiss.

against Dole, TXI Riverside Cement, Boeing, EgyptAir, Pacific Gas & Electric, Risperdal, Lockheed and others." Compl. ¶¶ 262-72. Hatcher's and WDC's receipt of multiple $50,000 payments from GK that were unconnected to the *Lion Air* case—or any other case—is sufficient to permit the conclusion that Hatcher and WDC's involvement with the Girardi Family Enterprise was deeper and longer-lasting than just the *Lion Air* fraud. *Id.* ¶¶ 171-82; *see also id.* ¶ 189 (Hatcher discussing "all the years I know [sic] the firm and Tom"). Even looking only at the Enterprise's conduct regarding the *Lion Air* case, the Complaint alleges that Hatcher recruited victims' families and referred them to GK "immediately" after the Lion Air plane crash in October 2018, *see id.* ¶¶ 81-82, and that Hatcher lied to the clients over WhatsApp on November 17, 2020, *id.* ¶¶ 199-200. Therefore, Hatcher's and the Enterprise's pattern of racketeering activity was conducted over a "substantial period of time." *H.J.*, 492 U.S. at 242; *Kearney v. Foley & Lardner, LLP*, 607 F. App'x 757, 759 (9th Cir. 2015) ("More than two years amounts to a substantial period of time to satisfy the closed-ended continuity requirement."); *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) ("thirteen months . . . . would have demonstrated that the criminal activity spanned a 'substantial period of time'").

Similarly, with respect to Griffin, Plaintiff's Complaint alleges that Griffin "commit[ed] dozens of predicate acts, including acts of wire fraud, money laundering, engaging in monetary transactions in property derived from specified unlawful activity, and interstate transportation of stolen goods" "over the years and

from scheme to scheme." Compl. ¶¶ 274, 276; *see also id*. ¶ 57 (describing how Griffin knew and approved of the illegal fee sharing agreements with Hatcher since before 2020); *id*. ¶ 123 (describing how each of Griffin's paychecks after March 5, 2020 was derived from embezzled *Lion Air* settlement funds); *id*. ¶¶ 134-37, 156, 202-20 (describing a series of communications between Griffin and other members of the Girardi Family Enterprise from April-December 2020).

In any event, Plaintiff's Complaint also satisfies the requirement of open-ended continuity because it alleges that the Enterprise's racketeering actions had a "threat of repetition" and were also the Enterprise's "regular way of doing business." *H.J.*, 492 U.S. at 242. For instance, the Complaint describes the "basic scheme" the Enterprise followed to bring in clients, reach settlements, and embezzle client money. Compl. ¶¶ 5-9. It also alleges that the Enterprise operated its Ponzi scheme "time and time again," *id*. ¶ 11, that the goals of the Enterprise were to "operate[e] Girardi Keese in a manner that appears to be a legitimate plaintiffs' law firm but in fact is a vehicle to obtain settlements . . . then steal the settlement funds," and to "permit[] Girardi Keese to retain more clients and steal more money," *id*. ¶ 259. The Complaint thus alleges that the Ponzi scheme was GK's and the Enterprise's "regular way of doing business" and that the Enterprise intended to—and did—repeat the scheme over and over again. *See id*. ¶¶ 262-71 (detailing a scheme similar to the *Lion Air* scheme that GK conducted several years prior).

Hatcher's argument that "there is no realistic possibility the alleged scheme

could qualify as an open-ended scheme" because "Tom Girardi is bankrupt," "GK is defunct," and "the scheme eventually collapsed" can easily be disregarded. Dkt. 167 at 14. "Open-ended continuity is determined based not on whether [the] activity is literally ongoing at the present time, but on whether at the time of the activity there was a 'threat of repetition.'" *Bokaie v. Green Earth Coffee LLC*, No. 18-CV-05244-JST, 2018 WL 6813212, at *5 (N.D. Cal. Dec. 27, 2018); *Blech v. Gantman*, No. 18-CV-02086-JLS-JDE, 2019 WL 3240111, at *7 (C.D. Cal. Apr. 24, 2019). Hatcher's proposed version of the open-ended continuity requirement would make no sense, since it would preclude RICO liability for criminal enterprises whose activities collapsed when the participants were, for instance, arrested. *See Allwaste*, 65 F.3d at 1529 (adopting Sixth Circuit holding that "fortuitous interruption of criminal acts does not preclude a finding of open-ended continuity"). Just like the defendants in *Allwaste*, if the Girardi Family Enterprise had not been "fortuitously interrupted . . . , the predicate acts could have recurred indefinitely." *Id.* at 1530. Plaintiff adequately alleges open-ended continuity.

### 4.    Racketeering Activity

In the twenty pages Hatcher and WDC submit on the Rule 12(b)(6) motion to dismiss, they spend little time discussing the allegations of underlying racketeering activity in the Complaint—*i.e.*, "acts of wire fraud, engaging in monetary transactions in property derived from specified unlawful activity, and interstate transportation of stolen goods." Compl. ¶ 278. In addition to the allegations related to stolen goods,

*e.g.*, *id.*, the multiple alleged wire fraud violations by themselves constitute a pattern of racketeering activity.

Wire fraud claims under 18 U.S.C. § 1343 have three elements: (1) the formation of a scheme to defraud, (2) the use of interstate wires in furtherance of that scheme, and (3) the specific intent to defraud. *Eclectic Props.*, 751 F.3d at 997. "The intent to defraud may be inferred from a defendant's statements and conduct. In the absence of direct evidence of intent, the party asserting fraud must first prove the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and then, by examining the scheme itself the court may infer a defendant's specific intent to defraud." *Id.* (internal citations and quotation marks omitted). Allegations of wire fraud also must satisfy the heightened pleading requirements of Rule 9(b). *Id.* at 995 n.5 (noting that the "circumstances constituting fraud" must be alleged with particularity, but "fraudulent intent" may be alleged generally).

WDC and Hatcher's only arguments regarding the alleged wire fraud are that "[t]he 'lulling' allegations are unbelievable on their face and fail to pass the *Twombly/Iqbal* plausibility standard," dkt. 167 at 16, and that Hatcher could not have had the requisite intent to defraud, *id.* at 20 ("How could Hatcher help hide a scheme he didn't know about?"). These conclusory arguments fall flat since Plaintiff's allegations establish a reasonable inference that Hatcher intended—at the least—to participate in a "scheme which was reasonably calculated to deceive persons of

ordinary prudence and comprehension." *Eclectic Props*, 751 F.3d at 997.

As discussed above, the Complaint alleges that Hatcher knew that GK repeatedly entered into illegal payment arrangements, *see* Compl. ¶¶ 55-58, 172, that he knew GK repeatedly delayed (at best) paying clients their settlement funds, *id.* ¶¶ 189 (Hatcher telling the Lion Air Clients, "Mohamed will tell you that he's had cases with us that disburse slow"), and that he "intended to lull the Lion Air Clients into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the discovery of the Enterprise's criminal scheme less likely," *id.* ¶ 191; *see also id.* ¶ 198. At the same time, Hatcher used interstate wire communications when he lied to the Lion Air Clients about whether GK's office was opening and processing payments, *id.* ¶¶ 187, 190, did not tell them that the letters Girardi had sent them contained lies, *id.* ¶ 188, tried to talk to them out of discussing matters with people outside the enterprise, *id.* ¶ 192, and withheld information about GK's poor financial situation from them, *id.* ¶¶ 195-200. Hatcher is welcome to argue at trial that his WhatsApp messages to the Clients should be "read as a sincere reflection of Hatcher's thoughts," dkt. 167 at 17, rather than misleading communications intended to further a fraudulent scheme. But at this motion to dismiss stage, when these facts are read in the light most favorable to the non-moving party, Plaintiff plausibly alleges facts—including the details of particular communications—to support its claim that Hatcher committed multiple wire fraud violations.

The Complaint also contains sufficient allegations to support the RICO conspiracy claim as to both Hatcher and WDC. Among other agreements, the Complaint plausibly alleges that Hatcher, Kamon, Girardi, GK, and WDC all agreed that GK would make $50,000 payments to Hatcher using the money stolen from the Lion Air Clients. Compl. ¶¶ 171-82. These payments were contemporaneous with Girardi's lies to the Lion Air Clients and Hatcher's attempts to minimize and cover up those lies. *Id.* ¶¶ 183-200. At the pleading stage, those allegations are sufficient to support the conclusion that Hatcher, Kamon, Girardi, GK, and WDC all agreed to commit wire fraud together as part of the Girardi Family Enterprise. At the pleading stage, no more is required.

## C. Plaintiff Adequately Alleges RICO Conspiracy Claims against the EG Defendants and Griffin

Despite allegations that they agreed to participate in the Girardi Family Enterprise, the EG Defendants, joined by Griffin, argue that Plaintiff fails to plead a RICO conspiracy claim as to their conduct. In fact, Plaintiff adequately alleges that Erika Girardi was "aware of the essential nature and scope of the enterprise" and "intended to participate in it." *Baumer*, 8 F.3d at 1346.[3] The EG Defendants' motion should be denied. Griffin's motion to join makes no argument as to why Plaintiff fails

---

[3] The EG Defendants misleadingly splice excerpts from *Wasco Prod., Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 990 (9th Cir. 2006) to suggest that Rule 9(b) applies "especially [to] the existence of an agreement." *See* Dkt. 166 at 20. This is not true, since elements of intent and knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

to plead a RICO conspiracy against *him* (he has merely joined the other motions), dkt. 171 at 5, so his motion should also be denied.

First, the EG Defendants incorrectly contend that "Plaintiff pleads no facts to provide a basis for th[e] conclusion" that "Ms. Girardi—and therefore EJ Global— knew about the Ponzi scheme." Dkt. 166 at 19.[4] To the contrary, the Complaint alleges that Erika generated more than "$25 million in credit card charges and invoices that she sent to the firm for payment," and "had actual and specific knowledge that the credit card bills and invoices that she submitted to Girardi Keese related to her own personal expenses [] had no connection whatsoever with the law firm." Compl. ¶¶ 60-62. It is not plausible that Erika thought this arrangement was normal or acceptable because Plaintiff alleges that she repeatedly made false public statements about "pay[ing] [her] own bills" and about the status of lawsuits against her and Tom. *Id.* ¶¶ 68-73. It is also reasonable to infer, based on the facts alleged, that Erika "knew that her false statements would further her and Tom's scheme by ensuring that their hordes of creditors continued to believe that they were wealthy and that clients would continue to hire Tom and trust him with their money." *Id.* ¶ 74. The Complaint also points to agreements Erika signed with California Attorney Lending which support the reasonable inference that "Erika had actual and specific knowledge

---

[4]    As with Hatcher and WDC, the Complaint alleges that EJ Global is wholly owned and operated by Erika Girardi, so Erika's knowledge and agreements may be imputed to EJ Global for purposes of § 1962(d) liability. The EG Defendants do not argue otherwise.

that she and Tom were on the hook for significant debt and that a lender had to be paid in full before her and Tom took any more money from Girardi Keese." *Id.* ¶ 92. Finally, the Complaint alleges that Erika was served with subpoenas regarding her assets and an attachment order in 2020, making her "increasingly aware that the money was drying up and that creditors were circling her." *Id.* ¶¶ 221-25.

These allegations, taken together, support a reasonable inference that Erika both knew and intended to participate in the "essential nature and scope" of the Enterprise: to use GK as a vehicle to obtain settlements and then misappropriate the settlement funds, and to cover up the scheme—including by increasing Tom's and Erika's public profiles—to permit GK to retain more clients and steal more money. *Id.* ¶ 259; *see also* Eclectic Props., 751 F.3d at 997 ("The intent to defraud may be inferred from a defendant's statements and conduct."). Like Hatcher, the EG Defendants can argue at trial that they were "duped by Tom Girardi" and believed that GK was operating appropriately. *See* Dkt. 166 at 20. But the question at this phase of litigation is not whether alternative interpretation of facts are "more plausible" or "just as plausibl[e]." *Id.* As long as the facts viewed in the light most favorable to the Plaintiff state a claim, then whether the EG Defendants are more likely than not liable is a question for another day.

The EG Defendants next argue that Plaintiff's RICO Conspiracy claim fails because the Complaint does not allege "plausible, non-conclusory facts that Ms. Girardi's, and by extension EJ Global's, actions were the proximate cause of

Plaintiff's injuries." Dkt. 166 at 22; *see also id.* at 20 (arguing that Tom Girardi and GK were more directly responsible for Plaintiff's losses). This argument ignores a fundamental tenet of conspiracy claims—that defendants may be held vicariously liable for the acts of other co-conspirators in furtherance of the conspiracy. See *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002) ("If a RICO conspiracy is demonstrated, '[a]ll conspirators are liable for the acts of their co-conspirators.'"); *Beck v. Prupis*, 529 U.S. 494, 506-7 (2000) (noting that "a plaintiff could, through a § 1964(c) suit for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962"); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 917-18 (C.D. Cal. 2012) (same). Therefore, it is not necessary for Plaintiff to allege that any of Erika's actions proximately caused the eventual injury, as long as Plaintiff alleges that Erika agreed to the essential nature and scope of the conspiracy that caused the harm.

The EG Defendants concede that, under the facts pleaded, racketeering activity committed by members of the Girardi Family Enterprise was directly responsible for the Lion Air Clients' losses. *See* Dkt. 166 at 23-24. Plaintiff therefore adequately states a RICO Conspiracy claim against the EG Defendants because they were "aware of the essential nature and scope of the enterprise" and "intended to participate in it." *Baumer*, 8 F.3d at 1346.

### D. Plaintiff Adequately Alleges Receipt of Stolen Property Claims Against Hatcher, WDC, the EG Defendants, and Griffin

Hatcher/WDC and the EG Defendants, joined by Griffin, also move to dismiss Counts 3-4 of the Complaint, which allege that Defendants received stolen property (Count 3) and concealed or aided in the concealing of stolen property (Count 4) in violation of Cal. Penal Code § 496(a). All motions filed by these Defendants argue that Plaintiff cannot plausibly allege that the funds Hatcher/WDC, the EG Defendants, and Griffin received were stolen from the Lion Air Clients since all the GK money was commingled. *See* Dkt. 167 at 20-22; Dkt. 166 at 24-26; Dkt. 171 at 5-6. WDC/Hatcher and the EG Defendants also argue that, for the same reason, Plaintiff cannot plausibly allege that these Defendants *knew* the money they received was stolen from the Lion Air Clients. *See* Dkt. 167 at 20-22; Dkt. 166 at 24-26. But Plaintiff does allege both of these elements as to these Defendants, based on plausible facts that support reasonable inferences, so the Court should deny the motions to dismiss Counts 3-4. Griffin again merely joins the motions and makes no independent argument as to the allegations against him.

"[T]he crime of 'receipt of stolen property' basically consists of three elements: (a) the property was stolen, and (b) the defendant was in possession of it, (c) knowing it was stolen." *Verdugo-Gonzalez v. Holder*, 581 F.3d 1059, 1061 (9th Cir. 2009) (citing *People v. Anderson*, 210 Cal. App. 3d 414, 420 (1989)); *see also* Cal. Penal Code § 496(a). "[E]mbezzlement, which is defined as the fraudulent appropriation of property by a person to whom it is intrusted [sic] (§ 503), is a

recognized form of theft within the meaning of section 496." *Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 350 n.11 (2022) (internal quotation marks omitted). "The mens rea element requires actual knowledge of or belief that the property is stolen." *United States v. Flores*, 901 F.3d 1150, 1161 (9th Cir. 2018).

On the first element, Plaintiff alleges specific facts about the money flowing out of the Girardi Keese Client Trust Account—down to the dates and amounts of specific checks. These facts support the allegation that the Enterprise misappropriated money that belonged to the Lion Air Clients and transferred that money to Hatcher/WDC, the EG Defendants, and Griffin. *See* Compl. ¶ 109 ("At the time the checks listed in Table 1 were deposited [in the GK operating account] . . . Girardi Keese was not entitled to attorneys' fees from the *Lion Air* matters" because "the entire amount of attorneys' fees owed to Girardi Keese had already been transferred directly from Boeing to California Attorney Lending."); *see also id.* ¶ 110 (explaining how "Girardi Keese could not be entitled to $500,000 of Anice Kasim's settlement"); *id.* ¶ 126(d) (explaining how thousands of dollars paid from the GK operating account to American Express "were for Erika's company, EJ Global, and could only have come from Anice Kasim's settlement" (internal citation omitted)); *id.* ¶¶ 173-80 (describing transfer of funds from the GK operating account and client trust account to Hatcher/WDC, and alleging that funds were "stolen from the Lion Air Clients"); *id.* ¶ 291 ("Between March and December 2020, Griffin received a salary from Girardi Keese. The money used to fund Griffin's salary was obtained from funds held

in trust for the Lion Air Clients by Girardi Keese in a manner constituting theft, which fact Griffin knew at all relevant times."). While this case may require more fulsome forensic accounting during discovery and to prove liability at trial, the allegations in the Complaint are sufficient to support the reasonable inference that Hatcher/WDC, the EG Defendants, and Griffin received specific funds that belonged to the Lion Air Clients.

The Complaint likewise plausibly alleges that both Hatcher and Erika knew that the money they received was stolen. Hatcher knew that the referral and fee-sharing arrangements he had with GK were illegal. *Id.* ¶¶ 55-58. He knew that GK sometimes paid him directly from the firm's client trust account, and he knew that the firm's operating account was not always solvent. *Id.* ¶ 172. He knew that the series of $50,000 checks he received between March and August 2020 were "*in addition* to the illegal one-third cut of the [Lion Air] fee that he was promised," that "he was not legally entitled to $50,000 of any Girardi Keese client's money, and was therefore not legally entitled to be paid from any client trust account," that some checks were indeed paid directly from the client trust account, and that the Lion Air Clients had not yet been paid their full settlement money. *Id.* ¶¶ 172-78; *id.* ¶ 197 (Hatcher acknowledging in November 2020 that the Lion Air Clients had not yet been fully paid). These allegations are neither "conclusory" nor "implausib[le]." Dkt. 167 at 22.

Erika knew that the $25 million in "credit card bills and invoices that she submitted to Girardi Keese related to her own personal expenses [] had no connection

whatsoever with the law firm." Compl. ¶¶ 60-62. As stated above, the Complaint also plausibly alleges that "Erika had specific knowledge that her financial arrangement with Girardi Keese was inappropriate and needed to be hidden from creditors," *id.* ¶ 73. Erika signed agreements with California Attorney Lending which support the reasonable inference that "Erika had actual and specific knowledge that she and Tom were on the hook for significant debt and that a lender had to be paid in full before her and Tom took any more money from Girardi Keese." *Id.* ¶ 92. Finally, the Complaint alleges that Erika was served with subpoenas regarding her assets and an attachment order in 2020, making her "increasingly aware that the money was drying up and that creditors were circling her." *Id.* ¶¶ 221-25. Based on these facts, Plaintiff's claim that the EG Defendants "accepted payment of the American Express balances . . . with the knowledge that the funds used to make those payments had been obtained in a manner constituting theft," *id.* ¶ 297, is "[]supported by adequate factual allegations." Dkt. 166 at 28.

The Court should deny both Hatcher/WDC's and the EG Defendants' motions to dismiss Counts 3-4, and Griffin's motion to the extent he successfully joined.

### E.   Plaintiff Adequately Alleges Conversion Claims Against Hatcher, WDC, and Griffin

Hatcher/WDC and Griffin move to dismiss Count 6 of the Complaint for the same reasons as Counts 3-4. *See* Dkt. 167 at 20-22; Dkt. 171 at 5. For all the same reasons stated above, Plaintiff adequately states a claim for conversion because the Complaint alleges that Hatcher/WDC and Griffin intentionally sought illegal

payments or salaries from GK with the knowledge that they would be paid with money belonging to the Lion Air Clients. *See Duke v. Superior Ct.*, 18 Cal. App. 5th 490, 501 (2017) ("The elements of conversion are (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." (internal quotation marks omitted)). The Court should therefore deny the motion to dismiss Count 6.

### F.   Plaintiff Adequately Alleges an Unfair Business Practices Claim Against CAL II and Griffin

Defendant CAL II, joined by Griffin, moves to dismiss Count 7 of the Complaint, which alleges unfair and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq*. CAL II makes only one argument in support of dismissing the claim: "there is nothing in CAL II's creditor relationship with Girardi Keese that constitutes 'fee sharing' prohibited by the Rules" because Girardi Keese's obligation to repay the loan was "absolute and unconditional, and required the firm to repay the entire amount borrowed." Dkt. 163 at 27-28. But including an unconditional obligation to repay in the promissory note does not immunize CAL II from a § 17200 claim.

Cal. Bus. & Prof. Code § 17200 provides a right of action to people injured by unlawful, unfair, or fraudulent business acts or practices. "The unlawful prong of [§ 17200] borrows violations of other laws and treats them as independently actionable." *Drakeford v. Cap. Benefit, Inc.*, No. 20-CV-04161-WHO, 2022 WL 2643984, at *7 (N.D. Cal. July 8, 2022) (internal quotation marks omitted). Violations of the

California Rules of Professional Conduct can serve as the basis for § 17200 claims. *See People ex rel. Herrera v. Stender*, 212 Cal. App. 4th 614, 632 (2012). "The unfair prong requires proving either (1) a practice that offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and that is tethered to specific constitutional, statutory or regulatory provisions; or (2) that the utility of the defendant's conduct is outweighed by the gravity of the harm to the alleged victim." *Drakeford*, 2022 WL 2643984, at *7 (cleaned up).

Here, Plaintiff has stated claims for both unlawful and unfair business practices. The Complaint alleges that DiNardo had "actual knowledge" by 2019 that GK was "misappropriating client settlement funds and improperly exercising control over funds held in its client trust account." Compl. ¶ 88. Nevertheless, CAL II continued to offer additional loans to GK, provided that CAL II "would receive 50% of the attorneys' fees from various cases when they settle, including from the Lion Air Clients" and that "the settling defendants in the covered cases [would] wire [CAL II's] 50% portion of the attorneys' fees directly to California Attorney Lending." *Id.* ¶ 93.[5] That payment structure falls squarely within the fee-sharing conduct prohibited

---

[5]     The facts presented in the Declaration of Paul Cody in Support of California Attorney Lending II, Inc.'s Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim, dkt. 164, along with the two exhibits attached to the Declaration, dkts. 164-1, 164-2, are not alleged in the pleadings. As such, notice must be given to the parties pursuant to Fed. R. Civ. P. 12(d) if the court decides to consider these materials. Fed. R. Civ. P. 12(d).

by Rule 5.4(a) of the Rules of Professional Conduct. CAL II argues that GK's *total* obligation to CAL II was "absolute and unconditional," but that does not change the fact that GK agreed to share 50% of its fees from the Lion Air case—not 50% of the firm's "accounts receivable" or revenues or profits. The payment structure is also significant because, when GK had a shortfall of funds, it meant that CAL II got paid before the clients did. And as alleged in the Complaint, CAL II knew that this was a very real possibility. *See, e.g.*, Compl. ¶¶ 93-94.

CAL II's loan agreement with GK was also unfair because it offends public policy, and the utility of its conduct is far outweighed by the harm to victims like the Lion Air Clients. Rule 5.4 "addresses the risk posed by the possibility of control by a non-lawyer more interested in personal profit than the client's welfare." *Matter of Gordon*, No. 12-O-15516, 2018 WL 5801495, at *6 (Cal. Bar Ct. Oct. 31, 2018), *publication ordered*, No. 12-O-15516, 2019 WL 2108090 (Cal. Bar Ct. Jan. 30, 2019); *see also Gassman v. State Bar*, 18 Cal. 3d 125, 132 (1976) ("[P]articipation in an illegal fee-splitting arrangement . . . posed serious danger to the best interests of his clients, and warrants discipline in and of itself. Prohibited fee-splitting between lawyer and layman . . . poses the possibility of control by the lay person, interested in his own profit rather than the client's fate[.] That very possibility has been realized here." (internal citations and quotation marks omitted)). CAL II's conduct violated the public policy behind Rule 5.4, and did indeed result in putting CAL II's own profit above the interests of the Lion Air Clients. Certainly the utility

of CAL II receiving more prompt repayment on a loan—issued to a firm that CAL II knew had missed loan payments and misappropriated client funds before—is far outweighed by the gravity of the harm to the Lion Air Clients.

Therefore, nothing in CAL II's or Griffin's motions refutes the validity of Plaintiff's § 17200 claim. The Court should deny the motions to dismiss Count 7.

### G.    Plaintiff Adequately Alleges a CLRA Claim Against CAL II and Griffin

CAL II, joined by Griffin, moves to dismiss Plaintiff's CLRA claim on two grounds: (1) CAL II's loans to GK are not "goods or services" within the statute, and (2) failure to state a plausible claim for unconscionability. Neither of these arguments justify dismissal of Plaintiff's CLRA claim.

The CLRA makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code §1770. The CLRA defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1761(b). CAL II argues that "the CLRA is wholly inapplicable to CAL II's business loan to Girardi Keese" because it is not a good or service within the statute. Dkt. 163 at 29. But CAL II's conclusory statement is not supported by the law.

Three considerations support the conclusion that CAL II's loan to Girardi Keese constitutes a "service" under the CLRA: First, the CLRA must be "liberally

construed" to promote the purpose of protecting consumers. Cal. Civ. Code § 1760; *Underwood v. Future Income Payments, LLC*, No. SACV171570DOCDFMX, 2018 WL 4964333, at *12 (C.D. Cal. Apr. 26, 2018). Second, "California courts generally find financial transactions to be subject to the CLRA." *Hawthorne v. Umpqua Bank*, No. 11-CV-06700-JST, 2013 WL 5781608, at *10-11 (N.D. Cal. Oct. 25, 2013) (holding that "debit cards are a 'service' for purposes of the CLRA."). And third, CAL II provided Girardi Keese with services that went beyond merely extending a line of credit. *Underwood*, No. 2018 WL 4964333, at *13 ("financial loans can constitute a 'service' under the CLRA" when the defendant provides additional services such as "develop[ing] and secure[ing] a plan to maintain the plaintiff's loan."); *Gaines v. Home Loan Ctr., Inc.*, No. SACV08667AHSRNBX, 2010 WL 11506442, at *22 (C.D. Cal. May 24, 2010) (finding that "loan closing services such as appraisals, FICO credit reports, and the use of notaries" are services within the CLRA). Specifically, CAL II developed and secured a plan to maintain Girardi Keese's loan by, among other things, "impos[ing] strict financial reporting obligations on the firm." Compl. ¶ 88; *Underwood*, No. 2018 WL 4964333, at *13.

CAL II's substantive argument fails for all the same reasons discussed above. Its agreement with GK was both illegal and unconscionable—particularly in light of CAL II's knowledge that GK had misappropriated client funds before. *See* Cal. Civ. Code § 1770(a)(19) (proscribing "[i]nserting an unconscionable provision in the contract"); *id.* § 1770(a)(26) (proscribing "selling a financial product that is illegal

under state or federal law").

In any event, if the Court is inclined to dismiss Plaintiff's CLRA claim for for failure to plead facts sufficient to establish that CAL II's loan to Girardi Keese is a "service" under the CLRA, Plaintiff respectfully requests leave to amend the Complaint. *Rex v. Chase Home Fin. LLC*, 905 F. Supp. 2d 1111, 1156 (C.D. Cal. 2012) (granting leave to amend "to include allegations indicating that [d]efendants' interaction with [p]laintiffs . . . went beyond the creation of an 'obligation to pay money.'").

Therefore, the Court should deny CAL II's and Griffin's motions to dismiss Plaintiff's CLRA claim or, in the alternative, should grant leave to amend.

## H. Plaintiff Adequately States a Claim for Money Had and Received

CAL II and DiNardo also argue that Plaintiff fails to state a claim for Money Had and Received. *See* Dkt. 161 at 12; Dkt. 163 at 23. Under California law, "[t]his common count is available in a great variety of situations and lies wherever one person has received money which belongs to another, and which in equity and good conscience should be paid over to the latter." *Gutierrez v. Girardi*, 194 Cal. App. 4th 925, 937 (2011) (internal citations and quotations omitted); *see also Rotskoff v. Cooley*, No. 05-cv-0314-AG, 2008 WL 11342739, at *2 (C.D. Cal. Apr. 21, 2008) ("This theory is available in a great variety of situations, including those where plaintiffs seek to recover money paid under mistake, fraud, or coercion where no contractual relationship is involved." (internal quotation marks omitted)). "Where, as

here, the defendant allegedly misappropriates the proceeds of a settlement that belong to the plaintiff, the plaintiff can maintain a money had and received cause of action." *Girardi*, 194 Cal. App. 4th at 937 (holding that the plaintiff had a money had and received claim against Tom Girardi for allegedly stealing his settlement funds).

Here, the money that CAL II and DiNardo received was part of the Lion Air Clients' settlement and so should have been used for the Clients' benefit: paying the attorneys' fees for legal services rendered in obtaining that settlement. The fees portion of the settlement represented a contingent fee, so the clients were only supposed to pay GK if GK actually obtained a recovery for them. But GK never actually gave a large chunk of the settlement—or in the case of Multi Rizki, any of the settlement—to the Lion Air Clients. Accordingly, GK never earned those legal fees, and the Lion Air Clients should not have had to pay them.

DiNardo insists that Plaintiff's claim lacks a "legal principal [sic] obligating DiNardo to remit payment," Dkt. 161 at 15, but he ignores Plaintiff's allegations that CAL II and DiNardo were not entitled to receive any portion of attorneys' fees in this case. For instance, Plaintiff alleges that CAL II and DiNardo knew that GK had misappropriated client funds before, so they knew that was a real risk in the *Lion Air* case. *See* Compl. ¶¶ 88, 93-94, 314. If they knew that GK was again not going to pay the settlement amounts to the clients, then they obtained their portion of the fees by fraud. And even if they did not know, then they obtained the money by mistake of fact (*i.e.*, under the assumption that the Lion Air Clients would receive legal services

that they did not, in fact, receive). Either way, the result is the same: under principles of equity and good conscience, they should not be allowed to keep it. *See Coleman v. Sterling*, No. 09-cv-1594 W BGS, 2011 WL 1668956, at *3 (S.D. Cal. May 3, 2011) ("A claim for money had and received can be based upon money paid by mistake[.]"); *Rotskoff*, 2008 WL 11342739, at *2 ("The theory advanced by [p]laintiffs specifically states a claim for money had and received where fraud is involved, and this theory is supported by the case law.").

At the same time as he demands a legal principle, DiNardo contends that the Money Had and Received claim must fail because no other claims are asserted against him. But in support of that position, he cites only cases stating that Money Had and Received claims should be dismissed if they are duplicative of other dismissed claims asserted against the same defendant. Dkt. 161 at 21. Those cases do not apply here. Moreover, by DiNardo's logic, Money Had and Received claims could never exist at all: if pleaded at the same time as the legal principle underlying it, it has to be dismissed as duplicative, but if pleaded without those principles, it has to be dismissed as insufficient. This contention is plainly gibberish and can be disregarded.

DiNardo also spills a great deal of ink discussing the application of a more restrictive test for money had and received. *Id.* at 13-15. "But this three-element articulation of an action for money had and received is not applicable in a case based on fraud." *Rotskoff*, 2008 WL 11342739, at *2. And to the extent it is necessary to

identify a sum certain for a claim based on mistake, *see*, *e.g*, *Givex USA Corp. v. Spaghetti Warehouse Rests., Inc.*, No. 17-cv-03730-BRO-SSX, 2017 WL 8183140, at *5 (C.D. Cal. Oct. 11, 2017)*, Plaintiff has done so. DiNardo appears to argue that federal notice pleading standards require the complaint to identify the breakdown of how much DiNardo is now holding and how much CAL II is now holding, but that is incorrect. Federal pleading "law does not require plaintiffs to plead the exact dollar amount of a sum certain at the pleading phase. Instead, it is sufficient to plead facts showing that the amount sought is *capable of* being reduced to a sum certain." *Haas v. Travelex Ins. Servs. Inc.*, 555 F. Supp. 3d 970, 982 (C.D. Cal. 2021) (emphasis in original). Here, Plaintiff alleges the total amount of attorneys' fees paid to GK, that 50% was wired directly to CAL, and that DiNardo kept a portion of it. *See* Compl. ¶¶ 287, 316, 327, 333. Bank records will easily enable calculation of the breakdown, and no more is required at the pleading stage.[6]

Finally, as far as the statute of limitations is concerned, CAL II and DiNardo incorrectly argue that the statute of limitations for money had and received is always two years from the date of the receipt of the funds. In fact, "[t]he statute of limitations that applies to a cause of action for money had and received is determined on the basis of the underlying tort." *Ringler Ins. Agency v. Atlas Settlement Grp., Inc.*, No.

---

[6]   DiNardo's arguments regarding veil-piercing, dkt. 161 at 22-25, are also irrelevant. Plaintiff's claims do not seek to hold DiNardo liable for the actions of CAL II but rather for his own inequitable receipt of the Lion Air Clients' money.

09-cv-597-DOC-MLGX, 2010 WL 11596114, at *3 (C.D. Cal. May 3, 2010) (citing *Fabricon Prods. v. United Cal. Bank*, 264 Cal. App. 2d 113 (1968)). "California courts [] therefore have applied different statutes of limitations to identically named causes of action for money had and received." *Id.* Where a cause of action for money had and received arises out of fraud or mistake, the statute of limitations is three years not two. *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1670 (1992); *ChinaCast Educ. Corp. v. Chen Zhou Guo*, No. 15-cv-05475-AB (EX), 2016 WL 6645792, at *5 (C.D. Cal. June 3, 2016). This cause of action arises out of fraud and Plaintiff filed this lawsuit well within the applicable three-year statute of limitations.

Neither CAL II nor DiNardo has demonstrated that the Money Had and Received claims against them should be dismissed. To the extent that the Court believes that additional facts need to be pleaded, Plaintiff requests the opportunity to do so, particularly with the benefit of additional information that has surfaced in other proceedings about the relationship between CAL II and GK.

## I.     Assignment of Claims Does Not Extinguish Them

As a final point on the Rule 12(b)(6) motions, several of the Defendants make the bizarre argument that the Lion Air Clients' assignment of their claims to Edelson PC somehow extinguishes them. Two of the defendants who make this argument, WDC and George Hatcher, contend that an assignment of rights for value necessarily extinguishes the assignor's claim. Dkt. 167 at 22-23. If this were true, assignments for value would be impossible, because the act of giving money to the assignor would

make the assignment worthless. Indeed, the only case cited by WDC holds that "[t]he California rule is that a chose in action is presumptively assignable" and that a party resisting the validity of an assignment cannot prevail if they "have shown no good reason why they should be excepted from its application." *Bush v. Superior Ct.*, 10 Cal. App. 4th 1374, 1378 (1992). The fact that the Lion Air Clients received consideration for their assignment of rights has no impact whatsoever on the continued validity of the assigned claims. *See also* Dkt. 1362, *In re Lion Air Flight JT 610 Crash*, No. 18-cv-7686 (N.D. Ill. Apr. 6, 2022) (approving Edelson PC's assignment agreement with Lion Air Clients).

CAL II, joined by WDC and Hatcher, offers a slightly more nuanced, but no less wrong, version of this argument. According to these Defendants, the California doctrine of equitable subrogation prevents Edelson from asserting its rights as an assignee. Dkt. 163 at 19-22; Dkt. 167 at 23. Under that doctrine, an assignee who is also a surety by operation of equity can only assert claims against a third party if the third party "is guilty of some wrongful conduct which makes the party's equity inferior to that of the surety or insurer." *AMCO Ins. Co. v. All Sols. Ins. Agency, LLC*, 244 Cal. App. 4th 883, 898 (2016). However, the complaint contains no allegations to support the theory that Edelson was a surety who had agreed to take responsibility for Girardi Keese's malfeasance. Even if Edelson were a surety, CAL II fails to apply the relevant test, and it has now waived the opportunity.

First, "the principles of equitable subrogation do not extend to situations where

the contractual assignee was not a surety and does not occupy the role of potential equitable subrogee." *Id.* at 901. According to CAL II, Edelson was a surety based on principles in the Restatement (Third) of Suretyship & Guaranty. However, it fails to account for the California statute governing sureties, which provides that "[a] surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." Cal. Civ. Code § 2787. The only allegation CAL II points to in the complaint that could even hypothetically support the position that Edelson promised to answer for the misconduct of GK is the existence of a co-counsel arrangement. But a co-counsel arrangement does not require attorneys at different firms to agree to bear responsibility for each other's actions. Ill. R. Prof'l Conduct 1.5(e)(1) (providing that fees may be shared between lawyers at different firms without the lawyers assuming joint financial responsibility for the representation). Indeed, after a three-day evidentiary hearing on the matter, the judge overseeing the *Lion Air* case concluded that the "realm of potential risk the Edelson firm reasonably perceived is not so great that the Court could find that the Edelson firm or any of its attorneys bears any responsibility for the clients' potential losses." *In re Lion Air*, 2022 WL 16635552, at *5. At this stage, the Court cannot conclude that Edelson agreed to be responsible for GK's conduct.

  Even if Edelson were a surety, CAL II could only avoid liability if it were in an equitably superior position to Edelson. *See AMCO*, 244 Cal. App. 4th at 901 & n.7 (holding that plaintiff was not a surety and that even if it was, its assignment

remained valid because its position was equitable superior to the defendants'). CAL II does not attempt to argue that it is in an equitably superior position and has thus forfeited the opportunity to make that argument for the first time on reply. In fact, Edelson is in an equitably superior position here. Before making the loan that the *Lion Air* money paid back, CAL II had full visibility into GK's finances and actual knowledge that GK was stealing from clients. Compl. ¶ 88; *see also* Dkt. 164-1 at 8 (confirming the accuracy of Edelson's allegation that GK was required to provide monthly bank statements to CAL II). That's probably why it insisted on direct payment from Boeing. Edelson, by contrast, "never had any reason to believe that Girardi was perpetrating a massive fraud." *In re Lion Air*, 2022 WL 16635552, at *5.

At this stage, the Court cannot conclude as a matter of law that Edelson's position is equitably inferior to that of CAL II such that it is not entitled to enforce its assignment. If the Court disagrees, Edelson requests the opportunity to amend its complaint to allege matters it has learned since filing, including CAL II's deep involvement in GK's fraud as alleged in the complaint filed by the Girardi Keese Chapter 7 Trustee after this action was filed. *See* Dkt. 1, *Miller v. Counsel Fin. Servs., Inc.*, No. 2:22-ap-01169-BR, (Aug. 31, 2022).

## IV.    ARGUMENT IN OPPOSITION TO RULE 12(b)(7) MOTIONS

Defendants Wrongful Death Consultants, George Hatcher, Erika Girardi, and EJ Global also move to dismiss under Rule 12(b)(7) for failure to join Tom Girardi and GK as required parties pursuant to Rule 19. *See* Dkts. 166 at 28, 167 at 23. These

motions should be denied because neither Tom nor GK is a necessary party.

The moving party has the burden of proving that dismissal for failure to join is proper. *Ikeda v. San Francisco Firemen Credit Union*, No. 20-CV-08071-TSH, 2021 WL 4776705, at *5 (N.D. Cal. Oct. 13, 2021). When determining whether dismissal is appropriate under Rule 12(b)(7), the court undertakes "three successive inquiries." *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 662 (N.D. Cal. 2020), *aff'd on other grounds*, 17 F.4th 930 (9th Cir. 2021). First, the court must determine whether the non-party should be joined as "necessary" under Rule 19(a). *Id.* at 663. Second, if a nonparty is necessary, the court determines "whether it is feasible to order that the absentee be joined." *Id*. Third, "if joinder is not feasible, the court must determine whether the party is 'indispensable' under Rule 19(b), that is, whether 'in equity and good conscience, the action should proceed among the existing parties or should be dismissed.'" *Id*. (citing Fed. R. Civ. P. 19(b)).

### A.   Tom Girardi and GK are Not Necessary Parties Under Rule 19(a)

#### 1.   The Court Can Accord Complete Relief Among Existing Parties Without Joining Tom and GK

"Finding a party to be necessary under Rule 19(a)(1)(A) requires the court to determine that 'complete relief' cannot be accorded between the existing parties absent the joinder of the nonparty." *WhatsApp*, 472 F. Supp. 3d at 678. "Complete relief" means that the existing parties can get "consummate rather than partial or hollow relief" without multiple lawsuits on the same cause of action. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir. 1983). As alleged RICO

co-conspirators, Defendants Hatcher, WDC, Erika, and EJ Global (and Lira and Griffin) are all jointly and severally liable to Plaintiff; Tom and GK would be as well, if joined. *Oki Semiconductor*, 298 F.3d at 775 (RICO conspirators are jointly and severally liable for the acts of their co-conspirators). It has long been the rule that nonparties who are also jointly and severally liable are not necessary parties because a Plaintiff can recover complete relief from any defendants already in the action. *Ward v. Apple Inc.*, 791 F.3d 1041, 1049 (9th Cir. 2015), *abrogated on other grounds by Sperring v. LLR, Inc.*, 995 F.3d 680, 682 (9th Cir. 2021); *Andrade v. Station Casinos LLC*, No. 20-CV-06495-EMC, 2021 WL 4441990, at *2 (N.D. Cal. Mar. 22, 2021) ("A plaintiff is not required to sue all co-conspirators in conspiracy; the plaintiff is not even required to sue the 'central player' in the conspiracy."). Therefore, Tom and GK are not necessary parties.

Defendants' arguments to the contrary make little sense. First, the EG Defendants argue that Tom and GK are necessary parties as "joint oblig[or]s."[7] Dkt. 166 at 29. But this is incorrect because RICO co-conspirators are jointly *and severally* liable, and joint obligors are generally not necessary or indispensable parties

---

[7]     These Defendants write that Tom and GK are necessary as "joint *obligees*" because they "are responsible for the malfeasance and the debts alleged in the Complaint." Dkt. 166 at 29 (citing *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 991 (9th Cir. 1994) (emphasis added)). Plaintiff assumes that they meant to argue that Tom and GK are joint *obligors* (those required to provide a benefit, such as debtors), since it would make little sense to argue that Tom and Girardi Keese are *obligees* (those entitled to receive a benefit, such as creditors).

under Rule 19. *Travelers Prop. Cas. Co. of Am. v. Levine*, No. 17-CV-07344-LB, 2018 WL 3377692, at *2 (N.D. Cal. July 11, 2018).

In addition, Hatcher and WDC argue that "because this case includes defendants that are former employees of GK and Thomas Girardi, California Labor Code § 2802(a) renders the GK law firm and Girardi indispensable parties." Dkt. 167 at 24. This is incorrect for two reasons. First, "a defendant's possible right of reimbursement, indemnity, or contribution against an absent party is not sufficient to make the absent party indispensable to the litigation." *SASCO v. Byers*, No. C 08-5641 JF (RS), 2009 WL 1010513, at *2 (N.D. Cal. Apr. 14, 2009). And in any event, the GK former employees are not entitled to indemnification from their former employer for the alleged acts because they knew the acts to be unlawful. *See* Cal. Lab. Code § 2802 (requiring an employer to indemnify an employee for conduct within the scope of employment *unless* the employee "believed [the conduct] to be unlawful"); *see also Dowie v. Fleishman-Hillard Inc.*, 422 Fed. App'x 627, 629 (9th Cir. 2011). Plaintiff alleges that the former GK employees knew their conduct was unlawful and committed intentional torts and crimes, *see, e.g.*, Compl. ¶¶ 291-93; 303, 321, 353, 354, 360, so they are not entitled to the dismissal of any claims on indemnification grounds. *Dowie*, 422 Fed. App'x at 629 (no right to indemnification where underlying crimes had knowledge or specific intent requirements).[8]

---

[8]     Judge Matthew Kennelly reached the same conclusion when Defendant Lira

### 2. There is No Risk of Impairing the Interests of Absent Parties, Nor Is There a Risk of Exposing an Existing Party to Inconsistent Obligations

For a court to reach a Rule 19(a)(1)(B) analysis, the *absent party*—not an existing party—must claim a legally protected interest in the action. *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999). Defendants present no evidence that Tom or GK claim any such interest. *See generally*, Dkt. 166 at 28-29; Dkt. 167 at 23-24. Even if Tom or GK had claimed an interest, Defendants do not show that Rule 19(a)(1)(B) would apply. Defendants make no arguments that a decision in Tom or GK's absence would "(1) impair or impede [Tom or GK's] ability to protect [their] interest; or (2) expose [an existing party] to the risk of multiple or inconsistent obligations by reason of [their] interest." *WhatsApp*, 472 F. Supp. 3d at 663 (quoting *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1155 (9th Cir. 2002)).

Therefore, neither Rule 19(a)(1)(A) nor 19(a)(1)(B) suggests that Tom and GK are necessary parties here.

### B. It is Not Feasible to Join Tom and GK to this Action Due to the 11 U.S.C. § 362(a) Automatic Stay

Even if Tom and GK were necessary parties under Rule 19(a), it is not feasible to join them because both are undergoing bankruptcy proceedings and are subject to

---

raised a similar argument in *Edelson PC v. Girardi et al*. *See* No. 20 C 7115, 2021 WL 3033616, at *15 (N.D. Ill. July 19, 2021) ("Viewing the allegations in the light most favorable to [plaintiff], Lira's *chance* of indemnification by his employer would not justify a stay" since "[t]he complaint alleges that Lira knew his acts were unlawful" (emphasis added)).

an automatic stay under 11 U.S.C. § 362(a). *Gross Belsky Alonso LLP v. Henry Edelson*, No. C 08-4666 SBA, 2009 WL 1505284, at *5 n.2 (N.D. Cal. May 27, 2009) (nonparty "cannot be joined as a result of its bankruptcy filing[.]"). The EG Defendants contend that "the automatic stay may no longer apply to Mr. Girardi" because "a complaint seeking a denial of discharge under section 727 of the Bankruptcy Code was filed," and "Mr. Girardi defaulted." Dkt. 166 at 29. This argument presumably refers to the bankruptcy court's January 24, 2022 order denying discharge of Tom's debts. *See* Dkt. 16, *In re Girardi*, No. 2:21-ap-01216-BR (Bankr. C.D. Cal. Jan. 24, 2022) (default judgment order denying discharge). However, there is no order from the bankruptcy court suggesting that the stay has been lifted as to Tom, and indeed counsel for the Trustee in Tom's Chapter 7 bankruptcy has advised that the automatic stay is still in place. *See* Declaration of Alexander G. Tievsky ¶ 2.

### C. Rule 19(b) Supports Allowing This Action To Proceed Among the Existing Parties.

Because Tom and Girardi Keese are not necessary parties under Rule 19(a), "the Court need not explore whether [they are] indispensable part[ies] under Rule 19(b)." *Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. C 06-01686 SI, 2007 WL 205068, at *3 (N.D. Cal. Jan. 25, 2007). However, even if they were necessary, the Rule 19(b) factors strongly favor proceeding among the existing parties.

A judgment in this case would pose no risk of prejudice to Tom or Girardi Keese. There is no right to contribution or indemnification for RICO claims, so a finding of liability against any Defendants here would not impose any contribution

obligations on Tom or GK. *See* Fed. R. Civ. P. 19(b)(1)-(2); *Tan v. Quick Box, LLC*, No. 3:20-CV-01082-H-DEB, 2021 WL 2473948, at *6 (S.D. Cal. June 16, 2021). Any judgment in the non-parties' absence would be adequate in that it would settle the entire dispute without the need for piecemeal litigation. *See* Fed. R. Civ. P. 19(b)(3); *Republic of the Philippines v. Pimentel*, 553 U.S. 851, 870 (2008) ("adequacy refers to the public stake in settling disputes by wholes, whenever possible" (internal quotations omitted)). And finally, dismissing this action for nonjoinder of Tom and GK would essentially deny Plaintiff a forum for its claims against the Defendants here, and would immunize those Defendants from accountability for their own unlawful acts. *See* Fed. R. Civ. P. 19(b)(4).

Tom and Girardi Keese are not necessary parties, their joinder is not feasible, and they are not indispensable. Therefore, Defendants' Rule 12(b)(7) motions to dismiss should be denied.

## V. CONCLUSION

For all of the foregoing reasons, the Court should deny each of Defendants' motions to dismiss under Rules 12(b)(6) and 12(b)(7). In the alternative, the Court should grant Plaintiff leave to amend any claims that are dismissed.

Respectfully Submitted,

Dated: February 6, 2023                    By: /s/ J. Eli Wade-Scott

*One of Plaintiff's Attorneys*

1

2

3

4

5

6

7

8

9

Jay Edelson (*pro hac vice*)
jedelson@edelson.com
J. Eli Wade-Scott (*pro hac vice*)
ewadescott@edelson.com
Alexander G. Tievsky (*pro hac vice*)
atievsky@edelson.com
Hannah P. Hilligoss (*pro hac vice*)
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Daniel "Sparky" Abraham (SBN – 299193)
sparky@jubilee.legal
Jubilee Legal
300 E Esplanade Dr., Ste 900
Oxnard, CA 93036
Tel: 805.946.0386
Fax: 805.620.7834

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **LOCAL RULE 11-6.2 CERTIFICIATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff, certifies that this brief complies with the stipulated page limit of 50-pages, granted dkt. 173.

Dated: February 6, 2023                    By: /s/ J. Eli Wade-Scott

*One of Plaintiff's Attorneys*