Steven D. Park (SBN 215219)
  *spark@parklawless.com*
Vincent Tremonti (SBN 301571)
  *vtremonti@parklawless.com*
**PARK LAWLESS & TREMONTI LLP**
555 West Fifth Street, 35th Floor
Los Angeles, CA 90013
Telephone:  (213) 640-3770
Facsimile:   (213) 640-3015

Damian J. Martinez (SBN 200159)
  *damian.martinez@aalrr.com*
**ATKINSON, ANDELSON, LOYA, RUUD & ROMO**
201 S Lake Avenue, Suite 300
Pasadena, CA 91101-4811
Telephone:  (626) 583-8600
Facsimile:   (626) 583-8610

Attorneys for Defendant
CHRISTOPHER KAMON

# UNTIED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| EDELSON PC, an Illinois professional corporation,<br><br>        Plaintiff,<br><br>        vs.<br><br>DAVID LIRA, an individual, KEITH GRIFFIN, an individual, ERIKA GIRARDI a/k/a ERIKA JAYNE, an individual, EJ GLOBAL, LLC, a California limited liability company, CHRISTOPHER KAMON, an individual, GEORGE HATCHER, an individual, WRONGFUL DEATH CONSULTANTS, a California corporation, JOSEPH DINARDO, an individual, CALIFORNIA ATTORNEY LENDING II, INC., a New York corporation,<br><br>        Defendants. | CASE NO.: 2:22-cv-08787-JFW-MAA<br><br>**DEFENDANT CHRISTOPHER KAMON'S NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS**<br><br>Hearing Date:   March, 20, 2023<br>Time:             1:30 p.m.<br>Judge:           Hon. John F. Walter<br>Courtroom:     7A |

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

YOU ARE HEREBY NOTIFIED that on March 20, 2023, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 7A, located at the United States Courthouse, 350 West First Street, Los Angeles, California 90012, Defendant Christopher Kamon, by and through his counsel, will and hereby does move this Court to stay proceedings in the above-captioned civil case (the "Civil Case") pending resolution of (i) *United States v. Thomas Girardi, et al.*, U.S. District Court, N.D. Illinois, Case No. 1:23-cr-00054 ("Illinois Criminal Case"); (ii) *United States v. Christopher Kamon*, U.S. District Court, C.D. California, Case No. 2:23-cr-00024 ("First California Criminal Case"), and (iii) *United States v. Thomas Vincent Girardi, et al.*, U.S. District Court, C.D. California, Case No. 2:23-cr-00047 ("Second California Criminal Case", and collectively with the First California Criminal Case and Illinois Criminal Case, "Criminal Cases").

This motion is based upon the attached memorandum of points and authorities, the concurrently filed Request for Judicial Notice (and the exhibits thereto) filed herewith, the files and records in this case, and such additional evidence and argument as may be presented at the hearing of this motion.

This motion is made following conferences of counsel pursuant to L.R. 7-3, which took place on February 2, 2023 and February 3, 2023. There is no substantive opposition to this motion but some of the Parties have raised potential procedural issues, which are outlined in the Joint Report of Local Rule 7-3 Conference. (Dkt. 176.) Specifically, Defendants Erika Girardi, EJ Global, LLC, Joseph DiNardo, and California Attorney Lending II, Inc. could not agree to stipulate to an immediate stay of this case because their motions to dismiss in this matter are currently set for hearing on February 27, 2023. Defendant California Attorney Lending II, Inc. ("CAL II"), states that it will oppose the aforementioned motions to stay to the extent that they would prevent the timely consideration of

CAL II's pending motion to dismiss because (i) the causes of action presently pled against CAL II cannot be maintained, even after amending the pleading, and (ii) after conferring with Edelson PC ("Plaintiff") regarding CAL II's opposition to the motion to stay, Plaintiff has not identified a non-frivolous alternate cause of action that might be pled against CAL II. These Defendants would, however, agree to a stay that becomes effective after their motions to dismiss are determined.

Plaintiff will not oppose a stay of this action, but cannot agree to a piecemeal stay. In the event that any Defendant intends to continue the litigation—whether through the motions to dismiss or otherwise—Plaintiff will insist on timely discovery productions to ensure that the case progresses as ordered by the Court. (*See* Standing Order, ¶ 4(b) ("Counsel shall begin to actively conduct discovery before the Fed. R. Civ. P. 26(f) conference because at the Scheduling Conference the Court will impose tight deadlines to complete discovery.")

DATED: February 10, 2023          ATTORNEYS FOR CHRISTOPHER KAMON


By: /s/ Steven D. Park
Steven D. Park
Vincent F. Tremonti
PARK LAWLESS & TREMONTI LLP
555 West Fifth Street, 35th Floor
Los Angeles, CA 90013
Telephone:      (213) 640-3770
Facsimile:      (213) 640-3015

Damian J. Martinez
ATKINSON, ANDELSON, LOYA, RUUD & ROMO
201 S Lake Avenue, Suite 300
Pasadena, CA 91101-4811
Telephone:      (626) 583-8600
Facsimile:      (626) 583-8610

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STAY PROCEEDINGS</u>

### I.    INTRODUCTION

Given the factual and legal overlap, the Court should stay this Civil Case pending the outcome of the Criminal Cases.

Both the United States of America and the Plaintiff in this action are pursuing parallel actions filed against Christopher Kamon, David Lira, and others, alleging that "[Thomas] Girardi, Kamon and [David] Lira knowingly misappropriated and caused to be misappropriated settlement funds belonging to the [Lion Air] Client Victims by diverting those funds or causing those funds to be diverted from [Girardi & Keese]'s IOLTA account for improper purposes." *See* Indictment, at ¶ 3, attached hereto as Exhibit 1; see also Civil Case Complaint, at ¶ 15 ["Girardi Keese appeared to have stolen the settlement monies of the families . . . [of the] crash of Lion Air Flight JT 610."].) The Illinois Criminal Case and the Civil Case involve the same claims and individuals and will be supported by the same evidence and witnesses. Similarly, the First California Criminal Case and the Second California Criminal Case will be supported by the same evidence and witness because it relates to Mr. Kamon's activities related to Girardi & Keese. Accordingly, the Court should stay the Civil Case pending the outcome of the Criminal Cases.

<u>First</u>, proceeding with the Civil Case would force Mr. Kamon, Mr. Lira, and likely other defendants—as identified by the U.S. Government as "GK Lawyer A" and "Lender A", see Indictment, at ¶ 1(c)-(d)—to choose between setting aside their Fifth Amendment rights, on the one hand, or invoking those rights, but then suffering the adverse evidentiary inferences that accompany such silence in civil litigation.

<u>Second</u>, because of Mr. Kamon's continued incarceration in the Metropolitan Detention Center, he is effectively precluded from any meaningful

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

participation in the preparation of his defense. And the continued media attention on Mr. Kamon's integrity in the civil case could result in a biased jury in the Criminal Proceeding and affect his due process rights.

Third, discovery in the Civil Case could turn into an unfair, unbalanced affair if Mr. Kamon, Mr. Lira, and other defendants invoke their Fifth Amendment rights. These defendants would be entitled to take affirmative civil discovery but likely required to stand silent when the Plaintiff seeks answers about their conduct in order to preserve their Fifth Amendment rights. Plaintiff's discovery would, therefore, largely consist of negative inferences based on Mr. Kamon, Mr. Lira, and other defendants' assertion of their Fifth Amendment rights.

Fourth, judicial efficiency weighs in favor of granting a stay. If a civil action is stayed until the conclusion of the criminal proceedings, then it obviates the need to make rulings regarding potential discovery disputes involving the invocation of the Fifth Amendment and other issues that may affect the criminal case.

Finally, the rights of non-parties are not directly or indirectly implicated or involved in the present case. With regard to public interest, advancing the Criminal Cases should take precedence over the Civil Case primarily because the public interest is in maintaining the integrity of the Criminal Cases, which implicates Mr. Kamon's liberty interest.

## II.    RELEVANT FACTS

On February 1, 2023, an indictment was filed in the U.S. District Court for the Northern District of Illinois against Mr. Girardi, Mr. Kamon, Mr. Lira, "GK Lawyer A", and "Lender A", alleging that "Girardi, Kamon and Lira knowingly misappropriated and caused to be misappropriated settlement funds belonging to the [Lion Air] Client Victims by diverting those funds or causing those funds to be diverted from [Girardi & Keese]'s IOLTA account for improper purposes." *See* Indictment, at ¶ 3, attached hereto as Exhibit 1.

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

In *Edelson PC v. Thomas Girardi, et al.*, U.S. District Court, N.D. Illinois, Case No. 1:20−cv−07115—which is another civil action similar to this Civil Case between Plaintiff, on the one hand, and Mr. Lira and other defendants, on the other—the U.S. District Court for the Northern District of Illinois issued a tentative stay. *See* Minute Entry, attached hereto as Exhibit 2.

Additionally, on January 24, 2023, a waiver of indictment was filed in the U.S. District Court for the Central District of California pertaining to Mr. Kamon. *See* Waiver of Indictment/Information, attached hereto as Exhibit 3. The Information in the First California Criminal Case was returned against Mr. Kamon. The First California Criminal Case also involves allegations against Mr. Kamon relating to Girardi & Keese.

Moreover, on January 31, 2023, another indictment was filed against Mr. Girardi and Mr. Kamon in the Second California Criminal Case. The United States of America filed a notice of related cases indicating that the First California Criminal Case and the Second California Criminal Case indicating that "the cases arise out of the same conspiracy, common scheme, transaction, series of transactions or events". *See* Notice to Court of Related Criminal Case, attached hereto as Exhibit 4.

The three Criminal Cases and the Civil Case arise out of allegations that individuals and entities misappropriated funds that were held in trust for Girardi & Keese's clients. Some of the same defendants and relevant allegations that reveal the significant overlap between these cases are below:

| Criminal Case Allegations | Civil Case Allegations |
|---|---|
| "Defendant DAVID R. LIRA was a lawyer who worked at GK." <br><br> Indictment, Count One, at 1(b).¶ | "Lira was a partner at Girardi Keese until May 2020. . . ." <br><br> Civil Case Complaint, at ¶ 27. |
| "Defendant CHRISTOPHER K. KAMON was employed as GK's head | "Kamon served as Girardi Keese's Chief Financial Officer. . . ." Civil |

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

| | |
|---|---|
| of accounting and finance." Indictment, at 1(c). | Case Complaint, at ¶ 29. |
| "GK Lawyer A was a lawyer who worked at GK." Indictment, at 1(d). | "Griffin was an attorney at Girardi Keese." Civil Case Complaint, at ¶ 28. |
| "Lender A was a litigation financing firm. GK and GIRARDI owed Lender A approximately $8 million for amounts that Lender A loaned to GK, which GIRARDI had personally guaranteed." Indictment, at 1(e). | "California Attorney Lending and Girardi Keese entered into a promissory note on November 8, 2019 by which California Attorney Lending loaned Girardi Keese the principal amount of $8,000,000." Civil Case Complaint, at ¶ 307. |
| "It was part of the scheme that GIRARDI, KAMON, and LIRA knowingly misappropriated and caused to be misappropriated settlement funds belonging to the Client Victims by diverting those funds or causing those funds to be diverted from OK's IOLTA account for improper purposes." Indictment, Count One, at 3. | The Girardi Family Enterprise never intended to safeguard the Lion Air Clients' settlement funds in the Girardi Keese client trust account. Instead, the Girardi Family Enterprise agreed to systematically steal the funds and use them to cover payroll, firm expenses, payments to clients whose money the firm had previously stolen, outstanding bills to lenders, and Erika's credit cards and invoices. Civil Case Complaint, at ¶ 102-103. |
| It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently misappropriated millions of dollars of the Client Victims' settlement funds from the IOLTA account by preparing checks from that account payable to GK and causing those checks to be deposited into one of GK's business accounts. Indictment, Count One, at 4. | Kamon deposited each of the checks . . . into Girardi Keese's operating account at Nano Banc on or about the date the check was written. Kamon deposited the checks via an internet-based merchant capture deposit system by which he used wires to transmit check information to Nano Banc in interstate commerce. At the time the checks listed in Tables 1 and 2 were deposited, both Kamon and the persons signing the checks knew that the money used to pay the checks would come from the *Lion Air* settlement funds. Civil Case Complaint, at ¶ 114-115. |

## III.  LEGAL STANDARD

It is well established that a court may stay a civil action pending resolution of a criminal investigation or action when the interests of justice require such a

7

1    stay order. "[A] court may decide, in its discretion, to stay civil proceedings,

2    postpone civil discovery, or impose protective orders and conditions 'when the

3    interests of justice seem . . . to require such action, sometimes at the request of the

4    prosecution, . . . sometimes at the request of the defense." *SEC v. Dresser*, 628

5    F.2d 1368, 1375 (D.C. Cir. 1980) (quoting *United States v. Kordel*, 397 U.S. 1, 12

6    (1970)); see also *Horne Brothers, Inc. v. Laird*, 463 F.2d 1268, 1271-72 (D.C. Cir.

7    1972). "The Court must make such determinations in the light of the particular

8    circumstances of the case." *Dresser*, 628 F.2d at 1375.

9         A court may issue a stay, even if defendants have not yet been indicted on

10   criminal charges. *eBay, Inc. v. Digital Point Solutions, Inc.*, 2010 WL 702463, at

11   *3 (N.D. Cal. Feb. 25, 2010) ("[C]ourts will not categorically deny a stay solely

12   because the defendant has not yet been indicted.") (quotes omitted); *Taylor, Bean

13   & Whitaker Mortg. Corp. v. Triduanum Fin., Inc.*, 2009 WL 2136986 at *3 (E.D.

14   Cal. July 15, 2009) ("[T]he mere possibility of criminal prosecution is all that is

15   necessary for the Fifth Amendment privilege against self-incrimination to be

16   invoked.") (citing to *Matter of Seper*, 705 F.2d 1499, 1501 (9th Cir.1983)); see

17   also *Delphi Connection v. Koehile Components*, 2012 WL 12895670 (CD. Cal.

18   Oct. 17, 2012) (same).

19        The Ninth Circuit has held that "a court may decide in its discretion to stay

20   civil proceedings when the interest of justice seem to require such action" as they

21   relate to threatened criminal prosecution. *Keating v. Office of the Thrift

22   Supervision*, 45 F.3d 322, 324 (9th Cir. 1995) (quoting *Dresser*, 628 F.2d at 1375).

23   In *Keating*, the Court held:

24        The decision whether to stay civil proceedings in the face of a parallel
         criminal proceeding should be made 'in light of the particular
25        circumstances and competing interests, involved in the case.' [*Federal
         Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902 (9th Cir
26        1989)]. This means the decision maker should consider 'the extent to
         which the defendant's Fifth Amendment rights are implicated.' *Id*. In
27        addition, the decision maker should generally consider the following
         factors: (1) the Interest of the plaintiffs in proceeding expeditiously
28        with this litigation or any particular aspect of it, and the potential

                                              8
                DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

*Keating*, 45 F.3d at 324-25.

As this Court previously noted, "the strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter." *Wimbledon Fund, SPC v. Graybox, LLC*, 2017 WL 11628850, at *4 (C.D. Cal. Jan. 9, 2017).

These factors weigh heavily in favor of a stay.

## IV.   ARGUMENT

### A.   Mr. Kamon's and Other Defendants' Fifth Amendment Rights Are Implicated.

Plaintiff's discovery demands would force Mr. Kamon and other defendants into a Sophie's choice. They could invoke their rights under the Fifth Amendment, but would suffer potentially severe consequences—a negative inference can (and often does) attach to silence in civil proceedings. See, e.g., *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (affirming summary judgment in civil case based largely on defendant's invocation of his Fifth Amendment rights, even when result "may seem harsh"); *Doe v. Glanzer*, 232 F.3d 1258, 1264 (9 th Cir. 2000)(". . . in civil proceedings adverse inferences can be drawn from a party's invocation of this Fifth Amendment right.") To avoid such an adverse inference in the civil case, Mr. Kamon and the other defendants would have to answer questions about precisely the same conduct for which they stand criminally charged or currently investigated to be potentially criminally charged—a result that runs up against their Fifth Amendment rights against self-incrimination. Not staying the Civil Case therefore would create substantial prejudice to Mr. Kamon and the other defendants. See *SEC v. Rampoldi*, 2017 WL 11421536, *2 (S.D. Cal. 2017)

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

(granting a stay where Defendants' Fifth Amendment rights would be implicated during the civil discovery process).

### B. Defending the Civil Case Will Burden Mr. Kamon, which Supports Stay of the Civil Case.

While the substantial implication of Mr. Kamon's Fifth Amendment rights and interests alone outweigh any claimed prejudice to the Plaintiff or to the public from staying this proceeding, the great burden that would be imposed on Mr. Kamon absent the relief requested extends even beyond that implication. Specifically, because of Mr. Kamon's continued incarceration in the Metropolitan Detention Center, he is effectively precluded from any meaningful participation in the preparation of his defense. Per that facility's stringent restrictions on communication with detainees—i.e., telephone communications and emails are monitored and non-confidential, and all mail and deliveries sent or received are scanned for security purposes, delaying receipt or delivery substantially—Mr. Kamon would have to resort to limited and more burdensome and less efficient in-person meetings with his counsel rather than communications by videoconference, phone, or email. See Federal Bureau of Prisons' Program Statement entitled *Legal Activities, Inmate*, at ¶ 10(d)(1), attached as Exhibit 3 ("The legal materials are subject to inspection and may be read or copied unless they are received through an authorized attorney visit from a retained attorney or are properly sent as special mail (for example, mail from a court or from an attorney), in which case they may be inspected for contraband or for the purpose of verifying that the mail qualifies as special mail."); see also Federal Bureau of Prisons' Program Statement entitled Legal Activities, Inmate, at ¶ 10, attached as Exhibit 5.

Additionally, the facility's rules prohibit all access to computers or other electronic devices, which effectively forecloses any possibility that Mr. Kamon could participate in his defense that requires the use of a computer or other electronic devices. See Federal Bureau of Prisons' Program Statement entitled

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

*Legal Activities, Inmate*, at ¶ 12(e), attached as Exhibit 6 ("Ordinarily, the use of any other electronic device (for example, videotape recorders or computers) are not to be permitted.").

Finally, if this case advances undeterred, it is likely to generate continued media attention and possibly a continued assault on Mr. Kamon's professional integrity, which could result in a biased jury in the Criminal Proceeding. See *U.S. v. American Radiator & Standard Sanitary Corp.*, 388 F.2d 201, 204 (3d Cir.1967). The charges against Mr. Kamon have already been the subject of media scrutiny, and it is highly likely that the media's close scrutiny of the case will continue: "[I]n highly publicized cases, such as the one at hand, ... it is especially necessary to guard the rights of defendants, and concern for the public deterrence value of an enforcement proceeding must not be allowed to override the individual defendant's due process rights." *Keating*, 45 F.3d at 326.

In the foregoing circumstances, requiring Mr. Kamon to simultaneously defend this case and the Criminal Proceeding would potentially curtail his due process rights.

## C. The Interests of the Plaintiff Also Support a Stay of the Civil Case.

Here, Plaintiff has advised that it does not intend to oppose this motion except that the stay should not be piecemeal. This is not surprising given that Plaintiff may also suffer significant prejudice if a stay is not issued because Mr. Kamon and the other defendants could take advantage of the broad scope of discovery available to them under the Federal Rules of Civil Procedure, including document requests, interrogatories, depositions (including expert depositions), and third-party subpoenas. At the same time, Mr. Kamon and the other defendants could resist Plaintiff's discovery demands by asserting their Fifth Amendment rights. Other non-party witnesses may also assert their Fifth Amendment rights if noticed for depositions. The wide range of parties and witnesses invoking their

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

Fifth Amendment rights would render civil discovery largely one-sided—"the [plaintiff] would produce scores of documents and witness testimony only to be precluded from gathering reciprocal discovery from the Defendants." *SEC v. Nicholas*, 569 F. Supp. 2d 1065, 1069 (C.D. Cal. 2008); see also *SEC v. Sripetch*, 2021 WL 165012 at *3 (S.D. Cal. 2021).

### D.     Efficient Use of Judicial Resources Supports a Stay of the Civil Case.

Judicial efficiency also weighs in favor of granting a stay. If a civil action is stayed until the conclusion of the criminal proceedings, then it obviates the need to make rulings regarding potential discovery disputes involving the invocation of the Fifth Amendment and other issues that may affect the criminal case. *Moloney v. Gordon*, 328 F. Supp. 2d 508, 513 (D. Del. 2004); *Javier H v. Garcia Botello*, 218 F.R.D. 72, 75 (WD.N.Y. 2003) ("By proceeding first with the criminal prosecution, the Court makes efficient use of judicial time and resources by insuring that common issues of fact will be resolved and subsequent civil discovery will proceed unobstructed by concerns regarding self-incrimination")). Finally, courts can alleviate concerns about a potentially indefinite stay by "allowing the parties to petition the Court to lift or modify the stay if there is a change in circumstances warrant it." *Walsh Securities, Inc. v. Cristo Prop. Mgmt. Ltd.*, 7 F. Supp. 2d 523, 529 (D.N.J. 1998) (citing *Brock v. Tolkow*, 109 F.R.D. 116, 121 (E.D.N.Y. 1985)); see also *Brock*, 109 F.R.D. at 119-20 (In granting the stay the court noted that "the resolution of the criminal case might reduce the scope of discovery in the civil case or otherwise simplify the issues."). Undoubtedly, it is in the interest of the Court and judicial economy to grant the requested stay.

### E.     A Stay Will Advance The Public Interest And Will Not Result In Prejudice To Third-Parties.

The rights of non-parties are not directly implicated or involved in the

present case. With respect to the plaintiffs in the Lion Air matter, their interests are aligned with the Plaintiff because Plaintiff is the assignee of the families that brought the Lion Air matter. *See* Civil Case Complaint, at p. i.

With regard to public interest, advancing the Criminal Cases should take precedence over the Civil Case primarily because the Criminal Cases implicates Mr. Kamon's liberty interest. "Staying the civil case, which carries only civil sanctions and monetary penalties, is not of an equally pressing nature." Nicholas, 569 F. Supp. 2d at 1073. The "public's interest in the integrity of the criminal case is entitled to precedence over the civil litigant." *Graybox*, 2017 WL 11628850, *6. Moreover, both matters advance the same public interest in promoting "the integrity of public markets, efficient punishment of wrongdoers, and deterrence of similar conduct by other corporate officers." *Nicholas*, 569 F. Supp. 2d at 1072. The Criminal Cases, therefore, will advance these interests even if the Civil Case is stayed.

## V.   CONCLUSION

For the foregoing reasons, Mr. Kamon respectfully requests this Court grant its Motion to stay the above-captioned proceedings pending resolution of all of the parallel criminal cases docketed at: (i) *United States v. Thomas Girardi, et al.*, U.S. District Court, N.D. Illinois, Case No. 1:23-cr-00054 ("Illinois Criminal Case"); (ii) *United States v. Christopher Kamon*, U.S. District Court, C.D. California, Case No. 2:23-cr-00024 ("First California Criminal Case"), and (iii) *United States v. Thomas Vincent Girardi, et al.*, U.S. District Court, C.D. California, Case No. 2:23-cr-00047.

DATED: February 10, 2023

ATTORNEYS FOR CHRISTOPHER KAMON


By: /s/ Steven D. Park
Steven D. Park
Vincent F. Tremonti
PARK LAWLESS & TREMONTI LLP

13

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

555 West Fifth Street, 35th Floor
Los Angeles, CA 90013
Telephone:       (213) 640-3770
Facsimile:       (213) 640-3015

Damian J. Martinez
ATKINSON, ANDELSON, LOYA,
RUUD & ROMO
201 S Lake Avenue, Suite 300
Pasadena, CA 91101-4811
Telephone:       (626) 583-8600
Facsimile:       (626) 583-8610

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLAICE

The undersigned, counsel of record for Defendant Christopher Kamon, certifies that this brief contains 4,117 words, which complies with the word limit of L.R. 11-6.1.

DATED: February 10, 2023          ATTORNEYS FOR CHRISTOPHER KAMON


By: /s/ Steven D. Park
          Steven D. Park
          Vincent F. Tremonti
          PARK LAWLESS & TREMONTI LLP
          555 West Fifth Street, 35th Floor
          Los Angeles, CA 90013
          Telephone:       (213) 640-3770
          Facsimile:       (213) 640-3015

          Damian J. Martinez
          ATKINSON, ANDELSON, LOYA,
          RUUD & ROMO
          201 S Lake Avenue, Suite 300
          Pasadena, CA 91101-4811
          Telephone:       (626) 583-8600
          Facsimile:       (626) 583-8610

DEFENDANT KAMON'S MOTION TO STAY PROCEEDINGS

**EXHIBIT 1**

23-CR-54
Judge Guzman
Magistrate Judge Cummings

**FILED**

FEB 0 1 2023 SMB

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEB  1 2023

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. |
| | ) | |
| v. | ) | |
| | ) | Violations: Title 18, United States |
| THOMAS V. GIRARDI, | ) | Code, Sections 1343 and 401(3) |
| CHRISTOPHER K. KAMON, and | ) | |
| DAVID R. LIRA | ) | |

## COUNT ONE

The SPECIAL OCTOBER 2022 GRAND JURY charges:

1.     At times material to this indictment:

*Individuals and Entities Involved*

a.     Defendant THOMAS V. GIRARDI was a lawyer who owned and operated a law firm called Girardi Keese ("GK"). GIRARDI was licensed to practice law in the State of California and was admitted to the general bar of the United States District Court for the Northern District of Illinois.

b.     Defendant DAVID R. LIRA was a lawyer who worked at GK. LIRA was licensed to practice law in the State of California and was admitted to the general bar of the United States District Court for the Northern District of Illinois.

c.     Defendant CHRISTOPHER K. KAMON was employed as GK's head of accounting and finance.

d.     GK Lawyer A was a lawyer who worked at GK.

1

e.    Lender A was a litigation financing firm. GK and GIRARDI owed Lender A approximately $8 million for amounts that Lender A loaned to GK, which GIRARDI had personally guaranteed.

*GK's Bank Accounts*

f.    IOLTA Trust Account: In California, all funds received by a lawyer or law firm for the benefit of a client, including settlement funds, must be deposited into a client trust account at a bank. Such funds can be deposited into a non-segregated trust account known as an "IOLTA" account only if the deposited funds are nominal in amount or are to be held for a short period of time. GIRARDI and LIRA were authorized signatories on an IOLTA account maintained by GK, and LIRA was identified as a "Partner" of GK on that account. KAMON was authorized to initiate wire transfers from GK's IOLTA account, and KAMON had online access to all information regarding that account.

g.    Other Bank Accounts: GK maintained separate checking accounts from which to pay GK's business and operational expenses and its payroll. GIRARDI and KAMON were authorized signatories on those accounts.

*California Rules of Professional Conduct for Lawyers*

h.    Lawyers licensed to practice law in California are required to comply with the California Rules of Professional Conduct ("CRPC").

i.    Under the CRPC, lawyers must: (1) promptly notify their clients when they receive funds in which their clients have an interest; (2) promptly distribute to their clients any undisputed funds that the clients are entitled to receive;

2

and (3) take reasonable remedial measures once they became aware that a person is or was engaged in criminal or fraudulent conduct with respect to a legal proceeding in which the lawyer was involved.

*GK's Representation of Victims of the Lion Air Crash*

        j.      On October 29, 2018, Lion Air Flight 610 crashed in the Java Sea shortly after takeoff from Jakarta, Indonesia. All 189 people on board the aircraft were killed. The aircraft was manufactured by Boeing.

        k.      Victims A through E are relatives of passengers who died in the Lion Air crash.

        l.      GIRARDI, LIRA, and GK Lawyer A, through GK, represented Victims A through E, and certain of their family members, including their minor children (collectively, "the Client Victims"), in lawsuits against Boeing (the "Lion Air cases"). Those lawsuits were filed in Chicago in the United States District Court for the Northern District of Illinois (the "Court"). GK engaged Law Firm A, a law firm based in Chicago, to act as co-counsel in those cases.

        m.      After filing the Lion Air cases, LIRA and GK Lawyer A participated in mediations on behalf of the Client Victims with counsel for Boeing. As a result of those mediations, LIRA and GK Lawyer A recommended to Victims A through D that they and their family members agree to settle their cases with Boeing for an aggregated total of approximately $11,000,000. Victims A through D agreed. Because certain of the Client Victims were minors, those agreements required Court approval.

n.      In or about February and March 2020, the Court issued orders approving each of those settlement agreements. Each of those orders required GK to distribute the settlement funds to Victims A through D and their family members from the IOLTA "as soon as practicable" after receiving those funds from Boeing's counsel.

o.      In or about April 2020, after an additional mediation involving Victim E's case, LIRA and GK Lawyer A recommended to Victim E that he settle his case with Boeing for approximately $1,550,000. Victim E agreed.

p.      After each of the settlement agreements were reached for the Client Victims, the Court entered orders dismissing their respective cases.

q.      On or about the dates set forth below, in the approximate amounts indicated, Boeing's counsel wired settlement funds into GK's IOLTA account pursuant to the terms of the settlement agreements with the Client Victims:

| CLIENT VICTIM | DATE | AMOUNT WIRED INTO GK'S IOLTA | AMOUNT DUE TO CLIENT VICTIM |
|---|---|---|---|
| A | March 4, 2020 | $2,105,000 | $1,710,000 |
| B | March 11, 2020 | $2,530,000 | $2,060,000 |
| C | March 27, 2020 | $2,112,500 | $1,725,000 |
| D | March 30, 2020 | $2,530,000 | $2,060,000 |
| E | June 9, 2020 | $1,317,500 | $1,069,500 |

Those wire transfers were net of GK's attorneys' fees. Specifically, under the terms of the settlement agreements for each of the Client Victims, the attorneys' fees to which GK was entitled were separately wired by Boeing's counsel directly to Lender A as partial payments toward GK's and GIRARDI's $8 million loan from Lender A. As a result, GK was not entitled to retain any attorneys' fees from those settlements.

4

Instead, except for attorneys' fees owed to Law Firm A, any costs incurred by GK (up to 1% of the settlement amount), and any advances that GK had made to the Client Victims, all the funds that Boeing's counsel wired into GK's IOLTA were required to be distributed to the Client Victims, as indicated in the above column labeled "Amount Due to Client Victim."

2. Beginning in or about 2019, and continuing until in or about December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, and others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud the Client Victims and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3. It was part of the scheme that GIRARDI, KAMON, and LIRA knowingly misappropriated and caused to be misappropriated settlement funds belonging to the Client Victims by diverting those funds or causing those funds to be diverted from GK's IOLTA account for improper purposes. Those improper purposes included, among other things: (1) paying GK's business and operating expenses; (2) funding GK's payroll; (3) paying American Express Card bills; and (4) funding settlements to other GK clients, whose own settlement funds previously had been misappropriated by GK. The defendants accomplished the misappropriation of the Client Victims' funds by, among other things, making false statements and causing false statements

5

to be made to the Client Victims regarding the status of their settlement funds, and concealing and causing those misappropriations to be concealed from the Client Victims, Law Firm A, and the Court.

*Misappropriation of the Client Victims' Settlement Funds*

4.     It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently misappropriated millions of dollars of the Client Victims' settlement funds from the IOLTA account by preparing checks from that account payable to GK and causing those checks to be deposited into one of GK's business accounts.

5.     It was further part of the scheme that KAMON caused false descriptions to be written in the memorandum section of those checks, including:

a.     that the misappropriated funds were "fees" owed to GK from the Lion Air cases, when, as the defendants knew, GK was not entitled to retain those funds as fees from those cases; and

b.     that the misappropriated funds were for "miscellaneous case costs," when, as the defendants knew, those funds did not represent expenses relating to any case.

6.     It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently used the Client Victims' funds that had been misappropriated to GK's business account to pay GK's business and operating expenses, to fund GK's payroll, and to pay American Express Card bills.

6

7.      It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently misappropriated additional amounts of the Client Victims' settlement funds from the IOLTA account by preparing checks from that account payable to other clients of GK, whose own settlement funds previously had been misappropriated by GK.

*False Statements about and Concealment of*
*the Misappropriation of the Client Victims' Funds*

8.      It was further part of the scheme that GIRARDI, KAMON, and LIRA fraudulently concealed and caused to be concealed from the Client Victims, Law Firm A, and the Court that GK had received the Client Victims' funds in its IOLTA account and had failed to distribute those funds to the Client Victims as required.

9.      It was further part of the scheme that, in response to repeated inquiries by the Client Victims regarding the status of their funds, GIRARDI, KAMON, and LIRA fraudulently concealed and caused to be concealed from the Client Victims, Law Firm A, and the Court that the Client Victims' funds were being misappropriated.

10.     It was further part of the scheme that GIRARDI, KAMON, and LIRA falsely stated and caused to be stated to the Client Victims that the COVID-19 pandemic prevented and delayed GK from distributing the settlement funds to the Client Victims. In fact, as the defendants knew, GK remained able to process financial transactions into and out of the IOLTA account during the pandemic and the reason the settlement funds could not be promptly distributed to the Client Victims was because those funds were being misappropriated.

7

11. It was further part of the scheme that, on or about April 6, 2020, in response to an email from Victim B to LIRA and GK Lawyer A requesting a "loan" of $40,000, KAMON, at GIRARDI's direction and with LIRA's and GK Lawyer A's knowledge, wired $40,000 to Victim B as a purported "advance." In fact, as the defendants knew, GK previously had received all of Victim B's settlement funds in its IOLTA account, GK was required to distribute those funds to Victim B without conditions and not as a loan or an advance, and the funds were being misappropriated.

12. It was further part of the scheme that, on or about May 14, 2020, GIRARDI emailed a letter to Victim B falsely stating:

> We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%.

LIRA and GK Lawyer A received GIRARDI's letter before it was sent to Victim B, and LIRA reviewed and approved that letter. KAMON received that letter shortly after it was sent to Victim B. Each of the defendants knew that there was no agreement with Boeing that prevented GK from distributing the settlement funds to Victim B until "all of the cases" are resolved, that no "special authorization" was required from Boeing to distribute those funds to Victim B, and that the reason the funds had not been distributed to Victim B was because they were being misappropriated.

13. It was further part of the scheme that, on or about May 14, 2020, GIRARDI emailed a letter to Victim C falsely stating:

8

> I got enough of the problem taken care of so we were able to
> release 50% of the settlement.

LIRA and GK Lawyer A received GIRARDI's letter before it was sent to Victim C,
and LIRA reviewed and approved that letter. KAMON received that letter shortly
after it was sent to Victim C. Each of the defendants knew that there was no
"problem" that prevented GK from distributing the settlement funds to Victim C, and
that the reason the settlement funds had not been distributed to Victim C was
because they were being misappropriated.

14. It was further part of the scheme that, on or about May 19, 2020,
GIRARDI, with the knowledge of KAMON, LIRA, and GK Lawyer A, sent a letter to
Victim D, in which GIRARDI stated, "I think you are going to love me in 30 days,"
falsely implying and promising that GK and GIRARDI would distribute the balance
of Victim D's settlement funds within 30 days and further concealing that those funds
were being misappropriated.

15. It was further part of the scheme that, on or about June 19, 2020,
GIRARDI sent letters to Victims A through D falsely stating:

> There are some serious issues. I have been back east four times
> to get everything resolved. I think I need two more weeks. I
> will insist that, at least, we get the interest in two weeks, if I
> cannot resolve it.

KAMON and GK Lawyer A subsequently received a copy of the letter sent to
Victim D. As each of GIRARDI, KAMON, and GK Lawyer A knew, there were no
"serious issues" preventing GK from distributing the settlement funds to Victims A
through D, GIRARDI had not been back east four times to get any such purported

9

issues resolved, and the reason the settlement funds had not been distributed to the Client Victims was because those funds were being misappropriated.

16.    It was further part of the scheme that the defendants fraudulently concealed from Law Firm A and the Court that GIRARDI sent the letters to Victims A through D containing the false statements described above.

17.    It was further part of the scheme that, on or about December 4, 2020, GIRARDI left a voicemail message for a lawyer at Law Firm A, in which GIRARDI falsely stated, "I think we got clearance to send money out today."

*Partial Lulling Payments to Victims A through D*

18.    It was further part of the scheme that, in response to repeated inquiries by Victims A through D about, and demands for, their settlement funds, and to hinder or delay Victims A through D from discovering and reporting the misappropriation of those funds, the defendants made partial payments and caused partial payments to be made to Victims A through D, as follows:

a.    on or about May 11, 2020, wire transfers from GK's IOLTA account to Victim A of approximately $855,000; to Victim B of approximately $1,010,000; to Victim C of approximately $862,500; and to Victim D of approximately $1,030,000;

b.    on or about July 6, 2020, wire transfers from GK's IOLTA account of $50,000 to each of Victims A through D; and

c.    on or about September 3, 2020, wire transfers from GK's IOLTA account to Victim A of approximately $305,000; to Victim B of approximately

10

$460,000; to Victim C of approximately $312,500; and to Victim D of approximately $460,000.

19.    As a result of the scheme, the defendants caused the Client Victims to suffer losses of over $3 million.

20.    It was further part of the scheme that GIRARDI, KAMON, and LIRA concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence, purpose, and acts done in furtherance of the scheme.

21.    On or about March 2, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GK Lawyer A, using the email address "[GKLawyerA]@girardikeese.com," received by, among others, a lawyer at Law Firm A and LIRA, using the email address "dlira@girardikeese.com," which email attached a settlement release signed by Victim B;

In violation of Title 18, United States Code, Sections 1343 and 2.

# COUNT TWO

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.　　The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.　　On or about April 6, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transfer of $40,000, purportedly as an "advance" to Victim B, from GK's IOLTA trust account to Victim B's bank account in Indonesia;

In violation of Title 18, United States Code, Sections 1343 and 2.

12

## COUNT THREE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.     On or about April 22, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA, using the email address "dlira@girardikeese.com," to Victims A through D, falsely stating that their settlement payments were delayed because of the pandemic, including that "[w]e are still under the government mandate to stay at home";

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FOUR

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.     On or about May 12, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA, using the email address "dlira@girardikeese.com," received by, among others, lawyers from Law Firm A, which email concealed and omitted material facts, including that: (1) all settlement funds for Victims A through D had been received in GK's IOLTA trust account; (2) GK had failed to distribute those funds to the Client Victims as required; and (3) GK was misappropriating settlement funds belonging to Victims A through D;

In violation of Title 18, United States Code, Sections 1343 and 2.

14

## COUNT FIVE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.　　The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.　　On or about May 14, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

>THOMAS V. GIRARDI,
>CHRISTOPHER K. KAMON, and
>DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GIRARDI's legal assistant to Client B in Indonesia, attaching a letter from GIRARDI containing the false statements: "We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%";

In violation of Title 18, United States Code, Sections 1343 and 2.

15

## COUNT SIX

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.    The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.    On or about May 14, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GIRARDI's legal assistant to Client C in Indonesia, attaching a letter from GIRARDI containing the false statement: "I got enough of the problem taken care of so we were able to release 50% of the settlement";

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SEVEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about May 15, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA using the email address "dlira@girardikeese.com," received by, among others, lawyers from Law Firm A, which email concealed and omitted material facts, including that: (1) all settlement funds for Victims A through D had been received in GK's IOLTA trust account; (2) GK had failed to distribute those funds to the Client Victims as required; (3) GK was misappropriating settlement funds belonging to Victims A through D; and (4) GIRARDI had sent letters to Victims B and C on or about May 14, 2020, which letters included false explanations for why those victims had not been sent their settlement funds;

In violation of Title 18, United States Code, Sections 1343 and 2.

17

## COUNT EIGHT

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.     On or about May 19, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GK Lawyer A, using the email address "[GKLawyerA]@girardikeese.com," received by, among others, a lawyer at Law Firm A and LIRA, using the email address "dlira@girardikeese.com," which email attached a settlement release signed by Victim E;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT NINE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.      Beginning on or about March 4, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated February 24, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim A as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

## COUNT TEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.     Beginning on or about March 11, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 4, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim B as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

## COUNT ELEVEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.    The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.    Beginning on or about March 27, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 9, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim C as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

## COUNT TWELVE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.     Beginning on or about March 30, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 4, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim D as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

## FORFEITURE ALLEGATION

The SPECIAL OCTOBER 2022 GRAND JURY further alleges:

1.     Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in this Indictment, defendants GIRARDI, KAMON, and LIRA shall forfeit to the United States of America any property which constitutes and is derived from proceeds obtained directly and indirectly as a result of the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     The property to be forfeited includes but is not limited to: a personal money judgment in the amount of approximately $3,069,500.

3.     If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code Section 853(p).

A TRUE BILL:

_____
FOREPERSON

_____
Signed by Jason Yonan on behalf of the
UNITED STATES ATTORNEY

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3
### Eastern Division

Edelson PC

                Plaintiff,

v.

Thomas Girardi, et al.

                Defendant.

Case No.: 1:20–cv–07115
Honorable Matthew F. Kennelly

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, January 9, 2023:

      MINUTE entry before the Honorable Matthew F. Kennelly: Video motion hearing held on 1/9/2023. Defendant Lira's motion to file under seal [213] is granted. Defendant Lira's motion to stay [214] is granted to the following extent: the case is stayed until 2/13/2023. The parties are directed to file a joint status report under seal on 2/9/2023. A telephonic status hearing is set for 2/13/2023 at 8:45 a.m. The following call–in number will be used for the hearing: 888–684–8852, access code 746–1053. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Mailed notice. (mma, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**EXHIBIT 3**



FILED
CLERK, U.S. DISTRICT COURT

JAN 2 4 2023

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NUMBER |
|---|---|
| PLAINTIFF | CR No. 2:23-cr-00024- |
| v. | |
| Christopher K. Kamon | **WAIVER OF INDICTMENT** |
| DEFENDANT(S). | |

I, Christopher K. Kamon , the above-named defendant,
who is accused of Wire fraud; Criminal forfeiture , in
violation of 18 U.S.C. 1343:  18 U.S.C. 981(a)(1)(C):  28 U.S.C. 2461: , being
advised of the nature of the charge, the proposed information, and of my rights, hereby waive in open court on
01/24/2023 , prosecution by indictment and consent that the proceedings may be by
information rather than by indictment.

_____
*Defendant*

_____
*Counsel for Defendant*

If defendant is not an English speaker, include the following:

I, _____ , am fluent in written and spoken English and _____
languages.  I accurately translated this Waiver of Indictment from English into _____
to defendant _____ , on this date.

*Date:* _____        _____
*Interpreter*

Before _____
*Judicial Officer*

**EXHIBIT 4**

**F I L E D**
CLERK, U.S. DISTRICT COURT

1/31/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAV _____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       PLAINTIFF<br><br>  v.<br><br>THOMAS VINCENT GIRARDI and<br>CHRISTOPHER KAZUO KAMON,<br><br>       DEFENDANTS | CASE NUMBER<br><br>CR  2:23-cr-00047-JFW<br><br>---<br><br>**NOTICE TO COURT OF**<br>**RELATED CRIMINAL CASE**<br><br>(PURSUANT TO GENERAL ORDER 14-03) |

Plaintiff United States of America hereby informs the Court that the above-entitled criminal case may be related to:

United States v. Christopher Kazuo Kamon, Case No. CR 23-00024-JLS, which:

  ✓  was previously assigned to the Honorable Josephine L. Staton;

  _____  has not been previously assigned.

The above-entitled cases may be related for the following reasons:

  ✓  the cases arise out of the same conspiracy, common scheme, transaction, series of transactions or events;

  ✓  the cases involve one or more defendants in common and would entail substantial duplication of labor in pretrial, trial or sentencing proceedings if heard by different judges.

  Additional explanation (if any):

Dated: January 31, 2023

         *Ali Moghaddas*
         ALI MOGHADDAS
         Assistant United States Attorney

**EXHIBIT 5**



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T

| | |
|---|---|
| OPI | CPD/CSB |
| NUMBER | 5267.09 |
| DATE | December 10, 2015 |

# Visiting Regulations

*/s/*
*Approved*:  Charles E. Samuels, Jr.
Director, Federal Bureau of Prisons

1.  **PURPOSE AND SCOPE**

**§540.40.  Purpose and scope.**

**The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community.  The Warden shall develop procedures consistent with this rule to permit inmate visiting.  The Warden may restrict inmate visiting when necessary to ensure the security and good order of the institution.**

Due to practical considerations and the different characteristics of institutions, certain limitations and controls must be established in developing and administering visiting regulations.  The extent of these limitations will vary with each institution, and are recognized as reasons upon which visiting restrictions may be based.  These limitations will be specified in the Institution Supplement.

The Warden has the authority to restrict or suspend an inmate's regular visiting privileges temporarily when there is reasonable suspicion that the inmate has acted in a way that would indicate a threat to the good order or security of the institution.  Ordinarily, the duration of the restriction or suspension should be limited to the time required to investigate and complete the discipline process.

**Federal Regulations from 28 CFR are shown in this type.**
Implementing instructions are shown in this type.

*Reasonable suspicion* exists when reliable information and/or facts are presented to the Warden that the inmate is engaged, or attempting to engage, in criminal or other prohibited behavior. Reasonable suspicion must be directed to the inmate(s)/visitor(s) in question.

In determining reasonable suspicion, staff should consider whether the available information could reasonably lead a person with correctional experience to suspect that the inmate is engaged in criminal or other prohibited behavior.  (See Section 13.c. of this Program Statement for reference to inmates in detention or segregation status.)

a. **Summary of Changes**.  This re-issuance incorporates the following modifications:

*Policy Rescinded*
P5267.08          Visiting Regulations (5/11/2006)

- Guidelines for Walsh Act assignments added.
- Clarified language for Minister of Record.

b. **Program Objectives**.  The expected results of this program are:

- All inmates will be permitted visits by family, friends, and community groups consistent with the security and orderly running of the institution.
- A record of visitors will be maintained for all inmates.
- A visiting schedule will be established for all institutions.
- Procedures to monitor all visiting areas will be established to prevent the passage of contraband and to ensure the security and good order of the institution.

c. **Institution Supplement**.  Each institution will develop local procedures and guidelines required to administer this Program Statement.  The institution will involve the Regional Office, Correctional Services Administrator, in developing the Institution Supplement.

The Institution Supplement must be available in English and Spanish.

The Institution Supplement will include, at a minimum, the following considerations:

- The visiting schedule for the institution, including all of its components (satellite camp, jail, etc.), if they differ.
- Holdover visiting procedures (time frame for approval; who is permitted to visit, etc.).
- Procedures addressing special visitors (i.e., minister of record and clergy visits).
- Procedures for disapproving proposed visitors.
- Procedures for approving any exception to the prior relationship requirement.

- The method by which staff will make written guidelines available to visitors.
- Limitations specific to the institution (e.g., visiting space, frequency of visits, number of visitors).
- Identify staff responsible for arranging and supervising special visits.
- Procedures to maintain a record of visitors for each inmate.
- Procedures for a backup system to the computer visiting program.
- Facility address/phone number, directions to the facility, and information about local transportation.
- Days and hours of visitation.
- Approved dress code.
- Identification requirements for visitors.
- Items authorized in the visiting room.
- Special rules for children.
- Authorized items that visitors may bring to give to the inmate, if applicable.
- Special visit requirements.
- Procedures for storing items not authorized in the visiting room (cellphones, car keys, handbags, etc.).
- Visiting procedures for inmates assigned to the Special Housing Unit.
- Visiting procedures for inmates hospitalized in the community.
- Procedures for child areas (i.e., whether inmates are permitted in areas designated for children).
- The size and quantity of any clear plastic container/bag used to carry authorized items into a visiting room.
- Procedures for the use of non-contact visiting areas (if available).
- Procedure to ensure the maximum capacity of the visiting room is not exceeded (i.e., early termination due to overcrowding).
- Procedures addressing frequency of changes to the inmate(s) Visiting List.
- Procedures addressing supervision of inmates convicted of a Walsh Act offense involving a minor.

## 2. PRETRIAL/HOLDOVER/DETAINEE PROCEDURES

The procedures specified in this Program Statement apply to all inmates housed in Bureau institutions. Refer to the Program Statement **Pretrial Inmates** for specific information regarding pretrial inmates.

3.  **VICTIM/WITNESS CASES**

Refer to the Program Statement **Victim and Witness Notification** for procedures when a Victim/Witness Program (VWP) inmate requests to place a victim or witness on his/her visiting list.

4.  **WITSEC INMATE**

Refer to the Program Statement **Central Inmate Monitoring System Operations Manual** (**Sensitive But Unclassified**) for procedures when an inmate in the Witness Security Program (WITSEC) requests to place an individual on his/her visiting list.

5.  **VISITING FACILITIES**

**§540.41.  Visiting facilities.**

**The Warden shall have the visiting room arranged so as to provide adequate supervision, adapted to the degree of security required by the type of institution. The Warden shall ensure that the visiting area is as comfortable and pleasant as practicable, and appropriately furnished and arranged.  If space is available, the Warden shall have a portion of the visiting room equipped and set up to provide facilities for the children of visitors.**

**a.  Institutions of minimum and low security levels may permit visits beyond the security perimeter, but always under supervision of staff.**

**b.  Institutions of medium and high security levels, and administrative institutions may establish outdoor visiting, but it will always be inside the security perimeter and always under supervision of staff.**

Reasonable accommodations should be made to ensure that all parts of the visiting area accessible to the public are also accessible to visitors and inmates with disabilities.

6.  **VISITING TIMES**

**§540.42  Visiting times.**

**a.  Each Warden shall establish a visiting schedule for the institution.  At a minimum, the Warden shall establish visiting hours at the institution on Saturdays, Sundays, and holidays.  The restriction of visiting to these days may**

**be a hardship for some families and arrangements for other suitable hours shall
be made to the extent practicable.  Where staff resources permit, the Warden may
establish evening visiting hours.**

**b.  Consistent with available resources, such as space limitations and staff
availability, and with concerns of institution security, the Warden may limit the
visiting period.  With respect to weekend visits, for example, some or all inmates
and visitors may be limited to visiting on Saturday or on Sunday, but not on both
days, in order to accommodate the volume of visitors.  There is no requirement
that every visitor has the opportunity to visit on both days of the weekend, nor
that every inmate has the opportunity to have visits on both days of the weekend.**

To the extent practicable, and consistent with available resources and concerns for institution
security, the Warden is encouraged to establish visiting and/or attempt to accommodate a visitor
who can only visit on a specific weekend day.

## 7.  FREQUENCY OF VISITS AND NUMBER OF VISITORS

**§540.43.  Frequency of visits and number of visitors.**

**The Warden shall allow each inmate a minimum of four hours visiting time per
month.  The Warden may limit the length or frequency of visits only to avoid
chronic overcrowding.  The Warden may establish a guideline for the maximum
number of persons who may visit an inmate at one time, to prevent overcrowding
in the visiting room or unusual difficulty in supervising a visit.  Exceptions may
be made to any local guideline when indicated by special circumstances, such as
distance the visitor must travel, frequency of the inmate's visits, or health
problems of the inmate or visitor.**

The Warden may establish a limit, consistent with available resources, on the number of visits an
inmate may receive and/or the number of visiting hours (in excess of four) allotted to the inmate
each month.  Due to space limitations, limits on visiting may be necessary when an inmate has
numerous regular visitors living in the vicinity of the institution.

Where facilities permit, the Warden may allow family groups to visit.  The Warden may also
authorize special visits to accommodate unique circumstances (e.g., a person traveling a long
distance to visit, a person visiting a hospitalized inmate).

8.  **REGULAR VISITORS**

**§540.44.  Regular visitors.**

**An inmate desiring to have regular visitors must submit a list of proposed visitors
to the designated staff.  See §540.45 for qualification as special visitor.  Staff are
to compile a visiting list for each inmate after suitable investigation in accordance
with §540.51(b) of this part. The list may include:**

§540.51(b) refers to Section 14.b. of this Program Statement.

**a.  *Members of the Immediate Family*.  These persons include mother, father,
step-parents, foster parents, brothers and sisters, spouse, and children.  These
individuals are placed on the visiting list, absent strong circumstances that
preclude visiting.**

The word "spouse" includes a common-law relationship that has been previously established in a
state that recognizes such a status.  In states that do not, a common-law relationship is not
considered "immediate family."  For determination of applicable state laws, the Regional
Counsel should be consulted.  Failure to obtain acknowledgment of parent or legal guardian may
preclude the addition of children to the visiting list.  When deemed appropriate, background
checks may also be completed on immediate family members.  For determination of applicable
state laws, the Regional Counsel should be consulted.

**b.  *Other Relatives*.  These persons include grandparents, uncles, aunts, in-laws,
and cousins.  They may be placed on the approved list if the inmate wishes to
have visits from them regularly and if there exists no reason to exclude them.**

**c.  *Friends and Associates*.  The visiting privilege ordinarily will be extended to
friends and associates having an established relationship with the inmate prior to
confinement, unless such visits could reasonably create a threat to the security
and good order of the institution.  Exceptions to the prior relationship rule may be
made, particularly for inmates without other visitors, when it is shown that the
proposed visitor is reliable and poses no threat to the security or good order of
the institution.**

Regardless of the institution's security level, the inmate must have known the proposed visitor(s)
prior to incarceration.  The Warden must approve any exception to this requirement.

See Section 14.b.(2) of this Program Statement regarding background investigations for proposed visitors.

Ordinarily, an inmate's visiting list should not list more than 10 friends and associates.  The Warden may make an exception to this provision when warranted.

Under 18 U.S.C. § 3582(d), which applies to offenses committed on or after November 1, 1987,

> "The court, in imposing a sentence to a term of imprisonment upon a defendant convicted of a felony set forth in chapter 95 (racketeering) or 96 (racketeer influenced and corrupt organizations) of this title or in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 801 et seq.), or at any time thereafter upon motion by the Director of the Bureau of Prisons or a United States attorney, may include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise."

Consultation with the Regional Counsel may be necessary to determine this provision's applicability to a specific case(s).

**d.  *Persons with Prior Criminal Convictions*.  The existence of a criminal conviction alone does not preclude visits.  Staff shall give consideration to the nature, extent, and recentness of convictions, as weighed against the security considerations of the institution.  Specific approval of the Warden may be required before such visits take place.**

Ordinarily, staff should obtain written authorization from the appropriate Federal or state probation/parole official prior to approving visitation privileges for an individual on probation, parole, or supervised release.  A copy of this authorization will be maintained in section 2 of the Privacy Folder in the Inmate Central File.

See Section 14.b.(2) of this Program Statement regarding background investigations for proposed visitors.

**e.  *Children Under Sixteen*.  Children under the age of 16 may not visit unless accompanied by a responsible adult.  Children shall be kept under supervision of a responsible adult or a children's program.  Exceptions in unusual circumstances may be made by special approval of the Warden.**

The signature of a parent or legal guardian on the Visitor Information form (BP-A0629) is necessary to process a request for an applicant under 18 years of age.  Ordinarily, completing the questionnaire portion of this form (items 1 through 14) is not required if such an applicant is a verified immediate family member of the requesting inmate.

In unusual circumstances, the Warden, after consultation with Regional Counsel, may make exceptions to the requirement for acknowledgment by parent or legal guardian.

9.  **QUALIFICATION AS SPECIAL VISITOR**

**§540.45.  Qualification as special visitor.**

**Persons in the categories listed in this section may qualify as special visitors rather than as regular visitors.  Visits by special visitors ordinarily are for a specific purpose and ordinarily are not of a recurring nature.  Except as specified, the conditions of visiting for special visitors are the same as for visitors.**

**a.  *Business Visitor*.  Except for pretrial inmates, an inmate is not permitted to engage actively in a business or profession.  An inmate who was engaged in a business or profession prior to commitment is expected to assign authority for the operation of such business or profession to a person in the community.  Pretrial inmates may be allowed special visitors for the purpose of protecting the pretrial inmate's business interests.  In those instances where an inmate has turned over the operation of a business or profession to another person, there still may be an occasion where a decision must be made which will substantially affect the assets or prospects of the business.  The Warden accordingly may permit a special business visit in such cases.  The Warden may waive the requirement for the existence of an established relationship prior to confinement for visitors approved under this paragraph.**

**b.  *Consular Visitors*.  When it has been determined that an inmate is a citizen of a foreign country, the Warden must permit the consular representative of that country to visit on matters of legitimate business.  The Warden may not withhold this privilege even though the inmate is in disciplinary status.  The requirement for the existence of an established relationship prior to confinement does not apply to consular visitors.**

**c.  *Representatives of Community Groups*.  The Warden may approve visits on a recurring basis to representatives from community groups (for example, civic, volunteer, or religious organizations) who are acting in their official capacity.**

**These visits may be for the purpose of meeting with an individual inmate or with a
group of inmates.  The requirement for the existence of an established
relationship prior to confinement for visitors does not apply to representatives of
community groups.**

**d.  *Clergy, Former or Prospective Employers, Sponsors, and Parole Advisors.*
Visitors in this category ordinarily provide assistance in release planning,
counseling, and discussion of family problems.  The requirement for the
existence of an established relationship prior to confinement for visitors does not
apply to visitors in this category.**

The following processing procedures apply to ministers of record and clergy:

(1)  **Minister of Record**.  An inmate wanting to receive visits from his/her minister of record
must submit a written request to the Chaplain.  Upon approval, unit staff add the name and title
(minister of record) to the inmate's visitor list.

An inmate may only have one minister of record on his/her visiting list at a time.  The addition of
the minister of record will **not** count against the total number of authorized regular visitors an
inmate is allowed to have on his/her visiting list, and will **not** count against the total number of
social visits allowed.

(2)  **Clergy**.  Visits from clergy (other than the minister of record) will be in accordance with the
general visitor procedures, and **will** count against the total number of regular visits allowed.

Ordinarily, clergy visits will not be accommodated unless requested by the inmate.  However,
the Chaplain may approve a visitation request initiated by the clergy if the inmate wishes to visit
with the clergy.

Clergy/minister of record visits will be accommodated in the visiting room during regularly
scheduled visiting hours and, to the extent practicable, in an area of the visiting room that
provides a degree of separation from other visitors.  If a private area is not available, the visit
may be rescheduled.

The Warden may establish a limit to the number of minister of record and clergy visits an inmate
receives each month, consistent with available resources.  However, during times of personal or
family emergencies, an inmate will be authorized a visit from his/her minister of record.  Refer to
the Program Statement **Religious Beliefs and Practices** for additional information regarding
minister of record and clergy.

10.  **ATTORNEY VISITS**

**§540.46.  Attorney Visits.**

**Requirements for attorney visits are governed by the provisions on inmate legal activities (see §543.12 through 543.16 of this chapter).  Provisions pertinent to attorney visits for pretrial inmates are contained in §551.117 of this chapter.**

§ 543.12 through 543.16 refers to the Program Statement **Inmate Legal Activities**.  §551.117 refers to the Program Statement **Pretrial Inmates**.

Staff may not subject visits between an attorney and an inmate to auditory supervision.  To the extent practicable, attorney visits, for both pretrial and sentenced inmates, are to take place in a private conference room.  However, areas designated for attorney visits will be arranged so as to provide adequate unobstructed visual supervision.

Where such a room is not available, the attorney visit may occur in a regular visiting room, provided the inmate and the inmate's attorney have a degree of separation from other visitors.

Occasionally, a situation may arise when a private area or conference room is not available, and the attorney does not wish to meet in a regular visiting room.  When this occurs, the attorney may reschedule the visit.  Refer to the Program Statement **Inmate Legal Activities** for additional information on processing legal visits.

11. **MEDIA VISITS**

**§540.47.  Media visits.**

**Requirements for media visits are governed by the provisions on contact with news media (see subpart E of this part).  A media representative who wishes to visit outside his or her official duties, however, must qualify as a regular visitor or, if applicable, a special visitor.**

[Section §540.48 is removed and reserved.]

12.  **TRANSPORTATION ASSISTANCE**

**§540.49.  Transportation assistance.**

**The Warden shall ensure that directions for transportation to and from the institution are provided for the approved visitor (see §540.51(b)(4)).  Directions for transportation to and from the institution and pay phone service, with commercial transportation phone numbers posted, are also to be made available at the institution to assist visitors.**

If pay phone service is not available, the visitor is to ensure transportation is arranged prior to the visit.

§540.51(b)(4) refers to Section 14.b.(4) of this Program Statement.

13.  **VISITS TO INMATES NOT IN REGULAR POPULATION STATUS**

**§540.50  Visits to inmates not in regular population status.**

**a.  *Admission and Holdover Status*.  The Warden may limit to the immediate family of the inmate visits during the admission-orientation period or for holdovers where there is neither a visiting list from a transferring institution nor other verification of proposed visitors.**

**b.  *Hospital Patients***

**(1)  When visitors request to see an inmate who is hospitalized in the institution, the Chief Medical Officer (or, in his absence, the Health Services Administrator), in consultation with the Captain, shall determine whether a visit may occur, and if so, whether it may be held in the hospital.**

When a visit is denied because the inmate is suffering from an infectious disease, is in a psychotic or emotional episode that makes a visit inadvisable, or is otherwise not in a condition to see visitors, the situation is to be carefully and sensitively explained to the approved visitor. Notification to the visitor will be addressed in the Institution Supplement.  Documentation is maintained in section 2 of the Privacy Folder in the Inmate Central File.

Inmates with medical conditions will be reviewed by the Chief Medical Officer or, in his/her absence, the Health Services Administrator, in consultation with the Captain, to determine

whether visiting will be permitted.  Visiting procedures for inmates with medical conditions will be addressed in the Institution Supplement.

**(2)  Visits to inmates hospitalized in the community may be restricted to only the immediate family and are subject to the general visiting policy of that hospital.**

**c.  *Detention or Segregation Status*.  Ordinarily, an inmate retains visiting privileges while in detention or segregation status.  Visiting may be restricted or disallowed, however, when an inmate, while in detention or segregation status, is charged with, or has been found to have committed, a prohibited act having to do with visiting guidelines or has otherwise acted in a way that would reasonably indicate that he or she would be a threat to the orderliness or security of the visiting room.**

**Loss of an inmate's visiting privileges for other reasons may not occur unless the inmate is provided a hearing before the Discipline Hearing Officer (DHO) in accordance with the provisions of §541.17 of this chapter, following those provisions which are appropriate to the circumstances, which results in a finding by the DHO that the inmate committed a prohibited act and that there is a lack of other appropriate sanctions or that imposition of an appropriate sanction previously has been ineffective.**

**The Unit Discipline Committee (UDC) may not impose a loss of visiting privileges for inmates in detention or segregation status.  The provisions of this paragraph (c) do not interrupt or delay a loss of visiting sanction imposed by the UDC or DHO prior to the inmate's placement in detention or segregation status.**

§541.17 refers to the Program Statement **Inmate Discipline Program**.

Ordinarily, an inmate in administrative detention or disciplinary segregation status may receive visits in accord with the same rules and regulations that apply to general population inmates, providing such visits do not pose a threat to the security or orderly operation of the institution. In such cases, the Warden may authorize special visiting procedures to preclude such a threat.

Refer to the Program Statement **Inmate Discipline Program** for information regarding loss of visiting privileges resulting from disciplinary action.

14. **PROCEDURES**

**§540.51  Procedures.**

**a.  *Responsibility*.  The Warden of the institution shall establish and enforce local visiting guidelines in accordance with the rules and regulations of the Bureau of Prisons.**

Ordinarily, the Captain is responsible for the visiting room's appearance/operation and the training of visiting room officers.

**b.  *Preparation of the List of Visitors*.**

**(1)  Staff shall ask each inmate to submit during the admission-orientation process a list of proposed visitors.  After appropriate investigation, staff shall compile a visiting list for each inmate and distribute that list to the inmate and the visiting room officer.**

An inmate will be provided written material on the institution's visiting procedures during the intake screening process.  At a minimum, the information will include the following:

- Facility address/phone number, directions to the facility, and information about local transportation.
- Days and hours of visitation.
- Approved dress code.
- Identification requirements for visitors.
- Items authorized in the visiting room.
- All authorized items entering the visiting room must be carried in a clear plastic container.
- Special rules for children.
- Authorized items that visitors may bring to give to the inmate, if applicable.
- Special visit requirements.

The initial visiting list is prepared and distributed as soon as practicable after receiving the required information to process the visiting list.  This list identifies immediate family members approved to visit the inmate.  Additional family members and friends may be added following the completion of an appropriate investigation.

Visiting privileges for a minister of record must be submitted directly to the Chaplaincy Services Department for review and approval/denial.

Whenever a person is deleted from or added to an inmate's visitor list, staff update the list as soon as possible to reflect the change.  A copy of the most current approved visiting list will be placed in section 3 of the Inmate Central File.

Likewise, if an inmate elects not to have any visitors, he/she will be asked to sign a visiting list indicating no visitors are requested.  This form is filed in section 3 of the Inmate Central File.

**(2)  Staff may request background information from potential visitors who are not members of the inmate's immediate family, before placing them on the inmate's approved visiting list.  When little or no information is available on the inmate's potential visitor, visiting may be denied, pending receipt and review of necessary information, including information which is available about the inmate and/or the inmate's offense, including alleged offenses.**

The Visitor Information form (BP-A0629) is used to request background information and obtain the visitor's consent to release information.  This form will be filed in section 2 of the Privacy Folder in the Inmate Central File.

Regardless of the institution's security level, staff should obtain background information on potential visitors, to include Minister of Record.  This is required in the Medium, High, and Administrative institutions due to their greater security needs.  The Warden or designee may make an exception to this procedure when warranted.

Staff in institutions housing pretrial offenders are strongly encouraged to complete a background check (NCIC) on potential visitors due to limited information received on these individuals.  Background checks may also be completed on immediate family members.

If the background information reveals that visitation privileges for the individual would present security concerns or disrupt the orderly running of the institution, the Warden may deny visiting privileges.  Documentation reflecting this decision should be maintained in section 2 of the Privacy Folder in the Inmate Central File.

Refer to the Program Statement **Pretrial Inmates** for additional information on visiting procedures for pretrial inmates.

**(3)  If a background investigation is necessary before approving a visitor, the inmate shall be held responsible for mailing a release authorization to the proposed visitor.  That form must be signed and returned to staff by the proposed visitor prior to any further action regarding visiting.  Upon receipt of the**

**authorization form, staff may then forward a questionnaire, along with the release authorization, to the appropriate law enforcement or crime information agency.**

The inmate is to mail the BP-A0629 to his/her proposed visitor(s).  The proposed visitor must complete this form and mail it directly to the unit staff member responsible for processing the inmate's visiting list.  Staff should advise the inmate to provide his/her proposed visitor with the staff member's name and address.

If necessary, staff will either send the Request for Conviction Information form (BP-A0311) to the appropriate law enforcement agency to gather additional background information or complete a background check using the National Crime Information Center (NCIC).

Visitor Information forms, Request for Conviction Information forms, and NCIC background information will be maintained in section 2 of the Privacy Folder of the Inmate Central File.

Ordinarily, when an inmate transfers from one institution to another, staff need not reapprove the visitors already contained on the inmate's visiting list.  However, staff should review the visiting list to ensure the approved visitors are still appropriate.  When possible, the unit team should be consulted prior to approval of a visitor not on the inmate's approved visiting list.

**(4)  Staff shall notify the inmate of each approval or disapproval of a requested person for the visiting list.  Upon approval of each visitor, staff shall provide the inmate with a copy of the visiting guidelines and with directions for transportation to and from the institution.  The inmate is responsible for notifying the visitor of the approval or disapproval to visit and is expected to provide the approved visitor with a copy of the visiting guidelines and directions for transportation to and from the institution.  The visiting guidelines shall include specific directions for reaching the institution and shall cite 18 U.S.C. 1791, which provides a penalty of imprisonment for not more than twenty years, a fine, or both for providing or attempting to provide to an inmate anything whatsoever without the knowledge and consent of the Warden.**

Refer to the Program Statement **Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities** for information regarding contraband warning signs.

**(5)  An inmate's visiting list may be amended at any time in accordance with the procedures of this section.**

**c.  *Verification of Special Visitor Credentials*.  Staff must verify the qualifications of special visitors.  Staff may request background information and official assignment documentation from the potential visitor for this purpose.**

**d.  *Identification of Visitors*.  Staff shall verify the identity of each visitor (through driver's license, photo identification, etc.) prior to admission of the visitor to the institution.**

Photo Identification must be a valid state or government-issued photo identification.

Visitors under the age of 16 who are accompanied by a parent or legal guardian are exempt from this provision.

**e.  *Notification to Visitors*.  Staff shall make available to all visitors written guidelines for visiting the institution.  Staff shall have the visitor sign a statement acknowledging that the guidelines were provided and declaring that the visitor does not have any article in his/her possession which the visitor knows to be a threat to the security of the institution.  Staff may deny the visiting privilege to a visitor who refuses to make such a declaration.**

Visiting room staff are to make the institution's written guidelines for visiting available to visitors.  The Notification to Visitor form (BP-A0224) may be retrieved via the Sallyport Policy/Forms page.

**f.  *Searching Visitors*.  Staff may require a visitor to submit to a personal search, including a search of any items of personal property, as a condition of allowing or continuing a visit.**

Refer to the Program Statement **Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities** for additional instructions on this subject.

**g.  *Record of Visitors*.  The Warden shall maintain a record of visitors to each inmate.  The visitor's signature may be required on that record and shall be required on at least one visiting log or record maintained by the institution.**

**h.  *Supervision of Visits*.  Staff shall supervise each inmate visit to prevent the passage of contraband and to ensure the security and good order of the institution.  The Warden may establish procedures to enable monitoring of the visiting area, including restrooms located within the visiting area.  The Warden must provide notice to both visitors and inmates of the potential for monitoring**

**the visiting area.  The Warden may monitor a visitor restroom within the visiting area when there is reasonable suspicion that a visitor and/or an inmate is engaged, or attempting or about to engage, in criminal behavior or other prohibited behavior.**

Visitor restrooms may be monitored physically only with the Warden's written approval, and only after it is determined that there is a reasonable suspicion that the visitor or inmate is engaged, or attempting to engage, in a criminal activity or other prohibited behavior.

Physical monitoring should be conducted by a person of the same sex as the visitor using the restroom.  Other restrooms may be inspected and monitored as needed for security purposes.

Refer to the Program Statement **Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities** for further information regarding "reasonable suspicion."

**(1)  The visiting room officer shall ensure that all visits are conducted in a quiet, orderly, and dignified manner. The visiting room officer may terminate visits that are not conducted in the appropriate manner. See 28 CFR §541.12, item 5, for description of an inmate's responsibility during visits.**

§541.12 refers to the Program Statement **Inmate Discipline Program**.   When terminating a visit, visiting room officers should consult with the Lieutenant or Institution Duty Officer.

**(2)  Staff shall permit limited physical contact, such as handshaking, embracing, and kissing, between an inmate and a visitor, unless there is clear and convincing evidence that such contact would jeopardize the safety or security of the institution.  Where contact visiting is provided, handshaking, embracing, and kissing are ordinarily permitted within the bounds of good taste and only at the beginning and at the end of the visit.  The staff may limit physical contact to minimize opportunity for the introduction of contraband and to maintain the orderly operation of the visiting area.**

An inmate who has been approved for, and is awaiting placement in the ADX-Florence Control Unit, may be limited to non-contact visits.

**(3)  The visiting room officer may not accept articles or gifts of any kind for an inmate, except packages which have had prior approval by the Warden or a designated staff member.**

All authorized items entering the visiting room must be carried in a clear plastic container/bag.

An inmate's visitor **may not** leave money with any staff member for deposit in the inmate's commissary account.   Refer to the Program Statement **Trust Fund/Deposit Fund Manual** for additional information on accepting packages.

**(4)  The visiting room officer shall be aware of any articles passed between the inmate and the visitor.  If there is any reasonable basis to believe that any item is being passed which constitutes contraband or is otherwise in violation of the law or Bureau regulations, the visiting room officer may examine the item.**

An Associate Warden, the Institution Duty Officer, or the Captain will be notified in such cases.

## 15.  PENALTY FOR VIOLATION OF VISITING REGULATIONS

**§540.52  Penalty for violation of visiting regulations.**

**Any act or effort to violate the visiting guidelines of an institution may result in disciplinary action against the inmate, which may include the denial of future visits, possibly over an extended period of time.  Moreover, criminal prosecution may be initiated against the visitor, the inmate, or both, in the case of criminal violations.**

In an effort to eliminate the introduction of drugs and drug paraphernalia into Bureau institutions, the Bureau will seek criminal prosecution against visitors who participate in contraband violations.  Additionally, as a disincentive for inmates found guilty of these violations, the Discipline Hearing Officer (DHO) or Unit Discipline Committee (UDC) may impose the loss of visiting privileges as a sanction.

Refer to the Program Statement **Inmate Discipline Program** for information regarding loss of visiting privileges resulting from disciplinary action.

## 16.  WALSH ACT REQUIREMENTS

The Unit Team will evaluate all inmates on their caseload and all incoming inmates to determine if they have an inmate who has been convicted of a sex offense involving a minor (WA CONV).

Any inmate fitting this criterion will have the following annotation placed in the visiting program under the comments section: "this inmate was convicted of a sex offense involving a minor."

Any inmate identified as having a Walsh Act assignment involving a minor will have his/her visits closely monitored.  Specific procedures will be determined locally by the Warden.

## 17.  VISITING REGULATIONS REGARDING PETS

Visitors are precluded from bringing animals on to institutional grounds, except for animals that assist persons with disabilities.  The visitor must provide staff with certification that the animal is trained for that purpose.

## 18. AGENCY ACA ACCREDITATION PROVISIONS

- ■   American Correctional Association 4th Edition Standards for Adult Correctional Institutions: 4-4156, 4-4267, 4-4285, 4-4498, 4-4499, 4-4499-1, 4-4500, 4-4501, 4-4503, and 4-4504.
- ■   American Correctional Association 4th Edition Performance- Based Standards for Adult Local Detention Facilities: 4-ALDF-2A-61, 4-ALDF-5B-01, 4-ALDF-5B-02, 4-ALDF-5B-03, 4-ALDF-5B-04 and 4-ALDF-7E-05.

## REFERENCES

*Program Statements*

| | |
|---|---|
| P1280.11 | JUST, NCIC, and NLETS Telecommunication Systems (Management and Use) (1/7/00) |
| P1315.07 | Legal Activities, Inmate (11/5/99) |
| P1490.06 | Victim and Witness Notification Program (5/23/02) |
| P4500.11 | Trust Fund/Deposit Fund Manual (4/19/15) |
| P5100.08 | Inmate Security Designation and Custody Classification (9/12/06) |
| P5180.06 | Central Inmate Monitoring System Operations Manual (3/24/08) |
| P5270.09 | Inmate Discipline Program (7/8/11) |
| P5270.10 | Special Housing Units (7/29/11) |
| P5280.09 | Inmate Furloughs (1/20/11) |
| P5360.09 | Religious Beliefs and Practices (12/31/04) |
| P5500.11 | Correctional Services Manual (10/10/03) |
| P5500.14 | Correctional Services Procedures Manual (10/19/12) |
| P5510.15 | Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities (7/7/13) |
| P5520.02 | Ion Spectrometry Device Program (4/1/15) |
| P5521.05 | Searches of Housing Units, Inmates and Inmate Work Areas (6/30/97) |
| P7331.04 | Pretrial Inmates (1/31/03) |

*BOP Forms*

BP-A0224     Notification to Visitor

BP-A0311     Request for Conviction Information

BP-A0629     Visitor Information Form

*Records Retention*

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

**EXHIBIT 6**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** OGC
**NUMBER:** 1315.07
**DATE:** 11/5/99
**SUBJECT:** Legal Activities,
Inmate

1.  **[PURPOSE AND SCOPE §543.10.  The Bureau of Prisons affords an inmate reasonable access to legal materials and counsel, and reasonable opportunity to prepare legal documents.  The Warden shall establish an inmate law library, and procedures for access to legal reference materials and to legal counsel, and for preparation of legal documents.]**

2.  **SUMMARY OF CHANGES.**  The changes include allowing the Central Office to contact the institutions by way of BOPNet GroupWise or memorandum, rather than Operations Memorandum, to direct the ordering of law library materials.

The procedures for posting and maintaining Bureau and U.S. Parole Commission Federal Register documents at institutions are revised and streamlined.  These documents will be sent via GroupWise to staff responsible for the institution law libraries instead of being issued by Operations Memoranda.

All references to the "Central Office Librarian" have been changed to "Bureau's Librarian" to reflect the Librarian's responsibility for providing services Bureau-wide.

The Standards Referenced have been updated to reflect the revised American Correctional Association standards.

Finally, the required publications in Attachments A, B, and C are updated to reflect a variety of changes including changes in name and title, volume numbers, publishers and publishing companies, etc.  Specific changes to publications in Attachments A, B, and C, requirements for the main, satellite camp and basic inmate law libraries, include:

**[Bracketed Bold - Rules]**
Regular Type - Implementing Information

a. **Additions**

   *Manual de Pautaus*, Zapp (Publicaciones Legales en Espanol,
   Inc.)

b. **Out-of-Print**

   *Military Law Reporter* (Public Law Education Institute).
   This publication will no longer be available but
   institutions which currently have this volume should
   continue to keep these volumes on the shelves.

c. **Removal and Replacements**

   The full-text of the *Federal Sentencing Guidelines* is
   included in the United States Code Annotated (USCA) volumes.
   Therefore, to prevent duplication and for cost containment,
   the other edition of the Federal Sentencing Guidelines
   published by West Group has been removed.

   *Shepard's Federal 2d Citations* and *Federal Supplement
   Citations* has been combined into one publication, the
   *Shepard's Federal Citations* (Lexis Law Publishing).

   *You and the Law* has been replaced with *ABA's Family Legal
   Guide* (Publications International Ltd).

   *Ballentine's Law Dictionary* has been replaced with *Black's
   Law Dictionary*.

d. **Clarifications**

   When single volumes of the *USCA* are purchased, the pamphlet
   volumes are not included.  To indicate this, a notation has
   been added after the *USCA* titles in Attachments B and C for
   Satellite Camp and Basic Inmate Law Libraries, respectively.

   The *Maryland Reporter and Atlantic 2d Reporter* are the only
   required legal publications for state case law that are
   provided.  The publisher only makes available DC case law in
   print format through their regional reporter - *Atlantic 2d*
   Reporter, which also contains case law for other states in
   that region.

   The Bureau **is not** mandated to provide state case law and
   other state legal materials.

3. **PROGRAM OBJECTIVES.**  The expected results of this program
are:

a.  Inmates will have reasonable access to legal materials for preparation of legal documents.

b.  Inmates will have reasonable opportunity to prepare their legal documents.

c.  Inmates and staff will be able to make oaths and affirmations and have them witnessed by institution case managers, as authorized by 18 U.S.C. § 4004.

## 4.  DIRECTIVES AFFECTED

### a.  Directive Rescinded

PS 1315.06      Inmate Legal Activities (3/3/97)

### b.  Directives Referenced

PS 1350.02      Acceptance of Donations (6/29/98)
PS 2100.03      Budget Execution Manual (8/4/95)
PS 4500.04      Trust Fund/Warehouse/Laundry Manual
                (12/15/95)
PS 5264.06      Telephone Regulations for Inmates (12/22/95)
PS 5265.11      Correspondence (7/9/99)
PS 5266.08      Publications, Incoming (8/20/97)
PS 5270.07      Discipline and Special Housing Units
                (12/29/87)
PS 5580.05      Inmate Personal Property (9/30/96)

c.  Rules cited in this Program Statement are contained in 28 CFR §543.10 through §543.16.

## 5.  STANDARDS REFERENCED

a.  American Correctional Association 3rd Edition Standards for Adult Correctional Institutions:  3-4256, 3-4257, 3-4261, 3-4262, 3-4263, 3-4264, 3-4442, 3-4447

b.  American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities:  3-ALDF-3D-18, 3D-23, 3E-01, 3E-02, 3E-03, 5D-12

c.  American Correctional Association 3rd Edition Standards for Boot Camp Programs:  1-ABC-3D-03

d.  American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies:  2-CO-5F-01

6.   **LAW LIBRARIES**

a.  **Main Law Libraries.**  Each Warden must establish a main law
library containing the materials listed in the Required Main Law
Library Materials (Attachment A), unless an item is out of print.

Institutions must replace any misplaced or destroyed volumes
within a reasonable time after staff become aware of the loss in
any Bureau Law Library.

b.  **Satellite Camp Law Libraries.**  Each institution with a
Satellite Camp must establish, at a minimum, a modified basic law
library in the Satellite Camp that contains the materials listed
in the Required Materials for Satellite Camp Law Libraries
(Attachment B), unless an item is out of print.

Multiple copies are required for certain materials listed in
Attachment B; however, Supervisors of Education may use their
discretion in lending duplicate resources to other inmate law
libraries.

For inventory and program review purposes, however, such
materials are considered to be in the Satellite Camp law library.

c.  **Basic Law Libraries.**  A basic law library must contain the
materials listed in the Required Materials for Basic Law
Libraries (Attachment C), unless an item is out of print.

d.  **New Law Libraries.**  New institutions, or existing
institutions constructing new housing units, must use start-up
funds to purchase required law library materials (including the
first annual subscription to the Criminal Law Reporter.)

The Bureau's Librarian may be consulted for assistance with
ordering publications.

e.  **Adding or Upgrading Law Libraries.**  The Warden may request
a basic law library be established when physical restrictions or
inmate assignments prevent adequate access to the main law
library.

Any request for an additional basic law library in an existing
institution, or an upgrade to a main law library, is to be
presented to the Regional Counsel for recommendation and
forwarded to the General Counsel for a decision.

f.  **Damaged Law Libraries.**  Requests for replacement funding
for missing or damaged books due to institution disturbances or
natural causes should be forwarded to the Regional Director.

7.  **MAINTENANCE OF LAW LIBRARIES**

   a.  The Central Office will fund the periodic updates of
required law library materials and all new additions which are
deemed necessary for one or more law libraries.  Ordinarily, each
institution must order its own publications.

   The Central Office will notify institutions either by way of
memoranda or GroupWise of:

   ●   the publications required,
   ●   the publishers and addresses for ordering the
       publications,
   ●   the prices of the publications, and
   ●   funding information.

   b.  The Supervisor of Education is to process new purchase
requirements within 30 days of receipt of such notice and forward
a copy of all orders charged to Accounting Classification Code
(Actclass) FP090022G2, to the Bureau Librarian in the Central
Office.

   c.  Maintenance of the materials is the institution's
responsibility.  Materials that have been lost or damaged must be
replaced with institution funding.  The Bureau Librarian may be
consulted to help order replacements.  Law books which are not
required for all libraries may be added to an institution's law
library collection under the following circumstances:

   (1) Pursuant to the Program Statement on Acceptance of
Donations, an inmate may donate an unwanted personally-owned law
book to the law library; however, staff may decline such a gift.
If there is a question about whether to accept a particular
volume, the Regional Counsel and Ethics Officer may be consulted.

   Donated materials, if lost or damaged, may not be replaced
by the institution or the Central Office.

   (2)  If a person other than an inmate offers a donation to
the institution law library collection, it may be accepted
pursuant to the Program Statement on Acceptance of Donations.
The Regional Counsel and Ethics Officer may be consulted about an
appropriate response to the offer.

   (3)  State officials are responsible for providing state
legal assistance and/or state legal materials to state inmates
transferred to Federal custody.  Staff may not interfere in an
inmate's attempts to obtain such assistance or materials.

If state correctional officials elect to provide state legal materials for their inmates, the institution will suggest the manner in which such materials should be provided.  The Regional Counsel must be notified if questions arise.

d.  In June and December of each year, the Education Branch, Central Office will provide each Supervisor of Education an inventory checklist of required law library publications.  Within 30 days of receipt, each Supervisor of Education must inventory each institution law library and list all missing or severely damaged materials on the checklist's discrepancy sheet.

Missing or severely damaged publications must be replaced using institution funds.  One copy of the institution's completed inventory must be kept at the institution and one copy of the discrepancy sheet sent to the Central Office Education Administrator, the Regional Education Administrator, and the Regional Counsel.

e.  Each institution must set aside a sufficiently large room where law library books will be kept to allow inmates the opportunity to work at tables without the need for removing the materials.

Each Reporter volume becomes a permanent part of the library collection.  Therefore, the site for the law library should allow for the expanding nature of the collection.

f.  Ordinarily, the Supervisor of Education is responsible for supervising the law library's upkeep and operation.  Since legal materials are expensive, supervision of law library areas must be provided as necessary to protect the materials.

The Reporter and other statutory materials and case reporters are frequently updated, and correct placement of supplements and pocket parts is important.  Out-of-date supplements and other outdated materials are to be disposed of when updated materials are received.

g.  Institution copying equipment may be made available to reproduce materials needed for research outside the library area. When this is done, procedures should be established for an inmate to request a reasonable amount of reproduced material. It is suggested that the request form contain a space for the inmate to indicate why the material is needed outside the time that is made available in the library.

By providing enough hours for library usage and by making copying equipment available when possible, destruction and theft of legal materials should be reduced.  Institutions may provide copy vending machines for inmate use.

8.  **MILITARY LAW MATERIALS.**  Several military law materials (see Attachment A) must be provided in the main law libraries at each institution.

   a.  Nine circulating sets of the <u>Military Justice Reporter</u> are available through the Bureau's Librarian in the Central Office.

      (1)  Upon receiving the <u>Reporter</u>, the Supervisor of Education will place the set in the institution's main law library.

      (2)  The Supervisor of Education must ensure that the requesting inmate is notified promptly that the <u>Reporter</u> is available.  If that inmate does not have access to the main law library, the volumes are to be made available by alternative means, such as through a basic law library.

      (3)  An inmate may not maintain the materials in his or her cell or as personal property.

      (4)  The Bureau's Librarian will fill requests for circulating sets in the order received in the Central Office.

      If requests exceed the number of circulating sets, the Librarian will notify the Supervisor of Education that the provided set will be withdrawn after 90 days.  Ordinarily, this notification is given to the institution which has had a set the longest period of time.

      The Supervisor of Education must place a notice to this effect with the set so that interested inmates are advised of the time period during which the set is available.

   b.  In addition to the nine circulating sets, a tenth set of the <u>Reporter</u> will remain in the Central Office Library and will not circulate.  The Central Office Librarian must also maintain a single reference copy of <u>Court-Martial Reports</u>.

      (**Note:**  This is a different publication than the <u>Court-Martial Reports Index and Citator</u>.)

(1)  An inmate may request copies of specific cases from
either the <u>Military Justice Reporter</u> or <u>Court-Martial Reports</u> by
submitting a written request to the institution's Supervisor of
Education.  The inmate's request must include case citations
sufficient to permit identification.

(2)  Ordinarily, the Supervisor of Education must respond to
the request within five work days of receipt by forwarding the
request (BOPNet GroupWise may be used) to the Bureau Librarian,
with a notation of the date that the request was received.

(3)  The Bureau Librarian must forward a copy of the
requested cases to the Supervisor of Education ordinarily within
five work days, but no later than 21 calendar days, from the date
the request was received.

(4)  Upon receiving the requested material, the Supervisor
of Education must have the material placed in the institution's
main law library (or other place he or she finds suitable) for
use by the requesting inmate and other interested inmates.

The Supervisor of Education is to ensure that the requesting
inmate is notified promptly that the requested cases are
available.

(5)  The inmate may not maintain the requested material in
his or her cell or as personal property unless the inmate pays
for a copy of the materials under the institution's established
procedures for copying legal materials.

9.  **FEDERAL REGISTER MATERIALS.**  Federal Register documents
(specifically, final rules, proposed rules, interim rules, and
certain notices) pertaining to the Bureau and to the U.S. Parole
Commission are to be maintained in the institution's inmate law
libraries.  Maintaining these documents in the inmate law
libraries is intended to ensure that inmates have the opportunity
to participate in the rulemaking process.

a.  The Rules Administrator in the Office of General Counsel is
to distribute these Federal Register documents to all institution
Education Supervisors via GroupWise attachments.  The Rules
Administrator is to include in a second attachment, a List of
Federal Register Documents available in the inmate law library.

Ordinarily, proposed rules and interim rules will be listed
until such time as the Bureau issues a final rule document in the
matter.  Final rules will be listed until the rules become
available in the annual revision of title 28 of the Code of
Federal Regulations.

b.   The Education Supervisor must distribute the attachments
(either on paper or via GroupWise) to staff responsible for the
institution's inmate law libraries.  Staff assigned to the
institution law libraries are to maintain paper copies of the
Federal Register documents along with the most recent copy of the
List of Federal Register Documents.

c.   The Education Supervisor must forward a copy of the most
recent List of Federal Register Documents to institution Unit
Managers for posting on inmate bulletin boards.  The List of
Federal Register Documents serves to notify inmates that the
documents are available in the inmate law libraries.

d.   The Education Supervisor must provide a copy to the
President of the local union of any of these Federal Register
documents pertaining to the Bureau.  Union representatives may
send comments on proposed or interim rules as members of the
public directly to the Rules Administrator.

e.   The Education Supervisor must also ensure that a copy of
each Federal Register document is posted on at least one
centrally located staff bulletin board.  Staff may send comments
on proposed or interim rules as members of the public directly to
the Rules Administrator, and need not send such comments through
the normal "chain of command."

10.   [**<u>LEGAL RESEARCH AND PREPARATION OF LEGAL DOCUMENTS</u> §543.11**

   **a.   The Warden shall make materials in the inmate law library
available whenever practical, including evening and weekend
hours.  The Warden shall allow an inmate a reasonable amount of
time, ordinarily during the inmate's leisure time (that is, when
the inmate is not participating in a scheduled program or work
assignment), to do legal research and to prepare legal documents.
Where practical, the Warden shall allow preparation of documents
in living quarters during an inmate's leisure time.**

   **b.   The Warden shall periodically ensure that materials in each
inmate law library are kept intact and that lost or damaged
materials are replaced.**

   **c.   Staff shall advise an inmate of rules and local procedures
governing use of the inmate law library.  Unauthorized possession
of library materials by an inmate constitutes a prohibited act,
generally warranting disciplinary action (see part 541 of this
chapter).]**

Part 541 refers to the Program Statement on Inmate Discipline
and Special Housing Units.

[d. An inmate's legal materials include but are not limited to
the inmate's pleadings and documents (such as a pre-sentence
report) that have been filed in court or with another judicial or
administrative body, drafts of pleadings to be submitted by the
inmate to a court or with other judicial or administrative body
which contain the inmate's name and/or case caption prominently
displayed on the first page, documents pertaining to an inmate's
administrative case, photocopies of legal reference materials,
and legal reference materials which are not available in the
institution main law library (or basic law library in a satellite
camp).]

Staff must consult with Regional Counsel if there is any
question whether certain items qualify as legal materials.

[(1)  An inmate may solicit or purchase legal materials from
outside the institution.  The inmate may receive the legal
materials in accordance with the provisions on incoming
publications or correspondence (see 28 CFR part 540, subparts B
and F) or through an authorized attorney visit from a retained
attorney.  The legal materials are subject to inspection and may
be read or copied unless they are received through an authorized
attorney visit from a retained attorney or are properly sent as
special mail (for example, mail from a court or from an
attorney), in which case they may be inspected for contraband or
for the purpose of verifying that the mail qualifies as special
mail.]

28 CFR part 540, subparts B and F refer to the Program
Statements on Correspondence and Incoming Publications
respectively.

[(2)  Staff may allow an inmate to possess those legal
materials which are necessary for the inmate's own legal actions.
Staff may also allow an inmate to possess the legal materials of
another inmate subject to the limitations of paragraph (f)(2) of
this section.  The Warden may limit the amount of legal materials
an inmate may accumulate for security or housekeeping reasons.]

To ensure that legal materials do not become a security or
housekeeping hazard (e.g., fire, sanitation), each institution
may establish a limit on the amount of, and storage location for
legal materials in the inmate's living area.

The amount of storage space provided for legal materials
depends upon the total storage space available.  Ordinarily, the
amount may not be restricted below three cubic feet per inmate.
In a segregation or detention area, the amount ordinarily may not
be restricted below one cubic foot per inmate.

Alternate storage areas may be provided only for storing
excess legal materials.  The Regional Counsel may be consulted if
there is a question as to the need for bulky or excess legal
material, or if there is any question regarding the applicability
of the legal materials to the inmate's own legal actions.

**[e.  An inmate is responsible for submitting his documents to
court.  Institution staff who are authorized to administer oaths
shall be available to provide necessary witnessing of these
documents, as requested by inmates and at times scheduled by
staff.**

See Section 16 for further instructions on administering oaths
and acknowledgments.

**f. (1)  Except as provided for in paragraph f.(4) of this
section, an inmate may assist another inmate in the same
institution during his or her leisure time (as defined in
paragraph a. of this section) with legal research and the
preparation of legal documents for submission to a court or other
judicial body.]**

Any assistance offered by one inmate to another is
voluntary.  An inmate is not entitled to assistance from any
specific inmate.  Because no inmate may conduct a business, the
assisting inmate may not receive compensation.  The assisting
inmate shall not be provided any privileges ordinarily afforded
to attorneys or paralegals, clerks, and legal assistants, even if
the inmate was an attorney before his or her incarceration.

Inmates who are in different institutions are prohibited
from providing legal assistance to each other except to the
extent that they may be allowed to correspond with each other
about legal matters.  For example, immediate family members or
co-defendants or co-plaintiffs may receive approval to exchange
correspondence (see the Program Statement on Correspondence).

Inmates who are allowed to exchange correspondence may
choose to include legal material pertinent to their joint action
in their correspondence.  Enclosed legal material, however, is
subject to inspection and can be read or copied.

Legal material which co-defendants or co-plaintiffs receive
through special mail or from an attorney through an attorney
visit is subject to inspection for contraband or qualification as
special mail only, and may not be read or copied.

**[(2)  Except as provided for in paragraph f.(4) of this
section, an inmate may possess another inmate's legal materials
while assisting the other inmate in the institution's main law
library and in another location if the Warden so designates.**

**(a)  The assisting inmate may not remove another inmate's
legal materials, including copies of the legal materials, from
the law library or other designated location.  An assisting
inmate is permitted to make handwritten notes and to remove those
notes from the library or other designated location if the notes
do not contain a case caption or document title or the name(s) of
any inmate(s).  The assisting inmate may also develop and possess
handwritten drafts of pleadings, so long as the draft pleadings
do not contain a case caption or document title or the name(s) of
any inmate(s).  These notes and drafts are not considered to be
the assisting inmate's legal property, and when the assisting
inmate has these documents outside the law library or other
designated location, they are subject to the property limitations
in § 553.11(a) of this chapter.]**

§553.11(a) refers to the Program Statement on Inmate
Personal Property.

**[(b)  Although the inmate being assisted need not remain
present in the law library or other designated location while the
assistance is being rendered, that inmate is responsible for
providing and retrieving his or her legal materials from the
library or other designated location.  Ordinarily, the inmate
must provide and retrieve his or her legal materials during his
or her leisure time.  An inmate with an imminent court deadline
may request a brief absence from a scheduled program or work
assignment in order to provide or retrieve legal materials from
an assisting inmate.]**

The law library is the most appropriate location for
allowing inmates to assist one another with legal matters
however, the Warden may choose to designate additional locations.

Where it is difficult to use the institution's main law
library (for example, at a medical facility, a metropolitan
detention center, a metropolitan correctional center, an
administration maximum security facility, an administrative high
security level institution, or in a special housing unit,

pretrial unit, or holdover unit), the Warden should designate
another location.  The need for institution security, good order,
or discipline, however, may prevent the use of another location.

     The inmate being assisted must bring his or her legal
materials to the law library or other designated location to
provide them to the assisting inmate.  The assisting inmate may
not remove the legal materials from the law library or other
designated location.

     Legal materials left unattended in the law library or
other designated location may be disposed of as nuisance
contraband or returned by staff to the owner.  Staff are to
consult with institution legal staff or Regional Counsel if they
have a question about who owns the legal materials.

    **[(3)  The Warden may give special consideration to the legal
needs of inmates in mental health seclusion status in federal
medical centers or to inmates in controlled housing.**

    **(4)  The Warden at any institution may impose limitations on
an inmate's assistance to another inmate in the interest of
institution security, good order, or discipline.]**

     For reasons of security, inmates in an administrative
institution or unit or in a special housing unit have limited
access to other inmates on those units and no access to general
population inmates.  Legal assistance under Section 10 of this
Program Statement remains available for such inmates.

    **[g.  The institution staff shall, upon an inmate's request and
at times scheduled by staff, duplicate legal documents if the
inmate demonstrates that more than one copy must be submitted to
court and that the duplication cannot be accomplished by use of
carbon paper.  The inmate shall bear the cost, and the
duplication shall be done so as not to interfere with regular
institution operations.  Staff may waive the cost if the inmate
is without funds or if the material to be duplicated is minimal,
and the inmate's requests for duplication are not large or
excessive.]**

     To prevent abuses of this provision (e.g., inmate shows a
pattern of depleting his or her commissary funds prior to
requesting duplication of legal documents), the Warden may impose
restrictions on the provisions of this subsection.  In such
cases, staff may request that the inmate complete the appropriate
form for reimbursement (BP-CMS-21/24) for the amount of legal
copies received at government expense.  Commissary staff will

hold the BP-CMS-21/24 form and charge the reimbursement against
the inmate's account as soon as the inmate has funds (see the
Trust Fund/Warehouse/Laundry Manual.)

   **[h.  Unless clearly impractical, the Warden shall allow an
inmate preparing legal documents to use a typewriter, or if the
inmate cannot type, to have another inmate type his documents.
The Warden may allow the inmate to hire a public stenographer to
type documents outside the institution, but the institution may
not assume the expense of hiring the public stenographer.  Staff
shall advise the inmate of any delay in the typing of which they
have received notice from the stenographer.**

   **i.  The Warden shall give special time allowance for research
and preparation of documents to an inmate who demonstrates a
requirement to meet an imminent court deadline.  Otherwise, each
inmate shall continue his regular institutional activities
without undue disruption by legal activities.]**

   Inmates who request time to do legal research and preparation
for filing legal documents during their regularly scheduled work
time may be required to do so first during all available leisure
time.  When such requests are made, staff may also authorize the
inmate to work reduced hours.  For example, an inmate may be
allowed mornings to do legal research, work in the afternoons,
and then use evenings for further research.  The Regional Counsel
may be consulted regarding such arrangements.

   **[j.  With consideration of the needs of other inmates and the
availability of staff and other resources, the Warden shall
provide an inmate confined in disciplinary segregation or
administrative detention a means of access to legal materials,
along with an opportunity to prepare legal documents.  The Warden
shall allow an inmate in segregation or detention a reasonable
amount of personal legal materials.  In no case shall the amount
of personal legal materials be such as to pose a fire,
sanitation, security, or housekeeping hazard.]**

   A reasonable amount of personal legal material in segregation
or detention is approximately one cubic foot.  Greater amounts
may be allowed when an inmate has an imminent court deadline.
The Regional Counsel should be consulted before accumulation of
legal materials is limited for housekeeping reasons.

11.   [<u>RETENTION OF ATTORNEYS</u> §543.12

   **a.   The Warden shall allow an inmate to contact and retain attorneys.  With the written consent of the inmate, staff may advise an attorney of the inmate's available funds.  Staff may not interfere with selection and retention of attorneys if the inmate has attained majority and is mentally competent.  If the inmate is a mental incompetent or a minor, the Warden shall refer to the inmate's guardian or to the appropriate court all matters concerning the retention and payment of attorneys.]**

   The Warden must ensure that a list of legal resources (including attorneys acting pro bono or through an established legal aid program at the institution) is made available.

   **[b.   The Bureau of Prisons may not act as guarantor or collector of fees.  As to correspondence with attorneys and telephone calls to attorneys, see part 540 of this chapter.]**

   Part 540 refers to the Program Statement on Correspondence and the Program Statement on Telephone Regulations for Inmates.

12.   [<u>VISITS BY ATTORNEYS</u> §543.13

   **a.   The Warden shall, under the conditions of this section, permit visits by the retained, appointed, or prospective attorney of an inmate or by an attorney who wishes to interview an inmate as a witness.**

   **b.   The Warden generally may not limit the frequency of attorney visits since the number of visits necessary is dependent upon the nature and urgency of the legal problems involved.  The Warden shall set the time and place for visits, which ordinarily take place during regular visiting hours.  Attorney visits shall take place in a private conference room, if available, or in a regular visiting room in an area and at a time designed to allow a degree of privacy.  The Warden may make exceptions according to local conditions or for an emergency situation demonstrated by the inmate or visiting attorney.]**

   To the extent practicable, staff are to provide an area for attorney-client visits that ensures their conversation has a high degree of privacy.

   **[c.   The attorney shall make an advance appointment for the visit through the Warden prior to each visit; however, the Warden shall make every effort to arrange for a visit when prior notification is not practical.**

**d.  The Warden may require an attorney to indicate where he is
licensed as an attorney and how that fact may be verified.  Prior
to each appointment or visit, the Warden shall require each
attorney to identify himself and to confirm that he wishes to
visit an inmate who has requested his visit or whom he represents
or whom he wishes to interview as a witness.  The Warden may not
ask the attorney to state the subject matter of the lawsuit or
interview.  If there is any question about the identity of the
visitor or his qualification as an attorney in good standing, the
Warden shall refer the matter to the Regional Counsel.**

**e.  Staff may not subject visits between an attorney and an
inmate to auditory supervision.  The Warden may permit tape
recordings to be used by an attorney during the course of a visit
only if the attorney states in writing in advance of the
interview that the sole purpose of the recording is to facilitate
the attorney-client or attorney-witness relationship.]**

Ordinarily, the use of any other electronic device (for
example, videotape recorders or computers) are not to be
permitted.  The Warden may permit such use, however, if it is
shown that such use is absolutely essential to facilitate the
attorney-client relationship, and such use would not be
inconsistent with the institution's maintenance of security, good
order, or discipline.  The Visiting Attorney Statement
(BP-S241.013) is a sample of a statement which institution staff
may reproduce locally.

**[f.  The Warden may, at any time, subject an attorney to a
search of his person and belongings for the purpose of
ascertaining if contraband is present, as a condition of visiting
an inmate.]**

Procedures for the exchange of legal documents in the visiting
room should be placed either in an Institution Supplement on
Legal Activities or in the required Institution Supplement on
Visiting.

**13.  [LIMITATION OR DENIAL OF ATTORNEY VISITS AND CORRESPONDENCE
§543.14**

**a.  An act by an attorney which violates Bureau regulations or
institution guidelines and which threatens the security, good
order, or discipline of the institution is grounds for limitation**

or denial by the Warden of the attorney's privileged visitation
and correspondence rights.  Acts by an attorney which may warrant
such limitation or denial include, for example, the following:

     (1)  A false statement as to the attorney's identity or
qualifications;

     (2)  A plan, attempt, or act to introduce contraband into
the institution;

     (3)  A conspiracy to commit, an attempt to commit, or the
actual commission of an act of violence within an institution;
and

     (4)  Encouraging an inmate to violate the law, Bureau of
Prisons rules, or local implementing guidelines.

   b.  Unless the breach of regulations is extreme or repeated,
limitation rather than a denial of visitation or correspondence
rights is proper, especially where the inmate is represented by
the attorney and is confronted with a court deadline.  For
example, the Warden may subject an attorney to a search of his
person and belongings or may permit the attorney only
non-privileged correspondence.  The Warden shall also consider
referral of the matter to the state agency regulating the
attorney's professional conduct.]

   The Warden must consult with the Regional Counsel before taking
action under this subsection.

   [c.  An act by an inmate in violation of Bureau regulations or
institution guidelines warrants a limitation by the Warden of the
inmate's correspondence or visiting rights with attorneys only if
necessary to protect institution security, good order, or
discipline.  The Warden may not deny correspondence or visiting
rights with attorneys generally.]

   The Warden must consult with the Regional Counsel before taking
action under this subsection.

   [d.  The attorney may appeal any limitation or denial by the
Warden of attorney visits or correspondence rights to the
Regional Director.  The inmate affected may appeal through the
Administrative Remedy Procedures.]

14.  [<u>LEGAL AID PROGRAM</u> §543.15

     **a.  A legal aid program which is funded or approved by the
Bureau is expected to provide a broad range of legal assistance
to inmates.  Staff shall allow these programs generally to
operate with the same independence as privately retained
attorneys.  The Warden shall refer a request or decision to
terminate or restrict a program, or individual participants in a
program, to the Regional Counsel.**

     **b.  In order to promote the inmate-program relationship, the
Warden shall give those students or legal assistants working in
legal aid programs the same status as attorneys with respect to
visiting and correspondence except where specific exceptions are
made in this section and in part 540 of this chapter.]**

     Part 540 refers to the Program Statement on Correspondence.

     **[c.  An attorney or law school professor shall supervise
students and legal assistants participating in the program.  The
supervisor shall provide the Warden with a signed statement
accepting professional responsibility for acts of each student or
legal assistant affecting the institution.  The Warden may
require each student or legal assistant to complete and sign a
personal history statement and a pledge to abide by Bureau
regulations and institution guidelines.  If necessary to maintain
security or good order in the institution, the Warden may
prohibit a student or legal assistant from visiting or
corresponding with an inmate.]**

     When an attorney requests that a student or legal assistant be
allowed to correspond or visit an inmate, staff ordinarily should
confirm the request by completing the Paralegal or Legal
Assistant Confirmation (BP-S242.013).  This confirmation should
be given or sent to the supervising attorney, along with the
Application to Enter Institution as Representative (BP-S243.013).
The Warden may require each student or legal assistant to
complete a BP-S243.013.  The form may be reproduced locally.

     The Warden must consult with the Regional Counsel if there is a
question regarding the qualifications of a participant before a
final determination is made, or on any recommendation or decision
to limit or prohibit a student or legal assistant.

15.   [OTHER PARALEGALS, CLERKS, AND LEGAL ASSISTANTS §543.16

   **a.  The Bureau of Prisons recognizes the use of assistants by
attorneys to perform legal tasks and, with proper controls and
exceptions enumerated in this section and in part 540 of this
chapter, accords such assistants the same status as attorneys
with respect to visiting and correspondence.]**

   Part 540 refers to the Program Statement on Correspondence.

   The special visiting/correspondence status accorded to
paralegals, clerks, and legal assistants depends upon an ongoing,
supervisory relationship with an attorney on an approved
visiting/correspondence list.  Absent any current supervisory
relationship, such persons may only receive social visiting or
general correspondence privileges.

   A request by a paralegal, law clerk, or legal assistant for
social visiting/general correspondence privileges must be
evaluated and considered on the same basis as requests from non-
legal persons.

   The Warden must consult with the Regional Counsel if there is a
question regarding the status of such persons before making a
final determination, or any recommendation or decision to limit
or prohibit the visiting/correspondence privileges of such
persons.

   **[b.  The attorney who employs an assistant and who wishes the
assistant to visit or correspond with an inmate on legal matters
shall provide the Warden with a signed statement including:**

   **(1)  Certification of the assistant's ability to perform in
this role and awareness of the responsibility of this position;**

   **(2)  A pledge to supervise the assistant's activities; and**

   **(3)  Acceptance of personal and professional responsibility
for all acts of the assistant which may affect the institution,
its inmates, and staff.  The Warden may require each assistant to
fill out and sign a personal history statement and a pledge to
abide by Bureau regulations and institution guidelines.  If
necessary to maintain security or good order in the institution,
the Warden may prohibit a legal assistant from visiting or
corresponding with an inmate.]**

   The Warden may require each paralegal, clerk, or legal
assistant to complete a BP-S243.013.

16.   **ADMINISTERING OATHS AND ACKNOWLEDGMENTS.**   28 U.S.C. § 1746
provides that an unsworn declaration under penalty of perjury may
be used with "like force and effect" as a sworn declaration,
verification, certification, statement, oath, or affidavit, when
such action is required by any law, rule, regulation, order, or
requirement of the United States.   Exceptions specified in the
statute are a deposition, an oath of office, and an oath required
to be taken before a specified official other than a notary
public.

Since most documents inmates sign are pursuant to a United States
law, rule, or regulation, a sworn oath is often not required.

When an unsworn declaration is not sufficient, 18 U.S.C. § 4004
authorizes specified Bureau staff to administer oaths and take
acknowledgments of officers, employees, and inmates.   Thus, while
state and local laws may often refer only to a notary public (or
similar officials) because they are the only officials authorized
by state law to administer oaths and witness signatures, Federal
law also authorizes certain Bureau officials to perform such
functions in Federal prisons.

    a.   **Unsworn Declarations.**   Other than for the exceptions cited
above, staff need not administer oaths and witness inmate
signatures on any documents to be filed in Federal courts or with
Federal agencies, unless directly instructed to do so by the
Court or agency.   Inmates may make their own unsworn declaration
on such documents by placing the following paragraph at the end
of the document:

        "I declare (or certify, verify or state), under penalty of
        perjury, that the foregoing is true and correct.   Executed
        on (date)."


                              _____
                               (Signature)


    b.   **Oaths.**   Unsworn declarations are not legally sufficient for
declarations on depositions, for oaths of office, or for oaths
required to be taken before an official other than a notary

public.  In addition, documents for submission to state courts
and state agencies may require a sworn declaration.  For such
documents, it is Bureau policy to administer oaths prior to
witnessing the signatures of persons executing these documents.

    (1)  **Administering Oaths.**  Title 18 U.S.C. § 4004 provides:

    **"The wardens and superintendents, associate wardens and
superintendents, chief clerks, and record clerks, of Federal
penal or correctional institutions, may administer oaths to
and take acknowledgments of officers, employees, and inmates
of such institutions, but shall not demand or accept any fee
or compensation therefor."**

For the purpose of this Program Statement, institution Case
Managers are considered to be chief clerks.

The person giving the oath must face the oath administrator
and raise his or her right hand while the administrator states:

    You do solemnly, sincerely, and truly swear that the various
matters and things set forth in this paper which you are
about to sign before me are true, and that you do this under
the pains and penalties of perjury.

After receiving the affirmative answer, the proper stamp is
to be affixed in the necessary places, and the paper(s) duly
signed by parties in the places provided.

    (2)  **Administering Affirmations.**  Affirmations are to be
offered for individuals who cannot or do not wish to swear or
take oaths.

The person giving the affirmation must face the affirmation
administrator and raise his or her right hand while the
administrator states:

    You do solemnly, sincerely, and truly affirm and declare
that the various matters and things set forth in this paper
which you are about to sign before me are true, and that you
do this under the pains and penalties of perjury.

After receiving the affirmative answer, the proper stamp is
to be affixed in the necessary places, and the paper(s) duly
signed by parties in the places provided.

PS 1315.07
11/5/99
Page 22

(3) **Stamps.**  The following shall be the wording of the
stamps used:

<u>   (name)          </u>, <u>     (title)      </u>,
Authorized by the Act of July 7, 1955, as amended, to
administer oaths (18 U.S.C. § 4004).


(4) **Validity of Witnessing.**  Any document witnessed without
the initiator's taking the oath or affirmation may be invalid.
The witnessing of a person's signature in no way is a
representation by the witness as to the validity of the material
or its contents, but is an indication that the document has been
signed by the individual whose signature appears thereon.

c.  **Staff Responsibility.**  Each Warden will assign an employee
to instruct appropriate personnel in the proper procedures to
follow in witnessing signatures and in giving affirmations.  Each
person issued a stamp is responsible for its control and
safekeeping, so it will not be available to unauthorized persons.



                            /s/
                       Kathleen Hawk Sawyer
                       Director

**REQUIRED MAIN LAW LIBRARY MATERIALS**

1.  REPORTERS:

    a. <u>United States Supreme Court Reports</u> (Lawyers' Edition
    2d Series), Volume 4-26, 37-present (Lexis Law Publishing
    Co.)  (New institutions should order Volumes 4 - present).

    b. <u>Supreme Court Reporter</u>, Volumes 91 - 93A (West Group)
    (New institutions do not order.)

    c. <u>Decisions of the United States Supreme Court</u>, 1964 -
    present (Lexis Law Publishing Co.).

    d. <u>Federal Reporter, 2d Series</u>, Volumes 267 - 999 (West
    Group).

    e. <u>Federal Reporter, 3d Series</u>, Volumes 1 - present (West
    Group).

    f. <u>Federal Supplement</u>, Volumes 173 - present (West Group).

    g. <u>Maryland Reporter</u>, volumes 91 - present (contains
    District of Columbia Court of Appeals cases that are also
    published in the Atlantic 2nd Reporter)  (West Group).

    h. <u>Military Justice Reporter</u>, Volume 36 No. 1 - present
    (West Group) (new institutions should order complete set).

    i. <u>Criminal Law Reporter</u> (new institutions purchase first
    annual subscription; subsequent subscriptions ordered by
    Central Office) (BNA).

2.  STATUTES:

    a. <u>United States Code Annotated</u>, complete set (West Group).

    b. <u>United States Constitution</u>, including Amendments (West
    Group).

    c. <u>District of Columbia Code Annotated</u>, complete set (Michie
    Publishing Co.).

3.  RULES:

    a. <u>Federal Civil Judicial Procedures & Rules</u> (West Group).

    b. <u>Federal Criminal Code & Rules</u> (West Group).

    c. <u>Military Rules of Evidence Manual</u>, Saltzburg, Schinasi &

Schlueter (Michie Publishing Co.).

4.  REGULATIONS:

    a. Title 8 of the Code of Federal Regulations
(U.S. Government Printing Office).

    b. Title 21 of the Code of Federal Regulations, chapter II,
Part 1300 to end (U.S. Government Printing Office).

    c. Title 28 of the Code of Federal Regulations
(U.S. Government Printing Office).

5.  PROGRAM STATEMENTS:

    a. All current Bureau of Prisons Program Statements which
contain rules codified in Chapters III or V of Title 28 of
the Code of Federal Regulations.

    b. Any other Program Statement or Institution Supplement
that the Warden may deem to be of interest to the inmate
population, except for those documents that are restricted.

6.  OTHER MATERIALS:

    a. <u>American Jurisprudence</u> 2d edition, complete set.
(West Group).

    b. <u>Black's Law Dictionary</u> (West Group).

    c. <u>Complete Manual of Criminal Forms</u>, Bailey and Rothblatt
(West Group).

    d. <u>Constitutional Rights of Prisoners</u>, Palmer (Anderson
Publishing Co.).

    e. <u>Law of Sentencing, Corrections and Prisoners' Rights</u>,
Krantz (West Group).

    f. <u>Criminal Practice Institute Trial Manual</u>, two volumes
(Public Defenders Service).

    g. <u>Criminal Procedure in a Nutshell</u>, Israel and LaFave
(West Group).

    h. <u>Court Martial Reports Index and Citator</u>, (Loaned by
Central Office Library).

i. <u>Federal Habeas Corpus Practice and Procedure</u>, Liebman and
Hertz (Michie Publishing Co.) (all volumes and supplements).

j. <u>Immigration Law and Procedure</u>, Gordon and Gordon (one
volume) (Matthew Bender Publishing Co.).

k. <u>Legal Research in a Nutshell</u>, Cohen and Kent
(West Group).

l. <u>Legal Research and Writing: Some Starting Points</u>, Statsky
(West Group).

m. <u>Manual de Pautaus</u>, Zapp (Publicaciones Legales en
Espanol, Inc.).

n. <u>Manual for Courts-Martial, 1995</u>, United States
(U.S. Government Printing Office).

o. <u>Manual for Prison Law Libraries</u>, Werner (Rothman
Publishing Co.).

p. <u>Military Criminal Justice: Practice and Procedure</u>,
Schlueter, 1982 Edition and Supplements (Michie Publishing
Co.).

q. <u>Military Justice Digest</u> (West Group).

r. <u>Modern Criminal Procedure</u>, Israel and Kamisar
   (West Group).

s. <u>Prisoners' Assistance Directory</u> (The National Prison
Project)

t. <u>Shepard's</u>, for District of Columbia (Shepard's).

u. <u>Shepard's United States Citations</u> (Shepard's).

v. <u>Shepard's Federal Citations</u> (Shepard's).

w. <u>Spanish/English Law Dictionary</u>, Solis (West Group).

x. <u>United States Supreme Court Digest Annotated</u>
(complete set) (Lexis Law Publishing Co.).

y. <u>ABA's Family Legal Guide</u> (Random House).

PS 1315.07
11/5/99
Attachment B, Page 1

REQUIRED MATERIALS FOR SATELLITE CAMP LAW LIBRARIES

1.  REPORTERS:

    a. Decisions of the United States Supreme Court,
    1964 - present. (Lexis Law Publishing Co.).

    b. Federal Reporter, 2d Series, Volumes 604 - 999
    (West Group).

    c. Federal Reporter, 3d Series, Volumes 1 - present
    (West Group).

    d. Criminal Law Reporter (new institutions purchase first
    annual subscription; subsequent subscriptions ordered by
    Central Office) (BNA).

2.  STATUTES:

    a. United States Code Annotated.  (West Group).
    (Pamphlet volumes not included)

        (1) Title 5, sections 1 - 5100.

        (2) Title 18, complete.

        (3) Title 21, complete.

        (4) Title 26, sections 3101 to end.

        (5) Title 28, volumes containing the Rules of the
        United States Supreme Court, United States Court of
        Appeals Rules and Federal Rules of Appellate Procedure.

        (6) Title 28, sections 2201 to end.

        (7) Title 42, sections 1771 - 2010.

    b. United States Constitution and Amendments, (complete).

3.  RULES:

    a. Federal Civil Judicial Procedures & Rules (West Group).

    b. Federal Criminal Code & Rules (West Group).

PS 1315.07
11/5/99
Attachment B, Page 2

4.  REGULATIONS:

    Title 28 of the Code of Federal Regulations
    (U.S. Government Printing Office) (three copies).*

5.  PROGRAM STATEMENTS:

    a. All current Bureau of Prisons Program Statements which
    contain rules codified in Chapters III or V of Title 28 of
    the Code of Federal Regulations.

    b. Any other Program Statement or Institution Supplement
    that the Warden may deem to be of interest to the inmate
    population, with the exception of those documents that are
    restricted.

6.  OTHER MATERIALS:

    a. <u>Black's Law Dictionary</u> (West Group).

    b. <u>Complete Manual of Criminal Forms</u>, Bailey and Fishman
    (West Group).

    c. <u>Constitutional Rights of Prisoners</u>, Palmer
    (Anderson Publishing Co.).

    d. <u>Law of Sentencing, Corrections and Prisoners' Rights</u>,
    Krantz (West Group).

    e. <u>Criminal Procedure in a Nutshell</u>, Israel and LaFave
    (West Group) (three copies).*

    f. <u>Federal Habeas Corpus Practice and Procedure</u>, Liebman and
    Hertz (Michie Publishing Co.) (all volumes and supplements)
    (two copies).*

    g. <u>Legal Research in a Nutshell</u>, Cohen and Kent (West Group)
    (three copies).

    h. <u>Legal Research and Writing: Some Starting Points</u>, Statsky
    (West Publishing Co.).

    i. <u>Manual for Courts-Martial, 1995</u>, United States
    (U.S. Government Printing Office).

    j. <u>Modern Criminal Procedure</u>, Israel and Kamisar
    (West Group).

PS 1315.07
11/5/99
Attachment B, Page 3

k. <u>Prisoners' Assistance Directory</u> (The National Prison
Project).

l. <u>ABA's Family Legal Guide</u>,
(Publications International Ltd.).

*    These copies may be loaned to other inmate law
libraries at the Supervisor of Education's discretion.

### REQUIRED MATERIALS FOR BASIC LAW LIBRARIES

1.  REPORTERS:

    a. <u>Decisions of the United States Supreme Court</u>, 1964 - present. (Lexis Law Publishing Co.).

    b. <u>Criminal Law Reporter</u> (new institutions purchase first annual subscription; subsequent subscriptions ordered by Central Office) (BNA).

2.  STATUTES:

    a. <u>United States Code Annotated</u>.  (West Group).
        (Pamphlet volumes not included)

    (1) Title 5, sections 1 - 5100.

    (2) Title 18, complete.

    (3) Title 21, complete.

    (4) Title 26, sections 3101 to end.

    (5) Title 28, volumes containing the Rules of the United States Supreme Court, United States Court of Appeals Rules and Federal Rules of Appellate Procedure.

    (6) Title 28, sections 2201 to End.

    (7) Title 42, sections 1771 - 2010.

    b. <u>United States Constitution</u> and Amendments, (complete).

3.  RULES:

    a. <u>Federal Civil Judicial Procedures & Rules</u> (West Group).

    b. <u>Federal Criminal Code & Rules</u> (West Group).

4.  REGULATIONS:

    a. Title 28 of the Code of Federal Regulations (U.S. Government Printing Office).

PS 1315.07
11/5/99
Attachment C, Page 2

5.  PROGRAM STATEMENTS:

    a. All current Bureau of Prisons Program Statements which
    contain rules codified in Chapters III or V of Title 28 of
    the Code of Federal Regulations.

    b. Any other Program Statement or Institution Supplement
    that the Warden may deem to be of interest to the inmate
    population, with the exception of those documents that are
    restricted.

6.  OTHER MATERIALS:

    a. Black's Law Dictionary (West Group).

    b. Complete Manual of Criminal forms, Bailey and Fishman
    (West Group).

    c. Constitutional Rights of Prisoners, Palmer (Anderson
    Publishing Co.).

    d. Law of Sentencing, Corrections and Prisoners' Rights,
    Krantz (West Group).

    e. Criminal Procedure in a Nutshell, Israel and LaFave
    (West Group).

    f. Federal Habeas Corpus Practice and Procedure, Liebman and
    Hertz (Michie Publishing Co.) (all volumes and supplements).

    g. Legal Research in a Nutshell, Cohen (West Group).

    h. Legal Research and Writing: Some Starting Points,
    Statsky (West Group).

    i. Manual for Courts-Martial, 1995, United States
    (U.S. Government Printing Office).

    j. Modern Criminal Procedure, Israel and Kamisar
    (West Publishing Co.).

    k. Prisoners' Assistance Directory
    (The National Prison Project).

    l. ABA's Family Legal Guide, (Publications International
    Ltd.).

PS 1315.07
11/5/99
Attachment D, Page 1


BP-S241.013  VISITING ATTORNEY STATEMENT,
        is available on BOPDOCS

BP-S242.013  PARALEGAL OR LEGAL ASSISTANT CONFIRMATION,
        is available on BOPDOCS.

PS 1315.07
11/5/99
Attachment F, Page 1

BP-S243.013  APPLICATION TO ENTER INSTITUTION AS REPRESENTATIVE,
is available on BOPDOCS.