1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Walter J. Lack, Esq. (SBN 57550)
Rachel M. Lannen, Esq. (SBN 333701)
**ENGSTROM, LIPSCOMB & LACK**
10100 Santa Monica Boulevard, 12th Floor
Los Angeles, CA 90067-4113
Tel: (310) 552-3800 / Fax: (310) 552-9434

Attorneys for Defendant,
DAVID LIRA

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDELSON PC, an Illinois professional corporation,<br><br>                    Plaintiffs,<br><br>          v.<br><br>DAVID LIRA, an individual, KEITH GRIFFIN, an individual, ERIKA GIRARDI a/k/a ERIKA JAYNE, an individual, EJ GLOBAL, LLC, a California limited liability company, CHRISTOPHER KAMON, an individual, GEORGE HATCHER, an individual, WRONGFUL DEATH CONSULTANTS, a California corporation, JOSEPH DINARDO, an individual, CALIFORNIA ATTORNEY LENDING II., a New York corporation,<br><br>                    Defendants. | Case No. 2:22-cv-08787-JFW (MAAx)<br>*Assigned to the Honorable John F. Walter*<br><br>**DEFENDANT DAVID LIRA'S NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS UNTIL RESOLUTION OF THE PARALLEL CRIMINAL PROCEEDING** |

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 20, 2023 at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 7A of the United States District Court for the Central District of California, located at 350 W. 1st Street, Los Angeles, California 90012, the Honorable John F. Walter presiding, defendant David Lira ("Defendant") will and hereby does move this Court for an Order Staying this action pending the resolution of *United States v. Thomas Girardi, et al.,* U.S. District Court, N.D. Illinois, Case No. 1:23-cr-00054, which is currently proceeding against Defendant.

This Motion to Stay will be made on the grounds that requiring Defendant to respond to discovery herein will force him to choose between either revealing information which might implicate him in the criminal matter, or refusing to respond and suffering a default judgment herein. Specifically, Defendant requests that the Court stay the entirety of this civil proceeding until the resolution of the parallel criminal case against Defendant in the United States District Court for the Northern District of Illinois.

This motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice with attached exhibits, the pleadings and records on file in this action, and upon such additional argument and evidence as may be presented at or before the Court's decision on the motion.

This motion is made following the conference of counsel pursuant to Local Rule 7.3, which took place on February 2 and 3, 2023. Defendants Erika Girardi, EJ Global, LLC, Joseph DiNardo, and California Attorney Lending, II, Inc. could not agree to stipulate to an immediate stay because of their pending motions to dismiss, which are currently set for hearing on February 27, 2023. Defendant California Attorney Lending II, Inc. ("CAL II"), states that it will oppose the

1  aforementioned motions to stay to the extent that they would prevent the timely

2  consideration of CAL II's pending motion to dismiss, because the causes of action

3  presently pled against CAL II cannot be maintained, even after amending the

4  pleading, and because (after conferring with Plaintiff regarding CAL II's

5  opposition to the motion to stay), Plaintiff has not identified a non-frivolous

6  alternate cause of action that might be pled against CAL II. These Defendants

7  would, however, agree to a stay that becomes effective after their motions to

8  dismiss are determined.

9         Plaintiff will not oppose a stay of this action, but cannot agree to a piece

10  stay. In the even that any Defendant intends to continue the litigation – whether

11  through the motions to dismiss or otherwise – Plaintiff must insist on timely

12  discovery productions to ensure that the case progresses as ordered by the Court.

13  (*See* Standing Order, ¶ 4(b) ("Counsel shall begin to actively conduct discovery

14  before the Fed. R. Civ. P. 26(f) conference because at the Scheduling Conference

15  the Court will impose tight deadlines to complete discovery.").

16

17  Dated: February 10, 2023          ENGSTROM, LIPSCOMB & LACK

18

19                                    By:_____

20                                        WALTER J. LACK, ESQ.
                                          RACHEL M. LANNEN, ESQ
                                          Attorneys for Defendant David Lira

21

22

23

24

25

26

27

28

**DEFENDANT DAVID LIRA'S NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS UNTIL
RESOLUTION OF THE PARALLEL CRIMINAL PROCEEDING: Case No. 2:22-cv-08787-JFW (MAAx)**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Due to the criminal proceeding against Defendant David Lira, the Court should stay this civil matter pending the outcome of the parallel criminal proceeding.

A defendant in parallel civil and criminal cases that are proceeding simultaneously faces a dilemma: if the defendant does not take the Fifth Amendment, the Fifth Amendment privilege will be considered waived in criminal proceedings. *See, United States v. Kordel,* 397 U.S. 1, 9 (1970); *Sec. & Exch. Comm'n v. Dreser Indus., Inc.,* 628 F. 2d 1368, 1375-76 (D.C.Cir.) (cert. denied 449 U.S. 993 (1980)). It is well-settled that when the government pursues both civil and criminal actions against an individual defendant, the Fifth Amendment concerns warrant a stay of the civil proceeding.

Here, Defendant David Lira ("Defendant") was indicted by the federal government on February 1, 2023 in the United States District Court for the Northern District of Illinois, case no. 1:23-cr-00054 ("Indictment"), attached hereto as Exhibit 1. The Indictment is based on nearly identical facts to those at issue in Plaintiff's Complaint, namely, Defendant's alleged involvement with Tom Girardi and Girardi Keese's mismanagement of the Lion Air clients' funds, and communications by Defendant and others related to the handling of those funds. Likewise, the Indictment asserts the criminal analogs to the civil claims in Plaintiff's Complaint. Furthermore, the United States Attorney's Office of the Central District of California has an ongoing criminal investigation arising from the same allegations that are the basis for this civil action. The risk of criminal prosecution in the Central District is not conjectural, it is real, because the U.S. Attorney's Office has informed counsel for Defendant that Defendant is a target of its investigation. A copy of the Indictment filed in the United States District Court for the Central District of California is attached hereto as Exhibit 2.

1    Since the Government's Indictment and Plaintiff's Complaint involve

2    significantly overlapping subject matter, Defendant must either (1) assert his Fifth

3    Amendment rights against compelled self-incrimination in order to avoid the risk

4    of providing evidence for his current indictment, and a potential future criminal

5    prosecution, thereby forsaking producing evidence in defense of the civil action, or

6    (2) defend himself fully in this action, but risk providing information that may be

7    used against him in his criminal proceeding. Given the formal criminal

8    proceedings underway, Defendant should not be faced with having to decide

9    between putting on a defense to Plaintiff's Complaint versus preserving his Fifth

10   Amendment rights. When a defendant is placed in such a position, it is appropriate

11   that the defendant's constitutional rights be protected by staying the civil action in

12   its entirety.

13   **II.    ARGUMENT**

14        **A. COURTS HAVE BROAD DISCRETION TO STAY A CIVIL**

15             **ACTION IN THE FACE OF A PARALLEL CRIMINAL**

16             **PROCEEDING**

17        Without a stay of the civil action, a defendant is presented with a Hobson's

18   choice: if the civil proceedings are not stayed and the defendant testifies or

19   otherwise provides discovery, the government will have been able to use the civil

20   proceedings to acquire incriminating information for its criminal case. Civil

21   discovery against a defendant is, of course, much broader and far-reaching than

22   criminal "discovery," ranging from mandatory initial disclosures to the liberal

23   discovery provided by Rule 26(b)(1) of the F.R. Civ. P. (allowing "discovery

24   regarding any matter ... . that is relevant to the claim or defense of any party).

25   Moreover, once an incriminating fact is disclosed, the privilege is waived, and a

26   defendant can no longer invoke Fifth Amendment protection for that fact. *Rogers v.*

27   *United States,* 340 U.S. 267 (1951). The only other "option" is to invoke the

28   privilege, thereby risking an adverse inference from the failure to provide evidence

457577                                    2

**DEFENDANT DAVID LIRA'S NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS UNTIL**
**RESOLUTION OF THE PARALLEL CRIMINAL PROCEEDING: Case No. 2:22-cv-08787-JFW (MAAx)**

1  or the preclusion of evidence needed to defend against civil liability. *See Baxter v.*
2  *Palmigiano,* 425 U.S. 308, 318 (1976)(reliance on the Fifth Amendment in civil
3  cases may give rise to an adverse inference against the party claiming its benefits).

4      A district court may in its discretion "stay civil proceedings pending the
5  outcome of parallel criminal proceedings." *Federal Savings and Loan Insurance*
6  *Corp. v. Molinaro,* 889 F.2d 899, 902 (9th Cir. 1989).* The federal courts have
7  repeatedly recognized that "the strongest case for deferring civil proceedings until
8  after completion of criminal proceedings is where a party under indictment for a
9  serious offense is required to defend a civil or administrative action involving the
10 same matter." *Sec. and Exch. Comm 'n v. Dresser Indus., Inc.,* 628 F.2d 1368,
11 1375-1376 (D.C. Cir. 1980).*

12     Accordingly, the Court should exercise its discretion and stay this action
13 pending the outcome of the parallel criminal proceeding.

14     **B. THE FIVE DISCRETIONARY FACTORS ARTICULATED BY**
15             **THE NINTH CIRCUIT WARRANTS A STAY OF THIS ACTION.**

16     A court must decide whether to stay civil proceedings in the face of parallel
17 criminal proceedings in light of the particular circumstances, competing interests
18 involved in the case, and the extent to which the defendant's Fifth Amendment
19 rights are implicated. *Federal Savings and Loan Insurance Corp. v. Molinaro,* 889
20 F.2d 899, 902 (9th Cir. 1989).*

21     In deciding whether or not "the interests of justice" support a stay in civil
22 proceedings, relevant factors include but are not limited to: (1) the interest of the
23 plaintiffs in proceeding expeditiously with this litigation or any particular aspect of
24 it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any
25 particular aspect of the proceedings may impose on defendants; (3) the
26 convenience of the court in the management of its cases, and the efficient use of
27 judicial resources; (4) the interests of persons not parties to the civil litigation; and

28

1   (5) the interest of the public in the pending civil and criminal litigation. *Keating v.*
2   *Off. of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995).

3          Further, when simultaneous civil and criminal proceedings involve "the
4   same matter," Fifth Amendment concerns may be sufficient to warrant a stay. *Sec.*
5   *& Exch. Comm'n v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980). In
6   such circumstances, courts have determined that the preservation of the defendant's
7   Fifth Amendment right is "the most important factor" to be considered. *Chao v.*
8   *Fleming*, 498 F. Supp. 2d 1034, 1039 (W.D. Mich. 2007). In the present matter,
9   Plaintiff's allegations virtually mirror the allegations in the indictment against
10  Defendant. Significantly, for purposes of this motion, the Indictment implicitly, if
11  not expressly, attempts to implicate Defendant with respect to the Lion Air matter.

12         In addition to the fact that the subject matter of the Indictment significantly
13  overlaps with that of this civil action, a consideration of the *Keating* factors weighs
14  in favor of a stay of this action.

15   **1. Plaintiff's Interests Do Not Outweigh Defendant's Fifth Amendment**
16      **Rights**

17         During the Local Rule 7-3 pre-filing conference held on February 3, 2023,
18  Plaintiff indicated that they would not be opposing this Motion to Stay.

19         While it is perhaps axiomatic that a plaintiff almost always has an interest in
20  proceeding expeditiously with a case, under the present circumstances, that interest
21  is of limited weight. In evaluating whether this civil case should be stayed, the
22  balance of interests as between the plaintiff and the defendants clearly weighs in
23  favor of a stay of this action until the parallel criminal case is concluded. The only
24  burden on the plaintiff is the brief delay of a case that seeks civil damages. Stripped
25  down to its simplest facts, this civil case is a subrogation matter. Plaintiff and its
26  insurer settled with the Lion Air families, thus extinguishing potential claims
27  against Plaintiff. Plaintiff obtained rights of assignment from the Lion Air families
28  that Plaintiff represented and has filed the instant matter.

In contrast, the burden on Defendant implicates and compromises his constitutional rights, creates an unfair situation with respect to discovery in the criminal case, and consumes valuable resources that are needed for the criminal defense. Inconvenience and delay to the plaintiff is not substantial enough to overcome the undue burden faced by Defendant.

While this will undoubtedly cause some inconvenience and delay to the plaintiff, this inconvenience pales in comparison to Defendants constitutional rights against self-incrimination. *See Volmar Distrib., Inc. v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993) (holding that while a "stay will result in inconvenience and delay to plaintiffs, ... under settled authority the Fifth Amendment is the more important consideration").

Here, a stay will both streamline discovery and preserve evidence, since both actions focus on the actions of Defendant in connection with the Lion Air matter. Moreover, since Defendant's s ability to exercise his Fifth Amendment rights unimpeded is a "more important consideration" than any claimed inconvenience on the plaintiff's part, and further, since staying this action will likely enhance, rather than hamper, plaintiff's ability to gather evidence, this Court should grant Defendant's request for a stay.

## 2.  Denying a Stay will Unduly Burden All Defendants

During the Local Rule 7-3 pre-filing conference held on February 2 and 3, 2023, all defendants indicated that they would not be opposing this Motion to Stay.

The second factor, which considers the burden on the parties seeking the stay if no stay is entered, weighs heavily in favor of a stay on all discovery in this action. As discussed above, if this action is allowed to proceed in tandem with the criminal case, Defendant will be forced into the unpalatable position of choosing either to waive his Fifth Amendment rights or to forfeit the civil suit. This choice has chilling implications for Defendant.

Furthermore, Defendant Christopher Kamon ("Kamon") is also facing criminal charges based on the same Indictment, and has already asserted his Fifth Amendment rights in his Answer to Plaintiff's Complaint. Moreover, it is anticipated that other defendants in this matter will be asserting their Fifth Amendment rights, given the ongoing investigation by the United States Attorney's Office of the Central District of California. These assertions of privilege, while proper and justified, do not allow for complete discovery at this time.

A stay protects the proper conduct of the state criminal proceedings and investigations through maintaining the integrity of the criminal discovery process. Moreover, a stay protects all parties' rights and interests in asserting their Fifth Amendment Privileges.

Thus, any invocation of the Fifth Amendment privilege by any defendant in this matter would prejudice *all* of the defendants. For these reasons, this factor is also in favor of the Court staying the present civil proceeding.

### 3. Granting a Complete Stay will Conserve Judicial Resources, Enhancing the Courts' Convenience and Efficiency

This Court has an interest in efficiently managing its docket. Since the outcome of the criminal proceeding will likely determine the scope or outcome of the civil proceeding, the Court may conserve its resources by not needing to separately litigate two proceedings. *Douglas v. United States*, No. C 03-04518 JW, 2006 WL 2038375, at *4 (N.D. Cal., July 17, 2006)(recognizing that "[a]llowing the criminal action to proceed first may narrow the issues and streamline discovery in the civil proceeding.").

As a practical matter, permitting the civil action to proceed alongside the criminal matter would be a waste of judicial resources as Defendant would anticipate a flurry of law and motion practice with regard to Defendant invoking his Fifth Amendment rights. Moreover, adjudication of the criminal matter may ultimately lead to a resolution of the civil matter without additional litigation.

1    At the very least, "common issues of fact will be resolved and subsequent

2    civil discovery will proceed unobstructed by concerns regarding self-

3    incrimination." *Jones v. Conte*, No. C 04-5312 SI, 2005 WL 1287017, at *2 (N.D.

4    Cal. Apr. 19, 2005) (citing *Javier H. v. Garcia-Botello,* 218 F.R.D. 72, 75

5    (W.D.N.Y. 2003)).

6    Such factors weigh heavily in favor of a stay.

7    **4.  No Third Party would be Prejudiced by a Stay**

8    There are no third parties whose interests are implicated in imposing a stay

9    at this juncture. Arguably, the Government may have an interest, but any interest in

10   denying a stay would ostensibly benefit the Government in impermissibly

11   obtaining discovery in the present matter to pursue the criminal matters against

12   Defendant and perhaps to mount a case against other defendants in this

13   matter. (Fed.R.Crim.P. 16.) To the extent the stay would affect interests of persons

14   not parties to this matter, such considerations are outweighed by Defendant's

15   interests. Thus, this factor weighs heavily in favor of imposing a stay of the civil

16   action.

17   **5.  The Interest of the Public Favors a Stay**

18   The public would benefit from the stay. The public has an "interest in the

19   integrity of the criminal case." *Jones v. Conte*, No. C 04-5312 SI, 2005 WL

20   1287017, at *2 (N.D. Cal. Apr. 19, 2005) (internal citations omitted). Without the

21   stay, Defendant will be forced to either forgo his Fifth Amendment rights or his

22   opportunity to offer a defense in this proceeding. This scenario does not further the

23   public interest in a fair and efficient judicial system, whereas the stay would

24   conversely promote the public interest by providing a defendant an opportunity to

25   exercise his constitutional rights *and* present a full and complete defense in this

26   proceeding.

27   Furthermore, the transactions at issue here are private transactions. There is no

28   public interest served in pursuing this civil action while the criminal matter is

**DEFENDANT DAVID LIRA'S NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS UNTIL RESOLUTION OF THE PARALLEL CRIMINAL PROCEEDING: Case No. 2:22-cv-08787-JFW (MAAx)**

1    pending. Any public interest would weigh in favor of proceeding with the criminal

2    matter before this matter. Thus, this factor favors imposing a stay of the civil action

3    pending resolution of the criminal proceedings.

4    **III.    CONCLUSION**

5         Based on the foregoing, Defendant respectfully requests that this Court enter

6    an order staying the instant matter, pending the conclusion of the parallel criminal

7    proceeding.

8

9    Dated: February 10, 2023                    ENGSTROM, LIPSCOMB & LACK

10

11                                                  By:_____
12                                                     WALTER J. LACK, ESQ.
                                                       RACHEL M. LANNEN, ESQ
13                                                     Attorneys for Defendant David Lira

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6</u>**

2

The undersigned, counsel of record for Defendant David Lira certifies that

3

this brief contains 2,783 words, which complies with the 7,000 words limit of L.R.

4

11-6-1.

5

6

Dated: February 10, 2023                    ENGSTROM, LIPSCOMB & LACK

7

8

                                            By:_____
9

                                                WALTER J. LACK, ESQ.
                                                RACHEL M. LANNEN, ESQ
10

                                                Attorneys for Defendant David Lira

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

FILED

FEB 01 2023 SMB

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

23-CR-54

**Judge Guzman**
**Magistrate Judge Cummings**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEB   1 2023

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. |
| | ) | |
| v. | ) | Violations: Title 18, United States |
| | ) | Code, Sections 1343 and 401(3) |
| THOMAS V. GIRARDI, | ) | |
| CHRISTOPHER K. KAMON, and | ) | |
| DAVID R. LIRA | ) | |

## COUNT ONE

The SPECIAL OCTOBER 2022 GRAND JURY charges:

1.     At times material to this indictment:

*Individuals and Entities Involved*

a.     Defendant THOMAS V. GIRARDI was a lawyer who owned and operated a law firm called Girardi Keese ("GK"). GIRARDI was licensed to practice law in the State of California and was admitted to the general bar of the United States District Court for the Northern District of Illinois.

b.     Defendant DAVID R. LIRA was a lawyer who worked at GK. LIRA was licensed to practice law in the State of California and was admitted to the general bar of the United States District Court for the Northern District of Illinois.

c.     Defendant CHRISTOPHER K. KAMON was employed as GK's head of accounting and finance.

d.     GK Lawyer A was a lawyer who worked at GK.

1

e.     Lender A was a litigation financing firm. GK and GIRARDI owed Lender A approximately $8 million for amounts that Lender A loaned to GK, which GIRARDI had personally guaranteed.

*GK's Bank Accounts*

f.     IOLTA Trust Account: In California, all funds received by a lawyer or law firm for the benefit of a client, including settlement funds, must be deposited into a client trust account at a bank. Such funds can be deposited into a non-segregated trust account known as an "IOLTA" account only if the deposited funds are nominal in amount or are to be held for a short period of time. GIRARDI and LIRA were authorized signatories on an IOLTA account maintained by GK, and LIRA was identified as a "Partner" of GK on that account. KAMON was authorized to initiate wire transfers from GK's IOLTA account, and KAMON had online access to all information regarding that account.

g.     Other Bank Accounts: GK maintained separate checking accounts from which to pay GK's business and operational expenses and its payroll. GIRARDI and KAMON were authorized signatories on those accounts.

*California Rules of Professional Conduct for Lawyers*

h.     Lawyers licensed to practice law in California are required to comply with the California Rules of Professional Conduct ("CRPC").

i.     Under the CRPC, lawyers must: (1) promptly notify their clients when they receive funds in which their clients have an interest; (2) promptly distribute to their clients any undisputed funds that the clients are entitled to receive;

2

and (3) take reasonable remedial measures once they became aware that a person is or was engaged in criminal or fraudulent conduct with respect to a legal proceeding in which the lawyer was involved.

*GK's Representation of Victims of the Lion Air Crash*

j.      On October 29, 2018, Lion Air Flight 610 crashed in the Java Sea shortly after takeoff from Jakarta, Indonesia. All 189 people on board the aircraft were killed. The aircraft was manufactured by Boeing.

k.      Victims A through E are relatives of passengers who died in the Lion Air crash.

l.      GIRARDI, LIRA, and GK Lawyer A, through GK, represented Victims A through E, and certain of their family members, including their minor children (collectively, "the Client Victims"), in lawsuits against Boeing (the "Lion Air cases"). Those lawsuits were filed in Chicago in the United States District Court for the Northern District of Illinois (the "Court"). GK engaged Law Firm A, a law firm based in Chicago, to act as co-counsel in those cases.

m.      After filing the Lion Air cases, LIRA and GK Lawyer A participated in mediations on behalf of the Client Victims with counsel for Boeing. As a result of those mediations, LIRA and GK Lawyer A recommended to Victims A through D that they and their family members agree to settle their cases with Boeing for an aggregated total of approximately $11,000,000. Victims A through D agreed. Because certain of the Client Victims were minors, those agreements required Court approval.

n. In or about February and March 2020, the Court issued orders approving each of those settlement agreements. Each of those orders required GK to distribute the settlement funds to Victims A through D and their family members from the IOLTA "as soon as practicable" after receiving those funds from Boeing's counsel.

o. In or about April 2020, after an additional mediation involving Victim E's case, LIRA and GK Lawyer A recommended to Victim E that he settle his case with Boeing for approximately $1,550,000. Victim E agreed.

p. After each of the settlement agreements were reached for the Client Victims, the Court entered orders dismissing their respective cases.

q. On or about the dates set forth below, in the approximate amounts indicated, Boeing's counsel wired settlement funds into GK's IOLTA account pursuant to the terms of the settlement agreements with the Client Victims:

| CLIENT VICTIM | DATE | AMOUNT WIRED INTO GK'S IOLTA | AMOUNT DUE TO CLIENT VICTIM |
|---|---|---|---|
| A | March 4, 2020 | $2,105,000 | $1,710,000 |
| B | March 11, 2020 | $2,530,000 | $2,060,000 |
| C | March 27, 2020 | $2,112,500 | $1,725,000 |
| D | March 30, 2020 | $2,530,000 | $2,060,000 |
| E | June 9, 2020 | $1,317,500 | $1,069,500 |

Those wire transfers were net of GK's attorneys' fees. Specifically, under the terms of the settlement agreements for each of the Client Victims, the attorneys' fees to which GK was entitled were separately wired by Boeing's counsel directly to Lender A as partial payments toward GK's and GIRARDI's $8 million loan from Lender A. As a result, GK was not entitled to retain any attorneys' fees from those settlements.

4

Instead, except for attorneys' fees owed to Law Firm A, any costs incurred by GK (up to 1% of the settlement amount), and any advances that GK had made to the Client Victims, all the funds that Boeing's counsel wired into GK's IOLTA were required to be distributed to the Client Victims, as indicated in the above column labeled "Amount Due to Client Victim."

2.      Beginning in or about 2019, and continuing until in or about December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, and others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud the Client Victims and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3.      It was part of the scheme that GIRARDI, KAMON, and LIRA knowingly misappropriated and caused to be misappropriated settlement funds belonging to the Client Victims by diverting those funds or causing those funds to be diverted from GK's IOLTA account for improper purposes. Those improper purposes included, among other things: (1) paying GK's business and operating expenses; (2) funding GK's payroll; (3) paying American Express Card bills; and (4) funding settlements to other GK clients, whose own settlement funds previously had been misappropriated by GK. The defendants accomplished the misappropriation of the Client Victims' funds by, among other things, making false statements and causing false statements

to be made to the Client Victims regarding the status of their settlement funds, and concealing and causing those misappropriations to be concealed from the Client Victims, Law Firm A, and the Court.

*Misappropriation of the Client Victims' Settlement Funds*

4. It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently misappropriated millions of dollars of the Client Victims' settlement funds from the IOLTA account by preparing checks from that account payable to GK and causing those checks to be deposited into one of GK's business accounts.

5. It was further part of the scheme that KAMON caused false descriptions to be written in the memorandum section of those checks, including:

    a. that the misappropriated funds were "fees" owed to GK from the Lion Air cases, when, as the defendants knew, GK was not entitled to retain those funds as fees from those cases; and

    b. that the misappropriated funds were for "miscellaneous case costs," when, as the defendants knew, those funds did not represent expenses relating to any case.

6. It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently used the Client Victims' funds that had been misappropriated to GK's business account to pay GK's business and operating expenses, to fund GK's payroll, and to pay American Express Card bills.

6

7.     It was further part of the scheme that KAMON, at GIRARDI's direction and with LIRA's knowledge and assistance, fraudulently misappropriated additional amounts of the Client Victims' settlement funds from the IOLTA account by preparing checks from that account payable to other clients of GK, whose own settlement funds previously had been misappropriated by GK.

*False Statements about and Concealment of*
*the Misappropriation of the Client Victims' Funds*

8.     It was further part of the scheme that GIRARDI, KAMON, and LIRA fraudulently concealed and caused to be concealed from the Client Victims, Law Firm A, and the Court that GK had received the Client Victims' funds in its IOLTA account and had failed to distribute those funds to the Client Victims as required.

9.     It was further part of the scheme that, in response to repeated inquiries by the Client Victims regarding the status of their funds, GIRARDI, KAMON, and LIRA fraudulently concealed and caused to be concealed from the Client Victims, Law Firm A, and the Court that the Client Victims' funds were being misappropriated.

10.     It was further part of the scheme that GIRARDI, KAMON, and LIRA falsely stated and caused to be stated to the Client Victims that the COVID-19 pandemic prevented and delayed GK from distributing the settlement funds to the Client Victims. In fact, as the defendants knew, GK remained able to process financial transactions into and out of the IOLTA account during the pandemic and the reason the settlement funds could not be promptly distributed to the Client Victims was because those funds were being misappropriated.

7

11.    It was further part of the scheme that, on or about April 6, 2020, in response to an email from Victim B to LIRA and GK Lawyer A requesting a "loan" of $40,000, KAMON, at GIRARDI's direction and with LIRA's and GK Lawyer A's knowledge, wired $40,000 to Victim B as a purported "advance." In fact, as the defendants knew, GK previously had received all of Victim B's settlement funds in its IOLTA account, GK was required to distribute those funds to Victim B without conditions and not as a loan or an advance, and the funds were being misappropriated.

12.    It was further part of the scheme that, on or about May 14, 2020, GIRARDI emailed a letter to Victim B falsely stating:

> We made an agreement with Boeing that all of the cases
> would be resolved. They gave us special authorization to
> distribute 50%.

LIRA and GK Lawyer A received GIRARDI's letter before it was sent to Victim B, and LIRA reviewed and approved that letter. KAMON received that letter shortly after it was sent to Victim B. Each of the defendants knew that there was no agreement with Boeing that prevented GK from distributing the settlement funds to Victim B until "all of the cases" are resolved, that no "special authorization" was required from Boeing to distribute those funds to Victim B, and that the reason the funds had not been distributed to Victim B was because they were being misappropriated.

13.    It was further part of the scheme that, on or about May 14, 2020, GIRARDI emailed a letter to Victim C falsely stating:

8

> I got enough of the problem taken care of so we were able to
> release 50% of the settlement.

LIRA and GK Lawyer A received GIRARDI's letter before it was sent to Victim C, and LIRA reviewed and approved that letter. KAMON received that letter shortly after it was sent to Victim C. Each of the defendants knew that there was no "problem" that prevented GK from distributing the settlement funds to Victim C, and that the reason the settlement funds had not been distributed to Victim C was because they were being misappropriated.

14. It was further part of the scheme that, on or about May 19, 2020, GIRARDI, with the knowledge of KAMON, LIRA, and GK Lawyer A, sent a letter to Victim D, in which GIRARDI stated, "I think you are going to love me in 30 days," falsely implying and promising that GK and GIRARDI would distribute the balance of Victim D's settlement funds within 30 days and further concealing that those funds were being misappropriated.

15. It was further part of the scheme that, on or about June 19, 2020, GIRARDI sent letters to Victims A through D falsely stating:

> There are some serious issues. I have been back east four times
> to get everything resolved. I think I need two more weeks. I
> will insist that, at least, we get the interest in two weeks, if I
> cannot resolve it.

KAMON and GK Lawyer A subsequently received a copy of the letter sent to Victim D. As each of GIRARDI, KAMON, and GK Lawyer A knew, there were no "serious issues" preventing GK from distributing the settlement funds to Victims A through D, GIRARDI had not been back east four times to get any such purported

issues resolved, and the reason the settlement funds had not been distributed to the Client Victims was because those funds were being misappropriated.

16.  It was further part of the scheme that the defendants fraudulently concealed from Law Firm A and the Court that GIRARDI sent the letters to Victims A through D containing the false statements described above.

17.  It was further part of the scheme that, on or about December 4, 2020, GIRARDI left a voicemail message for a lawyer at Law Firm A, in which GIRARDI falsely stated, "I think we got clearance to send money out today."

*Partial Lulling Payments to Victims A through D*

18.  It was further part of the scheme that, in response to repeated inquiries by Victims A through D about, and demands for, their settlement funds, and to hinder or delay Victims A through D from discovering and reporting the misappropriation of those funds, the defendants made partial payments and caused partial payments to be made to Victims A through D, as follows:

a.  on or about May 11, 2020, wire transfers from GK's IOLTA account to Victim A of approximately $855,000; to Victim B of approximately $1,010,000; to Victim C of approximately $862,500; and to Victim D of approximately $1,030,000;

b.  on or about July 6, 2020, wire transfers from GK's IOLTA account of $50,000 to each of Victims A through D; and

c.  on or about September 3, 2020, wire transfers from GK's IOLTA account to Victim A of approximately $305,000; to Victim B of approximately

$460,000; to Victim C of approximately $312,500; and to Victim D of approximately $460,000.

19.    As a result of the scheme, the defendants caused the Client Victims to suffer losses of over $3 million.

20.    It was further part of the scheme that GIRARDI, KAMON, and LIRA concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence, purpose, and acts done in furtherance of the scheme.

21.    On or about March 2, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GK Lawyer A, using the email address "[GKLawyerA]@girardikeese.com," received by, among others, a lawyer at Law Firm A and LIRA, using the email address "dlira@girardikeese.com," which email attached a settlement release signed by Victim B;

In violation of Title 18, United States Code, Sections 1343 and 2.

11

## COUNT TWO

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about April 6, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transfer of $40,000, purportedly as an "advance" to Victim B, from GK's IOLTA trust account to Victim B's bank account in Indonesia;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT THREE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about April 22, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA, using the email address "dlira@girardikeese.com," to Victims A through D, falsely stating that their settlement payments were delayed because of the pandemic, including that "[w]e are still under the government mandate to stay at home";

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FOUR

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about May 12, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA, using the email address "dlira@girardikeese.com," received by, among others, lawyers from Law Firm A, which email concealed and omitted material facts, including that: (1) all settlement funds for Victims A through D had been received in GK's IOLTA trust account; (2) GK had failed to distribute those funds to the Client Victims as required; and (3) GK was misappropriating settlement funds belonging to Victims A through D;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FIVE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about May 14, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GIRARDI's legal assistant to Client B in Indonesia, attaching a letter from GIRARDI containing the false statements: "We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%";

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.      On or about May 14, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GIRARDI's legal assistant to Client C in Indonesia, attaching a letter from GIRARDI containing the false statement: "I got enough of the problem taken care of so we were able to release 50% of the settlement";

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SEVEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.     On or about May 15, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from LIRA using the email address "dlira@girardikeese.com," received by, among others, lawyers from Law Firm A, which email concealed and omitted material facts, including that: (1) all settlement funds for Victims A through D had been received in GK's IOLTA trust account; (2) GK had failed to distribute those funds to the Client Victims as required; (3) GK was misappropriating settlement funds belonging to Victims A through D; and (4) GIRARDI had sent letters to Victims B and C on or about May 14, 2020, which letters included false explanations for why those victims had not been sent their settlement funds;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT EIGHT

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 20 of Count One are incorporated here.

2.     On or about May 19, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from GK Lawyer A, using the email address "[GKLawyerA]@girardikeese.com," received by, among others, a lawyer at Law Firm A and LIRA, using the email address "dlira@girardikeese.com," which email attached a settlement release signed by Victim E;

In violation of Title 18, United States Code, Sections 1343 and 2.

18

## COUNT NINE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.     Beginning on or about March 4, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated February 24, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim A as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

## COUNT TEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.     The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.     Beginning on or about March 11, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 4, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim B as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

20

## COUNT ELEVEN

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1.      The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2.      Beginning on or about March 27, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

THOMAS V. GIRARDI,
CHRISTOPHER K. KAMON, and
DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 9, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim C as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

## COUNT TWELVE

The SPECIAL OCTOBER 2022 GRAND JURY further charges:

1. The allegations in paragraphs 1 and 3 through 20 of Count One are incorporated here.

2. Beginning on or about March 30, 2020, and continuing until at least December 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

> THOMAS V. GIRARDI,
> CHRISTOPHER K. KAMON, and
> DAVID R. LIRA,

defendants herein, did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order dated March 4, 2020, issued by the Honorable Thomas M. Durkin, District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute the settlement funds to Victim D as required by that order.

In violation of Title 18, United States Code, Sections 401(3) and 2.

# FORFEITURE ALLEGATION

The SPECIAL OCTOBER 2022 GRAND JURY further alleges:

1.     Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in this Indictment, defendants GIRARDI, KAMON, and LIRA shall forfeit to the United States of America any property which constitutes and is derived from proceeds obtained directly and indirectly as a result of the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     The property to be forfeited includes but is not limited to: a personal money judgment in the amount of approximately $3,069,500.

3.     If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code Section 853(p).

A TRUE BILL:

_____

FOREPERSON

_____

Signed by Jason Yonan on behalf of the
UNITED STATES ATTORNEY

# EXHIBIT 2

```
                                           F I L E D
                                      CLERK, U.S. DISTRICT COURT

                                           1/31/2023

                                      CENTRAL DISTRICT OF CALIFORNIA
                                      BY: _____ vav _____ DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| UNITED STATES OF AMERICA, | CR No.   2:23-cr-00047-JFW |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| THOMAS VINCENT GIRARDI and CHRISTOPHER KAZUO KAMON, | |
| Defendants. | |

The Grand Jury charges:

COUNTS ONE THROUGH FIVE

[18 U.S.C. §§ 1343, 2(a)]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant THOMAS VINCENT GIRARDI was a resident of Pasadena, California.

b.   Defendant GIRARDI was an attorney licensed to practice law in the State of California.

c.   Defendant GIRARDI was the 100 percent owner and managing partner of Girardi Keese, a law firm located in Los Angeles, California, that primarily represented plaintiffs in personal injury

cases.  On or about December 18, 2020, after a series of civil lawsuits publicly alleged that Girardi Keese had misappropriated client funds, certain creditors of Girardi Keese commenced an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code against Girardi Keese.  On or about January 13, 2021, the Bankruptcy Court entered an Order for Relief Under Chapter 7 and ordered the appointment of a Chapter 7 Trustee.

d.   Defendant GIRARDI was a signatory on and exercised control over the following bank accounts, which were opened and maintained in Los Angeles, California:

i.   A Girardi Keese attorney-client trust account, also called an "Interest on Lawyer's Trust Account" or "IOLTA" account, at Torrey Pines Bank, bearing an account number ending in 5859 (the "Torrey Pines IOLTA Account"); and

ii.   A Girardi Keese IOLTA account, at Nano Banc, bearing an account number ending in 0567 (the "Nano Banc IOLTA Account").

e.   Defendant GIRARDI became a member of the State Bar of California in 1965 and was obligated to comply with the California Rules of Professional Conduct.  Defendant GIRARDI knew that the California Rules of Professional Conduct required him to, among other things, promptly notify a client of the receipt of any funds the client was entitled to receive, and promptly pay or deliver to the client or such payees as designated by the client any such funds that defendant GIRARDI and Girardi Keese held in trust for the client upon the client's request.

f.   Defendant CHRISTOPHER KAZUO KAMON was a resident of Palos Verdes and Encino, California.  From in or about 2004 until in

2

or about December 2020, defendant KAMON was the Controller and Chief Financial Officer ("CFO") of Girardi Keese, from which position he oversaw the law firm's financial affairs, supervised its accounting department, and was in charge of paying the firm's expenses. As Girardi Keese's Controller and CFO, defendant KAMON had a duty to maintain books and records that accurately reflected the firm's finances, including the disposition of monies held in its attorney-client trust accounts.

g. "Client 1" was an individual who resided in San Bruno, California. Beginning on or about October 1, 2010, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 1. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 1 in connection with a lawsuit against a public utility related to significant injuries Client 1 sustained as a result of an explosion that caused severe burns all over his body.

h. "Client 2" was an individual who resided in Lake Havasu City, Arizona. Beginning as early as in or around May 2019, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 2. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 2 in connection with potential litigation related to a boating accident where the boat unexpectedly sped up to 120 miles per hour, flipped, and ejected all three occupants, and as a result of which Client 2's husband died.

i. "Client 3" was an individual who resided in Castaic, California. Beginning as early as 2012, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 3. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 3 in connection with a lawsuit against a medical

3

device provider related to severe injuries, including organ damage,
Client 3 sustained as a result of a defective medical device.

j.   "Client 4" and "Client 5" were individuals who resided
in Los Angeles, California.  Beginning as early as in or around
December 2019, defendant GIRARDI and Girardi Keese had a formal
attorney-client relationship with Client 4 and Client 5.
Specifically, defendant GIRARDI and Girardi Keese agreed to represent
Client 4 and Client 5 in connection with a lawsuit related to
injuries Client 4, Client 5, and their minor son, who was paralyzed
from the neck down, sustained in an automobile collision.

B.   THE SCHEME TO DEFRAUD

2.   Beginning at least as early as in or around 2010 and
continuing through at least in or around December 2020, in Los
Angeles County, within the Central District of California, and
elsewhere, defendants GIRARDI and KAMON, together with others known
and unknown to the Grand Jury, knowingly and with intent to defraud,
devised, participated in, and executed a scheme to defraud victim
clients to whom defendant GIRARDI and Girardi Keese had agreed to
provide legal services including, but not limited to, Client 1,
Client 2, Client 3, Client 4, and Client 5, as to material matters,
and to obtain money and property from such victim clients by means of
material false and fraudulent pretenses, representations, and
promises, and the concealment of material facts, including material
facts that defendant GIRARDI had a duty to disclose.

3.   The fraudulent scheme operated, in substance, in the
following manner:

4

a.   Defendant GIRARDI would negotiate a settlement on behalf of a client that would require the payment of funds to the client.

b.   Defendant GIRARDI would misrepresent, conceal, and falsely describe to the client the true terms of the settlement and/or the disposition of the settlement proceeds.

c.   Defendants GIRARDI and KAMON would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts, including the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account, that defendants GIRARDI and KAMON controlled.

d.   Defendants GIRARDI and KAMON would thereafter embezzle and misappropriate settlement funds from the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account belonging to Girardi Keese clients for improper purposes.  The improper purposes included, among other things, paying other Girardi Keese clients whose own settlement funds previously had been misappropriated, paying Girardi Keese's payroll, and paying other Girardi Keese's expenses, including its American Express Card bills encompassing charges for defendant GIRARDI's and defendant KAMON's personal expenses.

e.   As part of their scheme and to conceal the embezzlements and misappropriations from the victim clients, defendants GIRARDI and KAMON would send and cause to be sent lulling communications to the clients that, among other things, falsely denied that the settlement proceeds had been paid and falsely claimed that Girardi Keese could not pay the settlement proceeds to clients until certain purported requirements had been met, such as addressing supposed tax obligations, obtaining supposedly necessary

1  authorizations from judges, and satisfying medical liens and other

2  debts.

3        f.   As further part of their scheme and to conceal the

4  embezzlements and misappropriations from the victim clients,

5  defendants GIRARDI and KAMON would also send and cause to be sent

6  lulling payments to the clients, falsely representing and maintain

7  the false pretense that such payments were "advances" on the

8  purportedly yet-to-be received settlement proceeds, or "interest

9  payments" on the settlement proceeds that purportedly could not be

10 paid to the clients until the fabricated requirements were satisfied.

11                    **Embezzlement of Client 1's Funds**

12      4.   In or about January 2013, defendant GIRARDI negotiated a

13 settlement of the lawsuit related to Client 1's injuries without

14 obtaining prior approval of the settlement terms from Client 1.  The

15 terms of the settlement provided that Client 1 would be paid

16 $53,000,000 to release all of Client 1's claims.  Pursuant to Client

17 1's retainer agreement with Girardi Keese, Girardi Keese's attorneys'

18 fees, in the amount of 25% of the settlement amount, costs, and

19 expenses were to be deducted from the settlement proceeds and paid to

20 Girardi Keese.

21      5.   On or about January 10, 2013, defendant GIRARDI told Client

22 1 that the case had settled.  Defendant GIRARDI had not previously

23 informed Client 1 of the settlement or obtained Client 1's consent to

24 the terms of the settlement and concealed the true terms of the

25 settlement from Client 1.  Defendant GIRARDI falsely represented to

26 Client 1 that the total settlement amount was approximately

27 $7,250,000, and concealed from Client 1 that the true amount of the

28 settlement was $53,000,000.  Defendant GIRARDI further falsely

                                     6

represented that the settlement would be structured as an annuity to be paid to Client 1 for the rest of Client 1's life when, as defendant GIRARDI then knew, the settlement terms did not require the creation of an annuity or any other structured settlement, and defendant GIRARDI had not obtained Client 1's consent to so structure the settlement.

6.   On or about January 24, 2013, over half of Client 1's settlement, namely, $28,000,000, was wire transferred to the Torrey Pines IOLTA Account.  Defendants GIRARDI and KAMON were provided notice of the incoming wire that same day.  Defendants GIRARDI and KAMON then misappropriated and embezzled a portion of Client 1's settlement funds and caused those funds to be used to pay other expenses and liabilities of Girardi Keese unrelated to Client 1, including payments to other Girardi Keese clients whose own settlement funds had previously been misappropriated by defendants GIRARDI and KAMON, and others.

7.   In order to lull Client 1 and prevent Client 1 from discovering that defendants GIRARDI and KAMON had embezzled Client 1's settlement funds, defendant GIRARDI and KAMON, aiding and abetting each other, committed and caused to be committed the following acts, among others:

a.   Falsely informing Client 1 that Client 1's settlement "should be tax free," and that delays in payment of settlement funds to Client 1 were due to defendant GIRARDI's efforts to remove any tax liability for Client 1 when, as defendant GIRARDI then knew, Client 1's settlement was not taxable;

b.   Falsely informing Client 1 that Client 1's settlement funds had been transferred into a separate interest-bearing account

7

when, in fact, no such transfers had been made and no such separate
interest-bearing account containing Client 1's settlement funds
existed;

      c.   Falsely informing Client 1 that Client 1's settlement
funds were "locked up" for a six-month period due to their deposit
into the separate interest-bearing account, when no such separate
interest-bearing account existed;

      d.   Sending and causing to be sent lulling payments to
Client 1 as purported "interest payments" deriving from the supposed
separate interest-bearing account;

      e.   Sending and causing to be sent letters to Client 1
falsely claiming that "we worked magic so far in getting these huge
interest rates and getting the first two years tax free";

      f.   Sending and causing to be sent letters to Client 1
falsely attributing delays in the payment of settlement funds to
Client 1 to supposed court oversight of the distribution of
settlement funds when, in fact, no such court oversight was required
or existed; and

      g.   Sending and causing to be sent, on July 1, 2019, a
check for $2,500,000 to Client 1 purportedly as a disbursement of
Client 1's settlement funds, which funds were, as defendant GIRARDI
then knew, settlement proceeds belonging to Client 4 and Client 5 (as
described below), and not Client 1's settlement proceeds, which
defendants GIRARDI and KAMON had already spent and caused to be spent
through disbursements unrelated to Client 1.

**Embezzlement of Client 2's Funds**

8.   In or about April 2020, defendant GIRARDI negotiated a
settlement of legal claims related to the death of Client 2's spouse.

8

On or about June 24, 2020, defendants GIRARDI and KAMON received a settlement check for $504,400 as payment on Client 2's claims. Pursuant to Client 2's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 33.3% of the settlement amount, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese.

9.   On or about June 25, 2020, defendant GIRARDI caused Client 2's settlement funds to be deposited into the Torrey Pines IOLTA Account.   Prior to that deposit, and in violation of the California Rules of Professional Conduct governing the management of attorney-client trust accounts, defendants GIRARDI and KAMON transferred and caused the transfer of approximately $183,605.45 from the Torrey Pines IOLTA account to a Girardi Keese operating account, as "fees" owed to Girardi Keese from Client 2's settlement, when defendants GIRARDI and KAMON then knew that the funds in fact came from settlement funds belonging to other Girardi Keese clients. Defendants GIRARDI and KAMON used the transferred funds to pay Girardi Keese payroll expenses and fund a $50,000 check written on the operating account to defendant GIRARDI, which defendant GIRARDI then used to make payments to two exclusive country clubs.

10.   In order to lull Client 2 and prevent Client 2 from discovering that defendant GIRARDI had embezzled Client 2's settlement funds, defendants GIRARDI and KAMON committed and caused to be committed the following acts, among others:

a.   In response to Client 2's repeated efforts to obtain the settlement funds, defendant GIRARDI falsely told Client 2 that he was working on the "last signature from a judge" and that defendant GIRARDI would send Client 2 a "personal check" for $50,000 as an

9

"advance" on Client 2's settlement, when, as defendant GIRARDI then knew, there was no need for any "signature from a judge" before Client 2's settlement proceeds could be disbursed, and there was no need for an "advance" because Girardi Keese had already received Client 2's settlement payment;

b.   On July 24, 2020, approximately one month after receiving Client 2's settlement check and after being informed that Client 2 still had not received her settlement payment and was contemplating filing a complaint with the State Bar of California, defendants GIRARDI and KAMON sent and caused to be sent, for the purpose of lulling Client 2, a $50,000 check drawn on the Torrey Pines IOLTA Account;

c.   In order to further lull Client 2, and to falsely assure Client 2 that Client 2 did not need to take any further steps to obtain full payment of her settlement, defendants GIRARDI and KAMON caused a $100,000 payment to be made to Client 2 in the form of a check drawn on the Nano Banc IOLTA Account;

d.   In order to further lull Client 2, defendant GIRARDI falsely told Client 2 and an attorney Client 2 had hired to help Client 2 obtain the settlement funds from Girardi Keese that defendant GIRARDI was working to mitigate the taxes purportedly owed by Client 2 on the settlement funds and, separately, that Girardi Keese had only received a portion of Client 2's settlement when, in fact, as defendant GIRARDI then knew, no taxes were owed on the settlement funds and Girardi Keese had received Client 2's full settlement amount approximately five months earlier; and

e.   In order to further lull Client 2, defendant GIRARDI falsely claimed to have arranged for a check for the balance of the

10

settlement to be available for Client 2 to pick up.  In fact, when the messenger sent to get the check arrived, defendant GIRARDI caused the messenger to be falsely told, among other things, that defendant GIRARDI was not available and that Client 2's check was inaccessible because it was purportedly locked in the Girardi Keese accounting office.

### Embezzlement of Client 3's Funds

11.  In or about October 2018, defendant GIRARDI negotiated a settlement of Client 3's lawsuit related to injuries caused by a defective medical device.  Pursuant to Client 3's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 40% of the settlement amount, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese.  Disbursement of Client 3's settlement funds required approval by the bankruptcy trustee and bankruptcy court, which was obtained in March 2020.

12.  On or about May 22, 2020, defendants GIRARDI and KAMON received a wire for $128,250 into the Torrey Pines IOLTA Account as settlement payment on Client 3's claims.  Defendants GIRARDI and KAMON then misappropriated and caused to be misappropriated Client 3's settlement funds, including by using amounts in excess of any money due to Girardi Keese to pay for leases of luxury cars.

13.  In order to lull Client 3 and prevent Client 3 from discovering that defendants GIRARDI and KAMON had embezzled Client 3's settlement funds, defendant GIRARDI committed and caused to be committed the following acts, among others:

a.  Causing a letter to be sent to Client 3, on or about July 31, 2020, falsely stating, in part, "We are trying desperately to get everything figured out.  Since there is a Bankruptcy Trustee,

11

we have to get an understanding of how much goes to the Trustee and how much goes to you . . . I am not getting much of a response from the Trustee."  In truth, as defendant GIRARDI then knew, defendant GIRARDI and the bankruptcy trustee had already negotiated the apportionment of Client 3's settlement funds, which the bankruptcy court had approved approximately four months earlier, in or around March 2020; and

      b.   Falsely stating in voicemail messages to Client 3 that the settlement funds could not be disbursed until "certain orders" were signed, when, as defendant GIRARDI then knew, no further court orders were necessary, and falsely stating that "we'd like our money just like you'd like yours," despite the fact that defendants GIRARDI and KAMON had already received (and misappropriated) all of Client 3's settlement proceeds.

### Embezzlement of Client 4's and Client 5's Funds

14.   In or about July 2019, defendant GIRARDI negotiated a settlement of the lawsuit related to the injuries sustained by Client 4, Client 5, and their minor child in an automobile accident.  The terms of the settlement provided for a total payment of $17,500,000, a portion of which would be paid to the paralyzed minor child with the remaining funds due to Client 4 and Client 5.  Pursuant to Client 4's and Client 5's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 25% of the settlement amount for the minor and 40% of the settlement amount for Client 4 and Client 5, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese.

15.   The settlement agreement specified that the minor's portion of the settlement proceeds would be placed in a trust and an annuity

to be controlled and administered by a third party, neither of which could be accessed by defendants GIRARDI and KAMON.  The remaining settlement funds were to be paid directly to Girardi Keese for the benefit of Client 4 and Client 5.

16.   On or about June 17, 2019, the first installment of the settlement payment, namely, $4,000,000, was wired transferred to the Nano Banc IOLTA Account.  Prior to that deposit, and in violation of rules governing the management of funds in attorney client-trust accounts, defendants GIRARDI and KAMON transferred and caused the transfer of approximately $1,450,000 purportedly as an "advance" from Client 4's and Client 5's settlement funds, which amount was deposited into Girardi Keese operating accounts, when defendants GIRARDI and KAMON then knew that the funds in fact came from settlement funds belonging to other Girardi Keese clients. Defendants GIRARDI and KAMON used the transferred funds to pay Girardi Keese operating expenses unrelated to the representation of Client 4 and Client 5.

17.   On or about July 1, 2019, defendants GIRARDI and KAMON caused a $2,500,000 check drawn on the Nano Banc IOLTA Account and comprised in large part of Client 4's and Client 5's settlement funds, to be issued to Client 1 as a partial payment of Client 1's settlement funds owed to Client 1 but which had been misappropriated by defendants GIRARDI and KAMON.

18.   On or about August 2, 2019, a further payment of Client 4's and Client 5's settlement, namely, a check for $5,119,449.61, was deposited into the Nano Banc IOLTA Account.

19.   In order to lull Client 4 and Client 5 and prevent them from discovering that defendants GIRARDI and KAMON had embezzled

13

1   their settlement funds, defendants GIRARDI and KAMON committed and

2   caused to be committed the following acts, among others:

3           a.   Providing incremental lulling payments to Client 4 and

4   Client 5, which comprised only a fraction of the total settlement due

5   to Client 4 and Client 5;

6           b.   Falsely informing Client 4 and Client 5 that the

7   remaining settlement funds could only be paid after medical liens had

8   been satisfied when, as defendant GIRARDI then knew, all medical

9   expenses related to Client 4's and Client 5's claims had already been

10  paid;

11          c.   Falsely informing Client 4 and Client 5 that

12  disbursement of their settlement proceeds was delayed due to court

13  proceedings related to their minor child when, as defendant GIRARDI

14  then knew, payment of settlement funds to Client 4 and Client 5 was

15  not dependent on any court proceedings;

16          d.   Falsely informing Client 4 and Client 5 that delays in

17  payment of their settlement funds were due to defendant GIRARDI's

18  purported efforts to remove any tax liability for Client 4 and Client

19  5, including defendant GIRARDI's travel to Washington, D.C., to meet

20  with government officials to remove tax liability for the settlement

21  when, as defendant GIRARDI then knew, Client 4's and Client 5's

22  settlement funds were not taxable; and

23          e.   Falsely informing Client 4 and Client 5 that their

24  settlement funds could not be disbursed until additional court

25  approvals were received when, as defendant GIRARDI then knew, no

26  further court orders were necessary.

27      20.  Between at least in or about 2010 and in or about December

28  2020, as a result of this scheme to defraud, defendants GIRARDI and

14

1    KAMON obtained money and property belonging to victim Clients 1-5 in

2    excess of $15,000,000.

3    C.    USE OF THE WIRES

4          21.  On or about the following dates, within the Central

5    District of California, and elsewhere, defendants GIRARDI and KAMON,

6    aiding and abetting each other, for the purpose of executing the

7    above-described scheme to defraud, transmitted and caused to be

8    transmitted by means of wire communication in interstate commerce the

9    following items:

| COUNT | DATE | WIRE |
|---|---|---|
| ONE | 6/17/19 | Wire Transfer of approximately $4,000,000 from City National Bank, in Los Angeles, California, through the Fedwire system to the Nano Banc IOLTA Account, in Los Angeles, California, from the settlement related to Client 4 and Client 5, which defendants GIRARDI and KAMON caused to be spent, in part, for costs and expenses unrelated to Client 4 and Client 5. |
| TWO | 7/1/19 | Wire clearing an approximately $2,500,000 check drawn on the Nano Banc IOLTA Account, in Los Angeles, California and deposited into First Century Bank, in Los Angeles, California, which wire traveled via a server located in Oklahoma City, Oklahoma, for the benefit of Client 1, the source of which funds was, in part, the settlement proceeds belonging to Client 4 and Client 5. |
| THREE | 5/22/20 | Wire Transfer of approximately $128,250 from Bank of America, in New York, New York, through the Fedwire system to the Torrey Pines IOLTA Account, in Los Angeles, California, from the settlement related to Client 3, which defendants GIRARDI and KAMON spent, in part, for costs and expenses unrelated to Client 3. |
| FOUR | 6/25/20 | Wire clearing a check of approximately $504,400 by drawing upon a JPMorgan Chase Bank account in Fort Washington, New York, and crediting funds to the Torrey Pines IOLTA Account in Los Angeles, California, representing Client 2's settlement proceeds, spent, in part, for costs and expenses unrelated to Client 2. |

15

| COUNT | DATE | WIRE |
|-------|------|------|
| FIVE | 7/9/20 | Wire transfer of approximately $15,000 from a Girardi Keese operating account in Los Angeles, California, to American Express via a server located in Phoenix, Arizona, as payment for charges incurred on the Girardi Keese Corporate American Express Card issued to defendant KAMON, the source of which funds was, in part, the settlement proceeds belonging to Client 2 |

//

//

//

1                           FORFEITURE ALLEGATION

2              [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3        1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 981(a)(1)(C) and Title 28, United States

7   Code, Section 2461(c), in the event of defendant THOMAS VINCENT

8   GIRARDI's and/or defendant CHRISTOPHER KAZUO KAMON's conviction of

9   and of the offenses set forth in any of Counts One through Five of

10  this Indictment.

11       2.   Any defendant so convicted shall forfeit to the United

12  States of America the following:

13            (a)  All right, title, and interest in any and all

14  property, real or personal, constituting, or derived from, any

15  proceeds traceable to the offense; and

16            (b)  To the extent such property is not available for

17  forfeiture, a sum of money equal to the total value of the property

18  described in subparagraph (a).

19       3.   Pursuant to Title 21, United States Code, Section 853(p),

20  as incorporated by Title 28, United States Code, Section 2461(c), any

21  defendant so convicted shall forfeit substitute property, up to the

22  value of the property described in the preceding paragraph if, as the

23  result of any act or omission of said defendant, the property

24  described in the preceding paragraph or any portion thereof (a)

25  cannot be located upon the exercise of due diligence; (b) has been

26  transferred, sold to, or deposited with a third party; (c) has been

27  placed beyond the jurisdiction of the court; (d) has been

28

                                    17

substantially diminished in value; or (e) has been commingled with

other property that cannot be divided without difficulty.

A TRUE BILL

/S/
_____
Foreperson

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

SCOTT PAETTY
Assistant United States Attorney
Deputy Chief, Major Frauds Section

ALI MOGHADDAS
Assistant United States Attorney
Major Frauds Section